**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

**NO. 16-1864**
_____

**IN RE LINDA MERRITT**
_____

**Appeal From Order In The United States District Court For The Eastern
District Of Pennsylvania, No. 15-04282, Affirming Order Entered in the
United States Bankruptcy Court for the Eastern District of Pennsylvania, No.
11-18134**
_____

**APPENDIX TO OPENING BRIEF OF APPELLANT
LINDA MERRITT**
_____

Eugene J. Malady, Esquire
EUGENE J. MALADY, LLC
211 N. Olive Street, Suite 1
Media, PA  19063
610 565-5000 (telephone)
610 565-1201 (facsimile)
emalady@ejmcounselors.com

_Attorney for Debtor-Appellant,
Linda Merritt_

| | | | |
|---|---|---|---|
| | | Linda Merritt's Fourth Amended Chapter 13 Plan | R. 1 |
| | | Linda Merritt's Cross Motion For Value of Claim Asserted by PNC Bank | R. 10 |
| | | Excerpt from Response to Generic Motion filed by 3rd Party Plaintiff Linda Merritt, Debtor Linda Merritt *//Response and Objection of PNC Bank, N.A. to Bankruptcy Debtor's Cross Motion Pursuant to Federal Rule of Procedure 3012 and Section 506 for Value of the Claim Asserted by PNC Bank, N.A. in Motion for Relief from the Automatic Stay* Filed by PNC Bank, National Association  02/04/2015) | R. 38 |
| | | Objection to Claim Number 4 by Claimant PNC Bank, N.A.. Filed by Linda Merritt. (Entered: 02/17/2015) | R. 52 |
| | | Response to Objection to Claim filed by 3rd Party Plaintiff Linda Merritt, Debtor Linda Merritt Filed by PNC Bank, N.A. (Entered: 03/05/2015) | R. 62 |
| | | Reply to PNC's Response to Notice of Objection Filed by Linda Merritt (Entered: 03/24/2015) | R. 90 |
| | | Motion to Reconsider (related documents Order (Generic)) *of June 16, 2015 overruling the Objection to Claim* Filed by Linda Merritt (Entered: 06/30/2015) | R.123 |
| | | Excerpt from Linda Merritt's Objection to Motion for Protective Order filed by Creditor PNC Bank, National Association Filed by PNC Bank, N.A. (Entered: 08/04/2015) | R. 142 |
| | | Excerpts from Linda Merritt's Reply to Response filed by Creditor PNC Bank, N.A. Filed by PNC Bank, National Association  (Entered: 08/10/2015) | R. 206 |
| | | 4-1 4-1, 11/14/2011, Claim #4 filed by PNC Bank, N.A., Amount claimed: $358866.71 (WINNEG, STUART ) (Entered: 11/14/2011) | R. 222 |

Debtor has already admitted to PNC Bank's standing as holder of the subject mortgage.

(B) Paragraph 2, 3, 5, 8 of the Notice of Deposition and Paragraph 9 of the incorporated Request

for Production, without waiving PNC Bank's objection to these requests as overly broad and

unrelated to the issues of a Motion for relief are unnecessary, as Debtor's counsel either already

has the information and/or the information can be obtained from some another source that is more

convenient and less burdensome.  Note that Debtor's counsel has already attached numerous

exhibits to her pleadings which explain PNC Bank's Policies and Procedures (*See* Ex. 15 of

Debtor's Response to the Motion for Relief).  Furthermore, Federal Home Loan mortgage

Corporation ("Freddie Mac") servicing guide, a 294 page document, is available to the public on

the internet at www.freddiemac.com.  And finally, information as to whether Freddie Mac is the

investor of a mortgage loan is also freely available to the public on the internet at

www.freddiemac.com.

(C) Paragraphs 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 18, and 19 of the incorporated Request for

Production seeks information which is outside the scope of the Motion for Relief and therefore

there is no need for the information, including but not limited to, the amounts due pre-petition,

PNC Bank's proof of claim, internal processes of PNC Bank, and documents filed by PNC Bank

in unrelated actions in both Federal and State actions.

(D) Paragraphs 13, 18 of the incorporated Request for Production has been "cut and paste" from

another document by Debtor's Counsel and discusses issues such as a "Pooling and Servicing

Agreement" and an authorized signor "Trisha Peyton".  Both are allegations and authorizations

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:    **Linda Merritt**                                    **Chapter      13**


                **Debtor(s)**                              **Bky. No. 11-18134-JKF**


### DEBTOR'S  FOURTH AMENDED CHAPTER 13 PLAN

**NOTICE:     THE DEBTOR HAS FILED FOR RELIEF UNDER CHAPTER 13
              OF THE BANKRUPTCY CODE**

### YOUR RIGHTS WILL BE AFFECTED

You should have received from the court a separate Notice of the Hearing on Confirmation of Plan, which contains the date of the confirmation hearing on the Plan proposed by the Debtor. This document is the actual Plan proposed by the Debtor to adjust debts.  If this case is a joint case, all references in the Plan refer to both Debtors unless otherwise stated.

You should read these papers carefully and discuss them with your attorney.

**Anyone who wishes to oppose any provision of this Plan must file a written objection within five (5) days of the date of the hearing on confirmation as required by Local Bankruptcy Rule 3015-1(c).**


1.  **PAYMENT AND LENGTH OF PLAN**

        a.    The Debtor shall submit to the supervision and control of the Trustee the following sums:

**If Closing on Sale of Real Estate of 276 Old Stottsville Rd, Parksburg, PA  19365 Occurs on or Before April 30, 2014:**  $600.00 per month for 26 months, then $700.00 per month for 34 months, and proceeds above exemption amount from sale of real estate, carve-out from secured claim of McComsey Builders Inc.("McComsey"), as stated more fully in Section 4 a. of this Amended Plan, **provided that a closing on the sale of real estate occurs on or before April 30, 2014;** and the proceeds above exemption amount, if any, from any litigation commenced.

                                **OR**

**If Closing on Sale of Real Estate of 276 Old Stottsville Rd, Parksburg, PA  19365 Does NOT Occur on or Before April 30, 2014:**  $600.00 per month for 26 months, then $700.00 per month for 6 months, and then $1,440.00 per month for 28 months; and the proceeds above exemption amount, if any, from any litigation commenced.  If sale does not occur as stated, then Debtor will satisfy her obligations to McComsey pursuant to the Court approved Stipulation of Settlement between the Debtor and McComsey, approved by Court Order entered October 24, 2013.

The Debtor has filed the following adversary complaints pursuant to  11 U.S.C 548 of the bankruptcy code in support of her claims to recover assets for the benefit of the creditors of this estate that were involuntarily transferred.  The adversary proceedings also include objections to the underlying claims.

.   i) Linda Merritt v. Wells Fargo Bank N.A. Adversary No.:13-00535
.   ii) Linda Merritt v. Chase Home Finance ,LLC et al. Adversary No.: 13-00534
.   iii) Linda Merritt v. R&R Capital, LLC and FTP Capital, LLC Adversary No.:13-00533
. iv) Linda Merritt v. MidAtlantic Farm Credit ACA, Chester County Land Preservation Trust and John Doe
      Adversary No.: 13-00532


                            ~ 1 ~

b.  The Debtor shall make the plan payments to the Trustee from the following sources:

____X____   Future Earnings from consulting fee above Debtor's regular earnings

____X____   Other sources of funding (describe source) **Carve- out from McComsey Builders, Inc.'s claim, see Section 4. a. of Amended Plan. It is anticipated that the sale of 276 Old Stottsville Rd., Parkesburg, PA 19365 will yield excess proceeds of approximately $50,000, after payment of the Debtor's exemption, all closing costs and the McComsey compromised debt.**

____X____   Sale of the following assets:  **Debtor has agreed with McComsey Builders Inc. to sell 276 Old Stottsville Rd., Parkesburg, PA 19365**

____X____   Litigation proceeds, if any.

c.  Expected Total of Payments to the Trustee (if calculable at outset of Plan):  **to be determined based on sale of the real estate identified in section 4. a. of this Amended Plan.**

2.  **CLASS 1 – ADMINISTRATIVE EXPENSES**

**Summary of Class 1 – Administrative Expenses**

| Admin. Expense Claimant | Type of Priority | Estimated Amount to be Paid |
|---|---|---|
| Chapter 13 Trustee | Administrative expense | Statutory commission |
| Debtor's counsel | Counsel fees pursuant to 11 U.S.C. 330 | Debtor's counsel will file a fee application, balance owing since inception of case estimated range of $19,000 to $24,000 |

a.  **Class 1 Claims** shall consist of all administrative expenses allowed by the court, see 11 U.S.C. §1326(b)(1), and the Trustee's statutory commission, see 11 U.S.C. §1326(b)(2).

b.  The Trustee will make distributions to the holders of Class 1 administrative expense until such allowed administrative expenses have been paid the full amount allowed by the court, pro rata.

c.  It is anticipated that the holders of allowed Class 1 will be those persons or entities identified in the Summary of Class 1 set forth above.

3.  **CLASS 2 – ALLOWED SECURED CLAIMS – CURE OF PREPETITION DEFAULT AND MAINTENANCE OF MONTHLY PAYMENTS**

**Summary of Class 2 – Cure of Prepetition Default and Maintenance of Monthly Payments**

| Class 2 Creditor | Property Securing the Debt | Arrearage |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |

~ 2 ~

a. **Class Claims** shall consist of all claims filed and allowed for prepetition arrears on allowed secured claims and which are provided for by the Debtor pursuant to 11 U.S.C. §1322(b)(5).

b. Commencing with the installment falling due the month after the plan is filed, all future regular monthly installment payments falling due on Class 2 claims will be paid by the Debtor directly to the holders of such claims and will not be paid to the Trustee, except as otherwise agreed to with the creditor.

c. Confirmation of the plan shall constitute a judicial finding, decree and order that the amount of the prepetition default on each Class 2 claim does not exceed the amount reflected on the claims docket as or determined by the court to be the prepetition arrears for each Class 2 Claim provided for in this Plan. In the event of a conflict, the court order shall be determinative.

d. The Trustee shall make distributions to the holders of Class 2 claimants in the full amount of the claim allowed for prepetition arrears as reflected on the claims docket or determined by the court. In the event of a conflict, the court order shall be determinative.

e. Upon completion of the payment of the prepetition arrears through the distribution made by the Trustee to the holders of Class 2 Claims pursuant to this Plan, the prepetition default on the secured claim giving rise to each Class 2 Claim will be cured by such payments made to the Trustee under the Plan and the holders of Class 2 Claims shall reinstate the Debtor's account to the original payment schedule for the underlying secured claim as if no default had ever occurred, except for the amount of any monthly installments falling due after commencement of this case which has not been paid.

f. Confirmation of this plan shall impose an affirmative and direct duty of each holder of a Class 2 claim to comply with Paragraph 3.e. above. The Debtor may enforce Paragraph 3.e. of this Plan above and Paragraph 9.a. below by, inter alia, instituting an appropriate enforcement proceeding in the bankruptcy court either before or after the entry of the discharge order and either before or after closing of this case.

g. It is anticipated that the holders of allowed Class 2 claims will be those persons or entities indentified in the Summary of Class 2 set forth above.

4. **CLASS 3A, 3B, 3C AND 3D– OTHER ALLOWED OR ALLEGED SECURED CLAIMS**

a. The holders of Class 3A, 3B, 3C and 3D claims, as set forth below shall retain the liens securing their claims during the pendency of this Plan as provided below.

### Summary of Class 3A – Allowed Secured Claims Paid in Full and/or Modified

| Class 3A Creditor | Property Securing the Debt | Amount to be Paid |
|---|---|---|
| **McComsey Builders, Inc. (POC #5)** | **276 Old Stottsville Rd Parksburg, PA 19365(First Mortgage) 1652 Doe Run Rd., Unionville, PA 19375 (Second Mortgage)** | **The Debtor and this creditor finalized a settlement agreement, approved by this Court, which provides for the sale of the identified real estate and the carve-out of a portion of the proceeds of sale from McComsey's claim for the benefit of the estate and creditors, subject to Debtor's exemption, if any, of part of the proceeds as identified more fully in the settlement agreement, and as stated in Section 1 of this Plan** |

~ 3 ~

| Land Rover Capital Group (POC #15) | 2004 Land Rover | $12,349 – this creditor will be paid $12,349, payment in full based on the value of the collateral pursuant to separate agreement with this creditor approved by the Court on March 21, 2013, see Court Docket entry # 140 |
|---|---|---|
| | | |
| | | |

b. **Class 3A Claims** shall consist of all claims filed and allowed which are secured by liens which are avoided by the Debtor or otherwise modified and which are provided for as set forth below in Paragraph 3.c. through 3.e.

c. Class 3A Claims will be paid the full amount of the secured claim as reflected on the claims docket or determined by the court. In the event of a conflict, the court order shall be determinative.

d. The holders of Class 3A claims shall retain the liens securing their claims during the pendency of this Plan, only to the extent of their allowed secured claim. To the extent that the allowed secured claim is paid during this case or thereafter, such creditors' liens shall be deemed satisfied in full. After payment of the secured claim, creditor must provide ownership documents to the Debtor, and in the case of Land Rover Capital Group, the title to the vehicle.

e. It is anticipated that the holders of allowed Class 3A claims will be those persons or entities identified in the Summary of Class 3A set forth above.

**Summary of Class 3B – Surrender of Secured Property or Agreement outside of Bankruptcy**

| Class 3B Creditor | Class 3B Property |
|---|---|
| **None** | |

f. **Class 3B Claims** shall consist of all claims filed and allowed which are secured by liens which are not avoided by the Debtor and which are provided for as set forth below in Paragraph 3.g through 3.k

g. The Debtor will surrender the property securing the Class 3B Claims pursuant to 11 U.S.C. §1325(a)(5)(C), or will enter an agreement with the creditor outside of the bankruptcy regarding the property .

h. If the Debtor and the creditor do not agree to the treatment of the property outside of the bankruptcy then the Debtor will affect the surrender of real property securing Class 3B Claims by either: (a) executing a deed in lieu of foreclosure in favor of a holder of the Class 3B Claim within fifteen (15) business days of a written request made by the holder or (b) not contesting a state court foreclosure, ejectment and/or other proceeding under applicable non-bankruptcy law by which the holder may obtain title or possession of the property.

i. The Debtor will affect the surrender of personal property securing Class 3B Claims by permitting a repossession of the personal property by the holder of the Class 3B Claim.

j. If the Debtor and the creditor do not agree to the treatment of the property outside of the bankruptcy then the confirmation order shall constitute an order granting the holders of Class 3B Claims relief from the automatic stay for the purpose of proceeding with its remedies under applicable non-

~ 4 ~

bankruptcy law in order to obtain title and/or possession of the property to be surrendered pursuant to this Plan.

k.  It is anticipated that the holders of allowed Class 3B claims will be those persons or entities identified in the Summary of Class 3B set forth above.

### Summary of Class 3C – Secured Claims "Not Provided For" By the Plan

| Class 3C Creditor | Not Provided For |
|---|---|
| None | |
| | |

l.  **Class 3C Claims** shall consist of all claims filed and allowed which are secured by a lien which is not avoided by the Debtor and which are treated by this Plan in the manner set forth in Paragraph 3.m.below

m.  No payments shall be made by the Trustee on account of Class 3C claims.  It is the intention of the Debtor that this Plan "does not provide for" the Class 3C claims within the meaning of 11 U.S.C. §1325(a)(5).  See also In re Waldman, 75 B.R. 1005 (Bankr. E.D. Pa. 1987).

n.  It is anticipated that the holders of allowed Class 3C claims will be those persons or entities identified in the Summary of Class 3C set forth above.

### Summary of Class 3D – Alleged Secured Claims

| Class 3D Creditor | |
|---|---|
| PNC Bank N.A. ("PNC")(POC #4 ) | PNC  has filed a proof of claim alleging that it holds a secured claim in this Estate based on a mortgage that PNC has asserted it holds against Debtor's primary residence: 699 West Glen Rose Road, Coatesville, PA, 19320.  Debtor disputes the PNC claim. In an effort to settle the dispute between the parties, Debtor has filed an application for a loan modification.  If the loan modification application is successful, then the claim of PNC will be determined based on the loan modification agreement.  If the application is not successful, then the claim of PNC is "Not Provided For" by the Plan and the claim will be resolved in accordance with litigation. |

~ 5 ~

| Bank of America, N.A. ("BAC") (POC #12) | BAC has filed a proof of claim alleging that it holds a secured claim in this Estate based on a mortgage that BAC has asserted it holds against Debtor's property at 1652 W. Doe Run Road. Unionville , PA 19375. Debtor disputes the BAC claim. In an effort to settle the dispute between the parties, Debtor has filed an application for a loan modification.<br><br>If the loan modification application is successful, then the claim of BAC will be determined based on the loan modification agreement.<br>If the application is not successful, then the claim of BAC is "Not Provided For" by the Plan and the claim will be resolved in accordance with litigation. |
|---|---|
| R.S.T. Pool Services (POC #13) | No payments as a secured claim as stated in section 4. q below |

     **o.** **Class 3D Claims** shall consist of the alleged secured claim filed by PNC Bank National Association (PNC), Proof of Claim number 4. The treatment of this alleged claim will be determined as stated above.

     **p.** **Class 3D Claims** shall also consist of the alleged secured claim filed by Bank of America, N.A. (BAC), Proof of Claim number 12. The treatment of this alleged claim will be determined as stated above.

     **q.** **Class 3D Claims** shall also consist of the alleged secured claim filed by R.S.T. Pool Services (RST), Proof of Claim number 13. The Debtor will object to the classification of this alleged claim, at best it is an unsecured claim and will be treated pursuant to final outcome of the Objection.

## 5. CLASS 4 – ALLOWED PRIORITY CLAIMS
### Summary of Class 4 – Allowed Priority Claims Other than Class 1 Claims

| Class 4 Creditor | Basis for Priority Status | Amount to be Paid |
|---|---|---|
| Chester County Tax Claim Bureau (POC #9) | Taxes | This claim scheduled as $3,728.31 will be paid directly at closing from the proceeds of the sale of 276 Old Stottsville Rd., Parkesburg, PA 19365 |
| Internal Revenue Service (POC #16) | Taxes | $18,900.00 |

     a.  **Class 4 Claims** shall consist of all claims filed and allowed which are entitled to priority under 11 U.S.C. §507, other than Class 1 Claims.

     b.  The Trustee will make distributions to the holders of Class 4 claims until the holders of Class 4 claims have been paid the full amount of their respective allowed priority claims.

     c.  Unless otherwise provided in this Plan, the Trustee shall make distributions to the holders of Class 4 claims in order of statutory priority. Unless otherwise provided in this Plan, the Trustee shall make distributions to holders of Class 4 Claims of equal statutory priority on a pro rata basis.

     d.  It is anticipated that the holders of allowed Class 4 claims will be those persons or entities identified in the Summary of Class 4 set forth above.

6. **CLASS 5 – ALLOWED UNSECURED CLAIMS – SEPARATELY CLASSIFIED**

**Summary of Class 5 – Allowed Unsecured Claims – Separately Classified**

| Class 5 Creditor | Basis for Separate Classification | Treatment | Estimated Amount to be Paid |
|---|---|---|---|
| None | | | |

    a.   **Class 5 Claims** shall consist of all other filed and allowed unsecured claims, not otherwise classified, which shall receive separate classification and treatment from other unsecured claims.

    b.   Class 5 Claims shall be treated as follows (if any, description follows):

7. **CLASS 6 – UNSECURED CLAIMS – NOT SEPARATELY CLASSIFIED**

    a.   **Class 6 Claims** shall consist of all other allowed unsecured claims, not otherwise classified.

    b.   After the Class 1, Class 2, Class 3, Class 4 and Class 5 claims have been paid in accordance with the provisions of this Plan set forth above, the remaining funds paid to the Trustee pursuant to Paragraph 1 of this Plan shall be distributed, pro rata, to the holders of the Class 6 claims.

8. **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

    a.   The following executory contracts and unexpired leases are assumed:

| Creditor | Name of Contract or Lease | Treatment by Debtor |
|---|---|---|
| None | | |

    b.   The following executory contracts and unexpired leases are rejected:

| Creditor | Name of Contract or Lease |
|---|---|
| | |

~ 7 ~

## 9. MISCELLANEOUS PLAN PROVISIONS

a. If the Plan provides for payments to continue for more than 36 months, confirmation of this Plan shall constitute a finding in accordance with 11 U.S.C. §1322 that there is cause for extending the Plan beyond three years. Confirmation shall also constitute approval of such extension. Such extension is essential to the success of the Plan.

b. The Debtor shall have sole right to use and possession of all property of the estate, including the rights to use, sell, or lease such property in the ordinary course of the Debtor's affairs, during the pendency of this case. In addition, unless modified by express order of the bankruptcy court, the stay provided 11 U.S.C. §362(a) shall remain in effect until entry of the discharge order.

c. The Trustee shall pay the allowed claims provided for by this Plan in the following order:

(1) Class 1 -    Administrative Expenses
(2) Class 2 -    Cure of Prepetition Default
(3) Class 3A -   Allowed Secured Claims Paid in Full and/or Modified
(4) Class 4 -    Allowed Priority Claims Other than Class 1 Claims
(5) Class 5 -    Allowed Unsecured Claims – Separately Classified
(6) Class 6 -    Unsecured Claims – Not Separately Classified

d. Notwithstanding any provision of this Plan, a holder of an allowed claim may agree to a different treatment than that provided in this Plan and such agreement shall be binding on the holder.

January 31, 2014

Linda Merritt

Eugene A. Camposano
Attorney for Debtor

1250 Germantown Pike – Ste. 205
Plymouth Meeting, PA 19462
Tele:    (610) 306-0626
Fax:     (610) 279-9390

~ 8 ~

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re: LINDA MERRITT,                    :
       Debtor                             :
                                  :     CHAPTER 13
                                  :     Case No.: 11-18134
                                  :
                                  :

FILED
JAN - 7 2015
TIMOTHY McGRATH, CLERK
BY_____ DEP. CLERK

## DEBTOR'S CROSS MOTION PURSUANT TO FEDERAL BANKRUPTCY RULE OF PROCEDURE 3012 AND SECTION 506 FOR VALUE OF THE CLAIM ASSERTED BY PNC BANK N.A. MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Comes now the Chapter 13 Debtor in possession, Linda Merritt (hereinafter "Debtor"),

acting Pro Se, who, in response to PNC Bank N.A, PNC Mortgage A Division Of PNC Bank

N.A. (collectively "PNC") Motion For Relief From The Automatic Stay (hereinafter the

"Motion"), cross moves for a hearing pursuant to Fed R. Bankr. P. 3012 and 11 U.S.C. 506

for a hearing to determine the value of the claim asserted in PNC's Motion as an antecedent to

utilizing the "cramdown" provisions of 11 U.S.C. 1322 to bifurcate the claim into secured and

unsecured portions.

## I. STANDARD OF REVIEW OF A PRO SE LITIGANT'S PLEADINGS

Debtor is a Pro Se litigant and respectfully requests that the Court liberally construe her

pleadings since she has no formal legal training in legal matters. See Haines v. Kerner, 404 U.S.

519,92 S.Ct. 594,30 L. Ed. 652 (1972)(".. pro se complainant ... we hold to less stringent

standards than formal pleadings drafted by attorneys.").

## II. INTRODUCTION AND BACKGROUND

Debtor is the owner of the premises located at 699 West Glen Rose Road, Coatesville,

Pennsylvania, 19320 (hereinafter the "Property") (ECF Doc 73, ¶2). The Property is Debtor's

current residence, consisting of Debtor occupied and renter occupied property. See Exhibit 1, 3/17/14 Merritt letter to PNC at pg.7.[1]

Debtor's purchase of the Property was funded by a mortgage from National City Mortgage Co. (hereinafter "National City")(ECF. Doc. 2) and a down payment from her personal funds. During the original loan negotiations for the subject mortgage, Debtor disclosed that the Property was an investment property, as her personal residence was 812 Carew Avenue, Orlando Florida. PNC alleges that it is the current holder of the mortgage and seeks relief from the automatic stay to permit foreclosure. (ECF Doc.73 ¶3).

Debtor is invoking her rights under the cramdown provisions under Section 1322 to modify the amount of PNC's secured claim from $358,866.71 (ECF. Doc. Claim-4) to the appraised value of $225,000 (as determined by PNC's appraiser during the loan modification negotiations. Exhibit 2, May 6, 2014 PNC/Freddie Mac appraisal) Debtor will fund the modification of PNC's secured debt by obtaining a new mortgage; in turn PNC, will release its security position on the Property at the closing on the new mortgage. The remainder of PNC's claim will be classified as unsecured debt.

## III. TIMELINESS OF DEBTOR'S MOTION FOR A CRAMDOWN VALUATION

"The proper mechanic to value the mortgage lien under Section 506(a) in chapter 13 cases is to bring a motion pursuant to Rules 3012, 9013, and 9014." *In re Miller*, 462 B.R.421, 433 (Bankr. E.D,N.Y. 2011) Rule 3012 states that "(t)he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and a hearing on notice to the holder of the secured claim..." Fed. R.Bankr.P. 3012. A

---

[1] See *In re Scarborough*, 461 F. 3d 406, 408, 412 and 414 (3d. Cir. 2006) ( as mortgagee at issue was secured by income producing rental property in addition to Debtor's principal residence, anti-modification provision of Section 1322(b)(2) was inapplicable and modification provision was permitted).*Id*.

2

determination under Rule 3012 may be sought at any time consistent with the purpose for which

it is sought. In re Lewis, 875 F. 2d 53, 57 (3d Cir. 1989) (quoting 8 Collier in Bankruptcy para

3012.03)). Thus, a Section 506 proceeding, to determine the extent of a secured claim, may be

brought at any time prior to the completion of the bankruptcy and subsequent to confirmation of

a Chapter 13 plan. *Id.* (allowing section 506 claim seven months after confirmation). See also *In*

*re Denito*, 126 Bankr.195,199 (Bankr. E.D.Pa. 1991) ( a 506 complaint maybe filed any time

before a case is closed ).

As there were no time limits set limiting Rule 3012 or section 506 proceedings in the

confirmation order, and as the confirmed plan states that PNC's claim "will be resolved in

accordance with litigation", (Doc.235 pg.5 ) Debtor's present motion for cramdown valuation is

timely.

Here, the issue is valuation, so no adversary proceeding was required to be filed. The

confirmed plan did not challenge PNC's secured claim; in fact , the reverse is true . The plan

acknowledged PNC's claim was "not provided for by the Plan and asserted that it would be

"..resolved .. with litigation". (Doc 235- pg.5) PNC did file an objection to the plan,

which it then withdrew. (ECF. Doc. 254 ).

The Bankruptcy Code states that a confirmed plan is binding on debtor's and all creditors.

11 U.S.C 1327 (c). Since the plan permits Debtor to resolve PNC's claim through litigation, this

Rule 3012 motion is timely.

## IV. DEBTORS RESIDENCE CONSISTING OF A COMBINATION OF DEBTOR
## OCCUPIED AND RENTER OCCUPIED UNIT IS SUBJECT TO THE PROVISIONS OF
## SECTION 1322

Consistent with the architecture of the Bankruptcy Code, Debtors' Chapter 13

rehabilitation strategy is to obtain a determination that PNC's claim is partially secured and

3

partially unsecured so that she may invoke the chapter 13 process to modify the claim under 11

U.S.C. 1322 (b)(2), provide for payment of only the allowed secured claim under 11 U.S.C. 1325

(a)(5)and relegate unsecured portion of the claim to pro rata distribution along with other

unsecured creditors.

The first step in the Debtors' strategy requires the valuation of the Property (the collateral

for their debt)  under 11 U.S.C.506(a). See also Fed. R. Bankr.P. 3012. A debtor bears the burden

of proof on the valuation issue under 506 (a). See e.g., *In re Erb*, 2011 Bankr.LEXIS 2542, 2011

WL2600647, at *2 (Bankr. M.D. Pa. June 29, 2011);  *In re Weichey*, 405 B.R.158,164

(Bankr.W.D.Pa.2009); *In re Finnegan* 358 B.R. 644,649 (Bankr. M.D. Pa. 2006).

The Bankruptcy Code Section 1322, permits bifurcation of an applicable claim such as

PNC's in the case at bar, into secured and unsecured portions. Section 1322 (b)(2) prohibits

modification of a claim if it is a mortgage secured only by an interest in real property that is

Debtor's principal residence. However in *In re Scarborough*, 461 F. 3d 406 (3d Cir. 2006), the

Third Circuit found that a debtor's residence, which consisted of Debtor's occupied and renter

occupied property, was not subject to the anti-modification provision of Section 1322 (b)(2), 461

F. 3d at 405, 412 and 414.

There is no question that in the case at bar National City, PNC's predecessor retained an

interest in real property that was not the Debtor's principal residence, as it was well aware that

the Property was both a third party rental property that was owner occupied and that Debtor's

actual homestead was 812 Carew Avenue, Orlando, Florida.[2]

---

[2] From 2001 until 2009 Debtor's primary residence was 812 Carew Avenue, Orlando Florida. See
this Courts 9/18/14 Decision and Order, finding in the matter of Linda Merritt v. JP Morgan
Chase Adversary No. 13-00535 (Doc  28, Factual and procedural Background at ¶C  ("The
Property was the Debtor's primary residence from 2001 until 2009..."). In 2002 Debtor purchased

A claim that is secured by any interest in personal or real property that is not debtor's

principal residence may be modified in a chapter 13 bankruptcy pursuant to 11 U.S.C. 1322.

Because PNC's predecessor, National City took an interest in real property that was an income

producing property, not Debtor's principal residence, PNC's claim is subject to modification.

## V. VALUATION OF THE PROPERTY

Federal Rule of Bankruptcy Procedure 3012 provides:

The court may determine the value of a claim secured by a lien on
property in which the estate has an interest on motion of any party in interest and
after hearing on notice to the holder of the secured claim and any other entity
as the court may direct.

Federal Rule of Bankruptcy procedure 3012 may be utilized to seek valuation of a

secured creditors collateral. *In re Windfelder*, 82 B.R. 367, 369 - 370 (Bankr. E,.D. Pa. 1988); *In*

*re McElwee*, 499 B.R. 669,670 (Bankr.M.D. Pa. 2011).

It has been noted that valuation of assets "is not an exact science and has inherent

vagaries". *In re Brown*, 289 B.R. 235,238 (Bankr. M.D. Fla. 2003) (internal quotations omitted).

Further, a court has wide latitude in determining value. A court is not bound by the values

determined by appraisals but may form its own opinion as to the value of the subject property. *In*

*re Richards*, 231 B.R. 571,1999 WL 14680 *7 (Bankr. E.D, Pa. 1999).

It would be appropriate for this Court to determine the fair market value of the property.

This approach is consistent with the "replacement value "approach adopted by the United States

Supreme Court for valuing secured claims in the cramdown context. *Associates Commercial*

*Corp. v. Rash*, 520 U.S. 953 962 117 S. Ct. 1879, 1885, 135 L. Ed. 2d 148 (U.S. 1997) The

"Fair market value " has been described as "...the price which  a willing  seller under no

---

699 West Glen Rose Road Coatesville, Pa. as an investment property from that time to now the
Property at issue here has been owner occupied and renter occupied.

5

compulsion to sell and a willing buyer under no compulsion to buy would agree after the

property has been exposed to the market for a reasonable time ". *In re Serda*, 395 B.R. 450,453-

454 (Bankr. E.D. Cal. 2007); *In re Stever*, 468 B,R. 776,783 N. 9 (Bankr. S.C. 2012).

On May 6, 2014, PNC informed Debtor that a recent valuation appraisal of the Property

resulted in a market price opinion amount of $225,000. See Exhibit 2, May 6, 2014 PNC/

Freddie Mac Appraisal Debtor will submit her own appraisal prior to the hearing. "In the

cramdown scenario, a chapter 13 plan must provide that the secured creditor receive the present

value of the secured claim within the life of the plan .." *In re Tavella*, 191 B.R. 677,639 (Bankr.

E.D.Pa. 1996).

In the instant case PNC will receive the present value of its secured claim after the

resolution of Debtor's Rule 3012 motion.[3]

In as much as, PNC's own appraisal values  the Property at $225,000, the value of the

Property appears to be 60% or less of the $358,886.71 secured amount claimed, valuation under

Rule 3012 is proper.

## CONCLUSION

For the foregoing reasons, Debtor's motion to determine the value of PNC's claim should

be granted, and Debtor should be permitted to bifurcate and cramdown PNC's claim.

Dated: January 07, 2015                                        Respectfully submitted,

                                                               *Linda Merritt*

                                                               Linda Merritt, Pro Se

---

[3] As aforesaid Debtor will obtain a new mortgage based on the courts valuation of the Property
and pay PNC's modified secured claim in full.

6

R.15

# Exhibit 1

Linda Merritt
699 West Glenrose Road
Coatesville, PA 19320
Phone: (610) 875-3581

March 17, 2014

*Via United Parcel Service*

PNC Mortgage
P.O. Box 1820
Dayton, Ohio 45401-0820

Re: **Loan Number:** **0003695149**
**Property Address:** **699 West Glenrose Road, Coatesville, PA 19320**

### AMENDED HARDSHIP LETTER
### AND PROJECTED 2014 PROFIT AND LOSS

To whom it may concern:

On January 19, 2014, Linda Merritt (hereinafter "Borrower") submitted the attached hardship letter in support of her request for a Loan Modification or restructure of her mortgage. See Exhibit A, 1/19/14 Hardship Letter.

On February 1, 2014 Borrower submitted her Fourth Amended Chapter 13 Plan (hereinafter "Amended Plan"). See Exhibit B, 2/1/14 Amended Plan. The Amended Plan details all of Borrowers debt, disposition of assets and a payment plan as to Borrowers disposable income to satisfy her unsecured obligations. This Amended Hardship Letter tracks the Amended Plan payments over the next thirty four (34) and details Borrowers projected 2014 income (Profit and Loss) to fund the Amended Plan payments and available income for payment of the Loan Modification. This application for a Loan Modification is separate and apart from the new Freddie Mac Loan modification program that began on July 1, 2013 that I will also pursue.

**REASON FOR DEFAULT:**

In August 2003 Borrower formed ten (10) Delaware limited Liability Companies (hereinafter the "Entities") with R&R Capital, LLC and FTP Capital, LLC (collectively "R&R"). R&R is 100% owned by Ira Russack. The Entities were the vehicles utilized by Borrower and R&R to invest in residential, commercial and agricultural real estate. As part of the agricultural real estate operations, there were investments in the breeding, sale and racing of thoroughbred race horses to take advantage of the substantial tax credits associated with this type of

Loan #: 0003695149

investment. The ownership structure of the Entities was the following: Borrower and R&R were each 50% members of the Entities. Borrower was named the Managing Member of the Entities.

On July 1, 2005 R&R stopped funding their capital call obligations pursuant to the Entities' operating agreements and attempted to remove Borrower as Managing Member of the Entities. Subsequently R&R filed a lawsuit in November of 2005 in the New York State Supreme Court. (hereinafter "The New York Action"). After protracted proceedings and a bench trial in the New York Action the court dismissed all of R&R's claims on December 11, 2007.

R&R's litigation strategy was to break Borrower financially and to then take over 100% of the Entities wiping out her 50% membership interest in the Entities. It is important to note that Borrower's investment and loans to the Entities both personally and through her wholly owned entities Mer-Lyn Farms, LLC (hereinafter "Mer-Lyn") and Merritt Litigation Support, Inc., (hereinafter "MLS") was in excess of four (4) million dollars. Having lost in New York, R&R then began to pursue multijurisdictional actions against Borrower by filing five actions in both State and Federal jurisdictions in Pennsylvania and Delaware. The cases filed in the other courts were in support of R&R's effort to circumvent the New York Court's rulings and was finally successful in the Chancery Court of Delaware, whereby committing fraud on the Court by convincing that court to appoint a receiver to dissolve the jointly owned Entities. See Exhibit 1, Delaware Chancery Court 9/14/09 Orders Appointing a Receiver to Liquidate the Entities. The receiver has liquidated the Entities causing the Borrower to lose her entire investment and loans to the Entities. Borrower appealed the Delaware Chancery Courts orders.

On June 26, 2013 the Delaware Supreme Court affirmed the Chancery Courts orders. See Exhibit 2, Delaware Supreme Court order. On July 16, 2013 the Delaware Supreme Court denied Borrowers Motion For Rehearing En Banc. Borrower has filed in the United States Supreme Court a Petition for Writ Of Certiorari. The Petition is pending.

The New York Action is pending but stayed because of Borrower's Bankruptcy pursuant to 11 U.S.C. 362 (the automatic stay) the only claims left to be adjudicated in the New York Action are Borrower's counterclaims against R&R.

**BORROWER'S CHAPTER 13:**

Based on R&R's multijurisdictional litigation over the last seven years, Borrower has basically been financially, emotionally and physically drained. This financial strain was compounded by PNC's foreclosure litigation designed to seize Borrower's personal residence.

Between August 2011 and October 2011 Borrower and R&R began settlement negotiations to terminate all of the litigation in the various jurisdictions. Under the proposed settlement agreement that was about to be concluded, Borrower was to receive over four and half million dollars ($4.5 million) in assets. While the R&R settlement and negotiations were being advanced by the parties, PNC pressed forward on its judgment it had obtained by default against Borrower based on its representations to the Chester County Court of Common Pleas where the lawsuit was filed that PNC was the owner of the note and mortgage on Borrowers residence which is the subject of this loan modification request. Borrower's counsel Eugene A.

2

Loan #: 0003695149

Camposano, Esq. attempted to negotiate with PNC a stay of the foreclosure sale of Borrower's home pending completion of the R&R settlement PNC rejected Borrower's proposal through counsel. The settlement of the R&R litigation of $4.5 million dollars in assets payable to Borrower would have paid all of her debts in full [including the mortgage at issue here].

On October 20, 2011 Borrower was forced to file for Chapter 13 in the Eastern District of Pennsylvania Bankruptcy Court in order to stop the sale of her home by PNC. The bankruptcy has stayed all of the frivolous litigation pressure, allowing Borrower time to reorganize her affairs and to put more time and effort into her litigation support business.

Borrower discovered during the Bankruptcy proceedings that Freddie Mac owns the note and mortgage not PNC. Borrower has filed an adversary complaint in the Bankruptcy Court against PNC asserting damage claims as a result of PNC's misrepresentations to the Courts that it owned the note and mortgage when in fact it was not the owner [Freddie Mac is the true owner of the note and mortgage]. See Exhibit 3, Merritt v. PNC Adversary Complaint. On March 25, 2013 the Bankruptcy Court dismissed certain counts of the Adversary Complaint and on June 11, 2013 the Court granted Borrower leave to amend the Adversary Complaint. See Exhibit 4, 6/11/13, Bankruptcy court order.

## I. DISPOSITION OF REAL ESTATE ASSETS

### A. Stottsville Road Property and the McComsey Builders Inc. Mortgage

i) Borrower is the owner of a three (3) bedroom two (2) bath home situated on one (1) plus acre lot located at 276 Old Stottsville Road, Parkesburg, PA. 19365; (hereinafter "Stottsville property"). Borrower purchased the Stottsville Property in 2004 as an investment property. Borrower has retained the real estate firm, Keller Williams to market and sell the property. Borrower is exploring all options to maximize the sale price of the Stottsville property for the estate, including but not limited to: i) an all cash out right sale; ii) a sale subject to the buyer obtaining a mortgage to purchase the property; iii) a short term lease purchase with a balloon on the balance due; and iv) a sale of the property with some amount of seller financing. In Borrowers bankruptcy Schedule (A) she listed the Stottsville Property with a value of $300,000. with secured debt of $300,000. Which secured debt is the McComsey Builders Inc. (hereinafter "McComsey") mortgage.

### B) McComsey builders Inc. Mortgage on the Stottsville property

ii) As stated above In 2003 and 2004 Borrower and R&R formed the 10  Entities that were used as vehicles to invest in commercial, residential, and agricultural  real estate located in Chester County, Pennsylvania and the city of Philadelphia, and the breeding, sale and racing of thoroughbred horses.

iii) McComsey was retained by the Entities to perform construction services' on the farms -two (2) residential properties and one (1) commercial property in Chester County PA. In 2005 R&R instituted the New York action against the Borrower. As aforesaid after all of R&R's claims were dismissed in its New York Action it filed five (5) additional actions in Pennsylvania State and

3

Federal court and the Delaware Chancery Court. R&R was successful in its multidistrict litigation in precluding the Entities from paying McComsey for the work it performed for the various Entity properties.

iv) McComsey filed mechanics liens against the various Entity properties to collect the debt he was owed by the Entities. The mechanics liens caused a default under the Entity loan agreements with MidAtlantic Bank (hereinafter "MidAtlantic") where Borrower was the borrower and guarantor on the MidAtlantic loans to the Entities. The mechanics liens also would cause a default under the long term Entity Hannum Farm Leases on the Dairy. In an effort to stop any defaults caused by the filing of mechanics liens Borrower provided McComsey with a  first mortgage in the amount of $248,327.23 on her Stottsville property and a blanket second mortgage on Borrowers Unionville property to cover the Entity debt to  McComsey . In exchange for these liens McComsey agreed to release the Entities and assign its claims to Borrower. McComsey filed a proof of claim in Borrowers estate in the amount of $523,225.31 which includes principal and interest. McComsey's debt far exceeded the equity in both the Stottsville property and the Unionville property.

v) Borrower and McComsey have entered into a compromise and settlement agreement (hereinafter "the Agreement") where it would accept $140,000. in satisfaction of all debt he is owed. The Court has approved the Agreement. It is anticipated that the sale of the Stottsville property should be in excess of $200,000. A sale at that price would yield an additional payment to the estate for the benefit of the creditors. To be clear without the McComsey Agreement the estate would have zero chance of any distribution from the sale of the property.

## C) The Unionville Property

i) Borrower is the owner of a two (2) bedroom one (1) bath home situated on a ten thousand (10,000) square foot lot located at 1652 Doe run Road, Unionville PA 19375 (hereinafter the "Unionville Property"). Borrower purchased the Unionville Properly in 2004 as an investment property. In Borrower's bankruptcy Schedule A she listed the Unionville property with a value of $240,000. and a secured debt of $180,000. Bank of America (hereinafter "BAC") is the alleged holder of the secured debt.

ii) On April 10, 2012 BAC filed a proof of claim in the amount of $201,946.24. According to the proof of claim BAC stated the following chain of alleged ownership of the Mortgage: Bank of America, N.A., Successor by Merger to BAC home loan servicing, LP FKA Countrywide home loans Servicing LP.

iii) The Unionville Property is currently leased on a year to year basis for $1500. per month. Prior to the current tenant occupying the property the former tenant had not paid rent for over eight (8) months and had to be evicted. Upon evicting the former tenant, the Unionville Property required substantial repairs and cleaning because the tenant failed to not only maintain the property but literally left the interior of the property in shambles. The new tenant took possession in November 2013. See Exhibit 5, Unionville Property lease.

4

iv) On April 13, 2011, BAC entered into a Consent Order with the Department of the Treasury's office, of the Comptroller of the Currency ("OCC"). The Consent Order was a result of the OCC's findings that BAC engaged, inter alia"... unsafe or unsound practices in residential mortgage servicing and in the banks [BAC] initiation and handling of foreclosure proceedings" See Exhibit 6, OCC/BAC Consent Order at pg.1. BAC was required under the Consent order to retain an independent consultant to "..conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the banks mortgage servicing portfolio." See Exhibit 6, OCC/BAC Consent Order at pg. 14

In February 2013 OCC and BAC entered into "Amendment to April 13, 2011 Consent Order" (The Amendment). The Amendment further enhanced the original Consent Order as to the independent Foreclosure review and foreclosure prevention. See Exhibit 7, Amendment to April 2011 Consent Order at pg. 7

v) The Independent Consultant has found the BAC mishandled the servicing and foreclosure of Debtors Mortgage. BAC has paid the Borrower $500. in connection to the independent Consultant's findings of BAC's conduct. Pursuant to the Amendment BAC is required to implement "foreclosure prevention" See Exhibit 7, Amendment at pg. 7 Borrower has filed an application for a loan modification with BAC to restructure the monthly payments and to adjust the value of the property to either the balance of the principle owed on the note and mortgage without past due interest and late fees or in the alternative current market value of the property. Put another way the value of the Unionville property is less than the note and mortgage. The loan modification process is ongoing.

### D) 699 West Glenrose Road Property

i) Borrower is the owner of a three (3) bedroom, two (2) bath home situated on a two (2) acre lot, locate at 699 West Glenrose Road Coatesville PA, 19320. (hereinafter The "Glenrose Property"). Borrower purchased the home in 2002 as a second home, her primary residence at that time was in Orlando, Florida. The Glenrose Property is now Borrower's primary residence. In Borrower's Schedule A she listed the Glenrose property with a value of $400,000. and a secured debt of $300,000. PNC Mortgage (hereinafter "PNC") asserted it is the alleged holder of the Mortgage.

ii) On November 14, 2011 PNC filed a proof of claim in the amount of $358,866.71.

iii) On April 13, 2011 PNC entered into a Consent Order with the Department of the Treasury's office of the Comptroller of The Currency ("OCC"). The Consent Order was a result of the OCC's findings that PNC engaged inter alia ("...unsafe or unsound practices in residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio." See Exhibit 8, OCC/PNC Consent Order at pg.14.

iv) In February 2013 PNC and OCC entered into "Amendment to the April 13, 2011 Consent Order" ("Amendment") the Amendment further enhanced the original Consent Order as to the Independent Foreclosure Review and Foreclosure Prevention. See Exhibit 9, Amendment at pg.7 Borrower  has filed an application for a loan modification with PNC to restructure the monthly payments and to adjust the value of the property to either the balance of the principle owed on

5

Loan #:  0003695149

the note and mortgage without past due interest and late fees or in the alternative the current market value the property. Put another way the value of the Glenrose Property is less than the note and mortgage. The loan modification process is ongoing.

v) Borrower has filed an adversary complaint - No.: 12-00687 against PNC asserting i) that it does not have standing to file a claim in this estate and ii) damages arising out of PNC's lack of standing. Borrower and PNC have not pressed the litigation in an effort to resolve the parties differences through the loan modification process.

## II. DISPOSITION OF BORROWER'S WHOLLY OWNED ENTITIES AND SOURCES OF INCOME

A) Borrowers wholly owned Entities, Mer-Lyn Farms LLC, The Big L Ranch, LLC and Merritt Litigation Support;
i) Debtor has four sources of income, two (2) of which are her wholly owned Entities: Mer-Lyn Farms LLC, (Mer-Lyn"), The Big L Ranch ("Big L") and Merritt Litigation Support, ("MLS");

ii) Borrower has been in the business of breeding and sale of both sport and thoroughbred horses for approximately ten (10) years. Debtor operates the horse business through Mer-Lyn and Big L. The cost on average to operate the Horse business is approximately $1,000. per month ($12,000. per year). The Horse Business will generate $10,000. in net income after recouping the $12,000. in costs;

iii) Borrower's primary business is litigation support services which she operates through MLS. Borrower has been in the litigation support business for over fifteen (15) years. MLS provides consulting and litigation support services' to law firms, corporations and individuals. MLS renders litigation support services connection to, criminal and civil litigation, regulatory actions i.e.: Securities and Exchange Commission ("SEC"), stock broker and private arbitrations, the assistance in small claims actions, general business consulting and accounting. Over the years MLS has performed litigation support services for a number of large law firms throughout the northeast region of the United States i.e.; Greenberg Trauig, Nixon Peabody LLP, Dilworth Paxson LLP Moses & Singer LLP, Sean O'Shea Partners LLP Curtis Mallet Prevost and Colt, and Brown Raysman Millstein Felder & Steiner. On June 1, 2013 MLS entered into an agreement with Reed St. Development LLC ("Reed St") to perform consulting and accounting services which will average $1800. per month for the coming year (21,600. for the next 12 months). See Exhibit 10, consulting and Accounting letter agreement. The Reed St. agreement was for one (1) year. The agreement has been renewed for a term of three (3) years. Because MLS has been in the business for over a dozen years a substantial amount of work is obtained by referral or repeat business with existing clients. MLS charges $200. per hour for Borrower's work and $125. per hour for paralegals and $75. per hour for assistants that are hired for large projects. MLS will earn at least $50,000. in net income over the next twelve (12) months which includes the consulting and accounting contract of $21,600. To be clear there is no limitation on MLS earnings as the case load increases Borrower has a group of paralegals and assistants that she can draw upon to perform the additional workload. Borrower has taken a conservative approach on the MLS income and intends to increase the volume of cases MLS will work over the next 12 months;

6

iv) Borrower receives $600. monthly from a part time job at VESHQ, Inc. a/k/a Stottsville Inn ($7200. for the net 12 months);

v) Borrower receives rental income from two sources 1) Borrower receives rental income of $400. per month for one room at the Glenrose Property ($4800. over the next 12 months) and 2) as previously discussed 1,500 per month from the Unionville residential property of which $1,396.82 is due for mortgage, insurance and taxes, leaving a next of $100 per month. The tenant pays all utilities and costs. ($1200. for the next 12 months);

vi) Projected Net Income From All Sources For The Year 2014:

| | |
|---|---|
| 1) Mer-Lyn/Big L ------------------------------------------ | $10,000. |
| 2) MLS ------------------------------------------------------ | $50,000. |
| 3) VESHQ--------------------------------------------------- | $ 7,200. |
| 4) Glenrose Property rental -------------------------------- | $ 4,800. |
| 5) Unionville property net rental ------------------------- | $ 1,200. |
| | |
| Total 12 month projected income-for 2014------------ | $73,000.[1] |
| | |
| Borrowers average monthly income will be ---------- | $ 6,100. |

## III. BORROWER'S PROJECTED PROFIT AND LOSS FOR THE YEAR 2014

vii) Borrowers average monthly expenses include:

| | |
|---|---|
| Oil ---------------------------------------------------------- | $ 375. |
| Electric ----------------------------------------------------- | $ 150. |
| Phone/TV/Internet --------------------------------------- | $ 175. |
| Food--------------------------------------------------------- | $ 600. |
| Dogs (food-meds) ---------------------------------------- | $ 125. |
| Mer-Lyn/Big L -------------------------------------------- | $1,000.[2] |
| misc rental repairs --------------------------------------- | $ 100. |
| Vehicle fuel ------------------------------------------------ | $ 400. |

---

[1] Borrower's projected income for 2014 will be $73,200. versus 2013 income which was 64,734.16. The reason for the projected increase in income for 2014 is because the Reed St. consulting and accounting agreement did not begin until June 1, 2013 (6 months of income for 2013 versus a full year of income for 2014) See Exhibit 10. Although Borrower has projected an income of $73,200. for 2014-- Borrower believes based on the current business environment in connection to the MLS litigation support business her income should exceed $80,000.

[2] From a cash flow stand point, Mer-Lyn and Big L will have up front expenses of approximately $1000 per month ($12,000. for the year 2014) to operate the horse business. When the horses are sold or leased the $12,000. in costs will be recouped, in addition to a net profit of approximately $10,000. The $12,000. will then be rolled over to support the following years costs.

7

| Auto Ins-------------------------------------------------- | $ 180. |
| MLS LIABILITY INS -------------------------------- | $ 120. |
| Auto maint. ---------------------------------------------- | $ 125. |
| Plan payments --------------------------------------------- | $ 700.[3] |
| | |
| Total monthly expenses ------------------------------ | $4,050.[4] |

## IV. PENDING LITIGATION TO BE RESOLVED

A. Adversary Complaints filed in the Bankruptcy Court.

i) Borrower has filed five (5) adversary complaints in the bankruptcy Court that are in various stages of litigation any positive result from the adversary actions will flow to the estate as the actions are resolved. Borrower is acting Pro Se in the Adversary's. Borrower is in the process of attempting to retain counsel to prosecute these cases.

1) Linda Merritt v. PNC Mortgage Adversary No.: 12-00687
2) Linda Merritt v. R&R Capital LLC Adversary No.: 13-00533
3) Linda Merritt v. MidAtlantic Farm Credit A.C.A. et al Adversary No.: 13-00532
4) Linda Merritt v. Wells Fargo Bank N.A. Adversary No.: 13-00535
5) Linda Merritt v. Chase Home Finance, LLC Adversary No.: 13-00534

B.) The R&R Capital, LLC Litigation

1) Prior to filing bankruptcy Borrower was involved in several actions initiated by R&R in several jurisdictions. There are two cases outside of the Bankruptcy Court left to be resolved:

i) R&R Capital LLC and FTP Capital, LLC v. Linda Merritt Index No 604080/2005. R&R filed this case in 2005 in The Supreme Court of the state of New York. All of R&R's claims were dismissed by the court. Borrower's counterclaims remain and have not been adjudicated. The case has been stayed pursuant 11 U.S.C 362 the automatic stay.

ii) R&R Capital LLC and FTP Capital, LLC v. Linda Merritt index No. 3989.

---

[3] Under the Fourth amended plan if the Stottsville property is sold by April 30, 2014 Borrower is obligated to pay to the Trustee $600. per month for 26 months (those payments have been made) then $700. per month for 34 months. On February 1, 2014, Borrower began paying the $700. per month to the Trustee. The plan provides alternatively that if the Stottsville property is not sold the Debtor will be required to pay Trustee $700. per month for six (6) months and then $1440. per month for 28 months. Whether the payment is $700. per month or $1440. per month Borrower will be able to make the payments. Borrower has already paid three months (3) months of $700. ($2100.) payments

[4] Borrower's anticipated gross monthly income is $6100, and total average monthly expenses of $4,050. there will be excess monthly cash of $2,050. The extra cash will be reserved for the final negotiation with PNC on the loan modification.

Loan #: 0003695149

R&R filed this case in 2008 in the Delaware Chancery Court of Chancery. The Chancery court found in R&R's favor and the petition for a Writ of Certiorari. The petition is pending.

Respectfully submitted:

Linda Merritt

9

# Exhibit 2

# PNC
## MORTGAGE℠

A Division of PNC Bank, National Association

**Loss Mitigation Contact Information:**
PNC Mortgage, B6-YM09-02-2
3232 Newmark Drive
Miamisburg, OH 45342-5421
1-888-224-4702

| | |
|---|---|
| LOAN NUMBER | 0003695149 |
| DATE | May 6, 2014 |
| PAGE 1 OF 1 | |

LINDA MERRITT
699 W GLENROSE RD
COATESVILLE, PA 19320

**Property Address:**
699 W GLENROSE RD
COATESVILLE, PA 19320

 **Notice of Valuation Disclosure Results**

**Notice of Disclosure Valuation Results:**

We want to ensure that you're aware of all the information we have concerning your recent loss mitigation application. That's why we're providing you a copy of a recent valuation that was performed on your property.

**Here's more information about the valuation**

THIS IS AN OPINION OF PRICE OR COMPARATIVE MARKET ANALYSIS AND IS NOT AN APPRAISAL. This opinion does not adhere to the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. This opinion may have been developed in connection with a loss mitigation request made by you. If so, this opinion is being provided to you on behalf of PNC and the Federal Home Loan Mortgage Corporation. PNC may have also used a different or additional property value or price to make a loss mitigation decision. If you have questions, please visit Freddie Mac's website at FreddieMac.com/valuation.

In addition, this letter does not represent a final decision on your loss mitigation application. We may need to perform additional valuations on your property to ensure we're using the most accurate value to make a final credit decision. If that's the case, you'll receive a copy of each valuation performed. And, we'll inform you of the final credit decision in a separate communication.

Please review the valuation and retain it with your records.

**Here is how you can reach us if you have questions or need assistance:**

Our goal is to help you make informed decisions regarding your home loan, and we are available to support you through this process. If you have any questions, please contact your representative LA TRINA R at 1-888-224-4702 ext. 904-092-0378. Representatives are available Monday through Friday, 8:00 a.m. to 5:00 p.m. You can also visit us online at www.pnc.com/mortgage; navigate to the Customer Service Center and click the "Having Trouble Making Payments" link.

LM_HOMEDISCRESULTS V01.1.1

To request information or notify us of an error regarding your account. please send a written request/notice to
PNC Mortgage
PO Box 8807
Dayton, OH 45401-8807

# Freddie Mac

**We make home possible** ℠

**BROKER'S PRICE OPINION**

Freddie Mac Loan # 444840036
Servicer Loan # 43837969

| | |
|---|---|
| Exterior /Curb Side [X] | Inspection Date 03/15/2014 |
| Interior [ ] | |
| Interior Access Denied [ ]    Reason | BPO # 43837969 |

| BPO Firm Name | Broker | Phone |
|---|---|---|
| GAMBA & LEVIN REAL ESTATE, I | EDWARD LEVIN | (215) 546-1717 |

## SUBJECT PROPERTY DESCRIPTION

| Property Address 699 W GLENROSE RD | | Unit # |
|---|---|---|

| City COATESVILLE | County CHESTER | State PA | Zip 19320 |
|---|---|---|---|

Is property currently listed for sale with a real estate firm? [ ] Yes [X] No    Name of Listing Broker, Salesperson or Firm    Phone

Property Type: Single Family    Condo Fee $  0

Occupant: [X] Owner  [ ] Tenant  [ ] Vacant

### Estimate of repairs needed for subject property

| Interior: | | | Exterior: | | |
|---|---|---|---|---|---|
| Painting | $ 0 | | Painting | $ 0 | |
| Structural | $ 0 | | Structural | $ 0 | |
| Appliances | $ 0 | | Landscaping | $ 0 | |
| Utilities | $ 0 | | Roof | $ 0 | |
| Carpet/Floors | $ 0 | | Windows | $ 0 | |
| Other | $ 0 | | Other | $ 0 | |
| Cleaning/Trash Removal | $ 0 | | Do you recommend repairs? [ ] Yes [X] No | | |

Repairs Total: $ 0.00

---

Overall Property Condition:  [ ] Excellent  [X] Good  [ ] Fair  [ ] Poor
Are there any items that require IMMEDIATE attention/action?  [ ] Yes  [X] No
Title/Legal Issues?  [ ] Yes  [X] No
Do any environmental issues affect the value of the property?  [ ] Yes  [X] No
If yes to any of the above, please explain:
NO NOTED RECENT UPDATING NOTED BASED ON EXTERIOR OBSERVATIONS. PROPERTY IS IN AVERAGE CONDITION

---

## NEIGHBORHOOD

Property Values:  [ ] Increasing  [ ] Stable  [X] Declining    Predominant Occupancy [X] Owner  [ ] Tenant
Marketing Time: [X] Under 3 Mos.  [ ] 3-6 Mos.  [ ] Over 6 Mos.    Vacancy Rate  [ ] 0-5%  [X] 5-10%  [ ] 10-20%  [ ] 20% +

No. of Active Listings in Neighborhood: 6    Price Range of Active Listings in Neighborhood: $ 100000  to $ 315000

COMMENTS HOME IS LOCATED IN A DISTANT SUBURBAN/RURAL NEIGHBORHOOD WHERE HOMES TYPICALLY SIT ON ACREAGE OF 1/4 ACRE OR LARGER. THIS AREA HAS SOME OLDER FARMS THAT WAS BEEN SOLD AND DEVELOPED IN THE EARLY 2000'S. AREA HOMES VARY IN STYLES, AGE AND SIZES.

---

## VALUE ESTIMATION

| Probable Sale Price | 90-Day Marketing Time | 120-Day Marketing Time | 180-Day Marketing Time |
|---|---|---|---|
| As Is | 225000 | 222500 | 220000 |
| As Repaired | 225000 | 222500 | 220000 |

Property should be listed:  As Is: [X]  As Repaired: [ ]
Anticipated Seller-Paid Financing Costs: $ 0
COMMENTS: (Describe your marketing strategy and reasons for As Is/As Repaired recommendations)
THE MARKET PRICE OPINION AS OF TODAY IS $225000. THE TYPICAL MARKETING TIME IS 90 DAYS.

---

PREPARED BY: /S/ EDWARD LEVIN
Signature    Date 03/16/2014

THIS IS AN OPINION OF PRICE OR COMPARATIVE MARKET ANALYSIS AND IS NOT AN APPRAISAL. This opinion does not conform to the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. This opinion may not have been developed in connection with a loss mitigation request made by you. If so, this opinion is being provided to you on behalf of your servicer and the Federal Home Loan Mortgage Corporation. Your servicer may have also used a different or additional property value or price to make a loss mitigation decision. If you have questions, please visit Freddie Mac's website at http://www.freddiemac.com/valuation.

## COMPETITIVE LISTINGS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 699 W GLENROSE RD | 102 DUTCHMANS LN | | 4 COUNTRY LN | | 3131 COMPASS RD | |
| Proximity to Subject | | 5+ Miles | | 5+ Miles | | 5+ Miles | |
| Current List Price | $ | $ 205000 | | $ 224900 | | $ 239500 | |
| Current List Date | | 12/17/2013 | | 12/06/2013 | | 10/23/2013 | |
| Original List Price | $ | $ 245000 | | $ 224900 | | $ 250000 | |
| Original List Date | | 12/17/2013 | | 12/06/2013 | | 10/23/2013 | |
| VALUE ADJUSTMENTS (Use the following codes for the adjustments: S=Superior E=Equal I=Inferior U=Unknown) | | | | | | | |
| DESCRIPTION | DESCRIPTION | DESCRIPTION | ADJ | DESCRIPTION | ADJ | DESCRIPTION | ADJ |
| Above Grade Room Count | Total # of Rooms 8  Bdrm 3  Baths 2 | Total # of Rooms 7  Bdrm 3  Baths 2.5 | | Total # of Rooms 7  Bdrm 3  Baths 2.5 | | Total # of Rooms 8  Bdrm 4  Baths 1.5 | |
| Gross Living Area | Sq. Ft. 2450 | Sq. Ft. 2716 | Code | Sq. Ft. 2090 | Code | Sq. Ft. 2322 | Code |
| Location | GOOD | GOOD | E | GOOD | E | GOOD | E |
| Site/Lot Size | 2.20AC | 1.20AC | I | 1.40AC | I | 1.40AC | I |
| Design and Appeal | SINGLE FAMILY | SFD | E | SFD | E | SFD | E |
| Age (number of yrs. since house was built) | 64 | 37 | S | 37 | S | 41 | S |
| Overall Condition | Good | Good | E | Good | E | Good | E |
| Garage/Carport | 2 Detached | 2 Attached | E | 2 Detached | E | 1 Detached | I |
| Porch, Patio Deck, Pool, Fence | POOL NONE | NONE | I | POOL NONE | E | NONE | I |
| Overall Rating/Est.$ Value of Adjustments | | 6593 | I | 13463 | I | 13543 | I |
| Indicate Property Most Comparable to Subject (Check One) | | ☒ | | ☐ | | ☐ | |

COMMENTS: 1)MASTER SUITE W/FULL BATH, SKY LIGHTS, WOOD-BURNING STOVE2)LARGE DETACHED SHOP/2-CAR GARAGE, IN GROUND FENCED POOL3)SPACIOUS LIVING AREA & SUNROOM! DETACHED GARAGE W/SHOP

## CLOSED SALES

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 699 W GLENROSE RD | 47 REASON LN | | 101 LAKEVIEW DR | | 77 E HIGHLAND RD | |
| Proximity to Subject | | 5+ Miles | | 2-5 Miles | | 1 Mile | |
| Original List Price | $ | $ 225000 | | $ 279900 | | $ 250000 | |
| List Price When Sold | $ | $ 225000 | | $ 230000 | | $ 235000 | |
| Sales Price | $ | $ 219000 | | $ 223000 | | $ 226000 | |
| Sales Date | | 03/14/2014 | | 09/27/2013 | | 12/16/2013 | |
| Days on Market | | 12 | | 74 | | 90 | |
| VALUE ADJUSTMENTS (Use the following codes for the adjustments: S=Superior E=Equal I=Inferior U=Unknown) | | | | | | | |
| DESCRIPTION | DESCRIPTION | DESCRIPTION | ADJ | DESCRIPTION | ADJ | DESCRIPTION | ADJ |
| Above Grade Room Count | Total # of Rooms 8  Bdrm 3  Baths 2 | Total # of Rooms 7  Bdrm 3  Baths 1.5 | | Total # of Rooms 8  Bdrm 4  Baths 2.5 | | Total # of Rooms 7  Bdrm 3  Baths 2 | |
| Gross Living Area | Sq. Ft. 2450 | Sq. Ft. 2196 | Code | Sq. Ft. 2445 | Code | Sq. Ft. 2216 | Code |
| Sales or Financing Concessions | | SALES | S | SALES | S | NONE | E |
| Location | GOOD | GOOD | E | GOOD | E | GOOD | E |
| Site/Lot Size | 2.20AC | 1.40AC | I | 1.30AC | I | 3.20AC | S |
| Landscaping | Good | Good | E | Good | E | Good | E |
| Design and Appeal | SINGLE FAMILY | SFD | E | SFD | E | SFD | E |
| Age (number of yrs. since house was built) | 64 | 36 | S | 45 | E | 36 | S |
| Overall Condition | Good | Good | E | Good | E | Good | E |
| Garage/Carport | 2 Detached | None | I | 2 Attached | E | None | I |
| Porch, Patio Deck, Pool, Fence | POOL NONE | NONE | I | POOL NONE | E | POOL NONE | E |
| Overall Rating/Est.$ Value of Adjustments | | 18203 | I | -3920 | S | -3497 | S |
| Indicate Property Most Comparable to Subject (Check One) | | ☐ | | ☐ | | ☒ | |

COMMENTS: 1)FEATURES INCLUDE A BRICK/PROPANE FIREPLACE IN THE LIVING ROOM, SKYLIGHT IN THE FOYE2)THE GARAGE IS OVERSIZED, FENCED IN INGROUND POOL3)PRIVATE WOODED LOT, WALK-OUT BASEMENT, FENCED AREA FOR PETS, STORAGE SHED

R.29

**BPOdirect Addendum**

BPOdirect Order #: 43837969     Project Code: _____

FM Loan Number: 444840036     SS Loan Number: 43837969

Property Address: 699 W GLENROSE RD    , COATESVILLE    , PA, 1

Comments:

HTTPS://WWW.EMORTGAGELOGIC.COM/PDOCS/ACD3244423.HTML ALL
COMPS ARE SIMILAR PROPERTIES & IN SAME/COMPETITIVE MARKETS.
SALES AND LISTINGS USED IN THIS REPORT WERE SELECTED USING
GLA AS ONE OF THE PRIMARY FACTORS ALONG WITH LOCATION. THE
AREA MARKET IS IN A SLOW DECLINE WITH NO EXPECTED CHANGES
FOR SEVERAL MONTHS DUE TO THE TIGHTENING OF THE MORTGAGE
MARKET IN THE AREA; INVENTORIES ARE INCREASING AND SALES ARE
SLOW AND THERE ARE LESS QUALIFIED BUYERS IN THE MARKET.
OTHER ADJUSTMENTS: CS1 NONE 0, CS2 NONE 0, CS3 NONE 0, CL1
NONE 0, CL2 NONE 0, CL3 NONE 0  EXACT
MILEAGE-SC1:6.49MI,SC2:4.95MI,SC3:0.96MI,LC1:5.62MI,LC2:6.31MI,LC3:7.3

ADJ-SC1:2500BABR,-400YRBLT,8000LOTSIZE,4603SQFT,3000GAR,4000EXT,-
ADJ-SC2:-4000BABR,9000LOTSIZE,-8920FIN
ADJ-SC3:-400YRBLT,-10000LOTSIZE,3903SQFT,3000GAR
ADJ-LC1:-2500BABR,-350YRBLT,10000LOTSIZE,-4557SQFT,4000EXT
ADJ-LC2:-2500BABR,-350YRBLT,8000LOTSIZE,8313SQFT
ADJ-LC3:1000BABR,-150YRBLT,8000LOTSIZE,193SQFT,500GAR,4000EXT

**Comments, cont:**

**Comments, cont:**

*Order 43837969, FRONT_1.JPG*



*Order 43837969, ADDR_VERIFICATION_1.JPG*



03/14/2014

*Order 43837969, STREET_1.JPG*



*Order 43837969, SIDE_1.JPG*



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: LINDA MERRITT, | : |
| Debtor | : |
| | :      CHAPTER 13 |
| | :      Case No.: 11-18134 |
| | : |
| | : |

## <u>CERTIFICATE OF SERVICE</u>

Linda Merritt certifies that she served a copy of the forgoing, Debtor's Cross Motion Pursuant To Federal Bankruptcy Rule Of Procedure 3012 And Section 506 For Value Of The Claim Asserted By PNC Bank N.A. Motion For Relief From The Automatic Stay, by sending a copy of same, pursuant to Fed. R. Bankr. P. 7004 (h)(1), to PNC's attorney of record, via first class mail postage prepaid:

John Kishbaugh, Esq.                      Kassia Fialkoff, Esq.
Udren Law Offices, P.C.                   Duane Morris, LLC
Woodcrest Corporate Center              30 South 17th Street
111 Woodcrest Road, Suite 200          Philadelphia, PA 19103
Cherry Hill, NJ 08003-3620

PNC Bank
222 Delaware Avenue
Wilmington, DE 19801

Dated: January 07, 2015

*Linda Merritt*

Linda Merritt – Pro Se
699 West Glen Rose Road
Coatesville, PA.19320
610-857-3581

FILED
JAN - 7 2015
TIMOTHY McGRATH, CLERK
BY_____ DEP. CLERK

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 13 |
| LINDA MERRITT, | Case No. 11-18134 (JKF) |
| Debtor. | Related to Doc. No. 281 |
| | Hearing Date: To be set by Court |

**RESPONSE AND OBJECTION OF PNC BANK, N.A. TO
BANKRUPTCY DEBTOR'S CROSS MOTION PURSUANT TO FEDERAL RULE
OF PROCEDURE 3012 AND SECTION 506 FOR VALUE OF THE CLAIM ASSERTED
BY PNC BANK, N.A. IN MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

PNC Bank, N.A. ("PNC") by and through its undersigned counsel, hereby responds and objects (the "Objection") to the above-captioned Debtor's "Cross Motion Pursuant to Federal Bankruptcy Rule of Procedure [sic] 3012 and Section 506 for Value of the Claim Asserted by PNC Bank, N.A. [in] Motion for Relief from the Automatic Stay" [Doc. No. 281] (the "Motion"). In support of the Objection, PNC respectfully states as follows:

**Relevant Background**

1.      Debtor is the owner of the premises located at 699 West Glen Rose Road, Coatesville, Pennsylvania (the "Property"). (Motion at 1.) The Property is her principal residence. Id. at 1-2.

2.      In or about October 2004, the Debtor applied to refinance her mortgage of the Property with National City Mortgage Company ("National City"). PNC is the successor-in-interest to National City. (*See* Mot'n at 4-5.)

R.38

3.      On or about November 5, 2004,[1] Debtor signed a Uniform Residential Loan Application (the "Loan Application") with National City stating that she was applying for a $297,150 loan (the "Loan")[2] the purposes of which was to "Refinance" and that the Property would be her "Primary Residence."  Ex. A Loan Application at 1 § II.

4.      The Loan Application identified Debtor's present and mailing address at the Property's address, 699 W. Glen Rose Rd, Coatesville, PA 19320.  Id. at § III.

5.      The Loan Application further identified Debtor's employer as herself located at Merritt Litigation Support Inc. at the Property's address.  Id. at § IV.

6.      The Loan Application identified no rental income earned by the Debtor.  Id. § V.

7.      In connection with the Loan, the Debtor also signed a Note, Ex. B, and a Mortgage, Ex. C, in favor of National City, each dated November 24, 2004.

8.      The Debtor signed the Note and Mortgage and initialed each page of the Note and Mortgage.  Id.

9.      Pursuant to the Mortgage, the Debtor conveyed to the mortgagee a security interest in the Property along with "all improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property."  Ex. C. at 3.

10.      The Mortgage provides for no other security interest to the holder, nor does it grant PNC an interest in any rental income generated in connection with the Property.  *See* id.

---

[1]      The Debtor signed two loan applications, one on November 5, 2004 and one on November 24, 2004 apparently changing some of the estimates to the prepaid items due in connection with the Loan.  PNC has provided both at Exhibit A.  Both Loan Applications make the same affirmative statements with respect to the principal residence nature of the Property noted herein.

[2]      Upon information and belief, the Loan refinanced a first mortgage also held by National City in the principal amount of $295,468.  *See* Ex. A Loan Application at 5.

11.     Pursuant to the Mortgage, the Debtor agreed to "occupy, establish, and use the Property as [Debtor's] principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as [Debtor's] principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing . . . or unless extenuating circumstances exist which are beyond [Debtor's] control."  Ex. C at § 6.

12.     Pursuant to Section 8 of the Mortgage, it was a condition of default for the Debtor to provide "materially false, misleading, or inaccurate information or statements to Lender…in connection with the Loan" which material representations were explicitly defined to include "representations concerning [Debtor's] occupancy of the Property as [Debtor's] principal residence." Ex. C at § 8.

13.     The Mortgage attached no "Second Home", "1-4 Family" or "Other" Rider.  Ex. C at 3.

14.     On May 11, 2010 PNC commenced an action by Complaint in mortgage foreclosure against Debtor in the Chester County Court of Common Pleas, No. 10-05953. (*See* Adversary Proceeding[3] Dkt. Nos. 1, and 3.) A default judgment was entered in the foreclosure action favor of PNC and against Debtor.  *Id.*

15.     On October 10, 2011 (the "Petition Date"), the Debtor filed for chapter 13 bankruptcy protection.

16.     On November 14, 2011, PNC filed proof of claim no. 4 (the "Claim") in the Debtor's bankruptcy case asserting a claim of $358,866.71 secured by the Property.

17.     As of the date thereof, the Claim asserted $86,790.27 in arrearages required to reinstate the Mortgage.  *See* Claim at 2.

---

[3]     References to the "Adversary Proceeding" are to the now dismissed proceeding related to this bankruptcy case, captioned *Merritt v. PNC Bank, N.A. et al.*, Case No. 12-00687-jkf.

18.    On February 1, 2014, Debtor filed her Fourth Amended Chapter 13 Plan [Dkt. No. 235] (the "Plan").

19.    The Plan was confirmed by order of the Court on April 8, 2014 [Dkt. No. 262].

20.    By her Motion, Debtor admits that the Property is a "three (3) bedroom, two (2) bath home," is her "current residence," and that the Property was originally purchased as her "second home." (Motion at 1, Ex. 1 at 5.)

21.    Debtor further admits that she currently receives "rental income" of $400 per month for renting "one room at the [Property]…" (*Id*. at Ex. 1 at 7.)

22.    Debtor has attached to the Motion a Broker's Price Opinion dated March 16, 2014 ("BPO") related to the Property obtained by PNC in connection with the Debtor's "loss mitigation application." (Motion at Ex. 2 at 1.) The BPO identifies the Property as a "Single Family" home. (*Id*. at Ex. 2 at 2.)

23.    There is no evidence in the record that reflects PNC's knowledge of or consent to the Property's purchase or use as a multi-unit rental or investment property. Nor does the Mortgage explicitly grant PNC a security interest in any rental income related to the Property.

**<u>Legal Standard</u>**

24.    Pursuant to Section 1322(b)(2) of the Bankruptcy Code,[4] a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence…" 11 U.S.C. § 1322(b)(2). The Bankruptcy Code, as amended in 2005, defines a "debtor's principal residence" as "a residential structure if used as the principal residence by the debtor, including incidental property, without

---

[4]    References to the "Bankruptcy Code" are to 11 U.S.C. § 101 et seq. References to the "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure.

regard to whether that structure is attached to real property."  11 U.S.C. § 101(13A).  It goes on

to explain:

> "incidental property" means, with respect to a debtor's principal
> residence—
>
> (A) property commonly conveyed with a principal residence in the
> area where the real property is located;
>
> (B) all easements, rights, appurtenances, fixtures, rents, royalties,
> mineral rights, oil or gas rights or profits, water rights, escrow
> funds, or insurance proceeds; and
>
> (C) all replacements or additions.

11 U.S.C. § 101(27B).  Cases prior to the 2005 BAPCA amendments to the Bankruptcy Code

have struggled with the questions of whether a claim is secured "only" by "real property" which

must also be only "principal residence" property, to avoid modification pursuant to a chapter 13

plan.  *See e.g.  Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d

406, 411 (3d Cir. 2006) (noting the Court's practice of construing statute narrowly).  Following

the 2005 BAPCA amendments, however, courts have been able to apply the more expansive

definition of a "debtor's principal residence" and "incidental property" to clarify that a secured

claim may not be modified even if it takes a security interest in additional collateral often

associated with the conveyance of real property.  *See Abdosh v. IndyMac Mortg. Corp. (In re

Abdosh)*, 513 B.R. 882, 886 (Bankr. D. Md. 2014) ("the statute is clear that insurance proceeds

and escrows are part and parcel of the Debtors' principal residence"); *In re Inglis*, 481 B.R. 480,

482-83 (Bankr. S.D. Ind. 2012) (same); *In re Lunger*, 370 B.R. 649, 651 (Bankr. M.D. Pa. 2007)

(security interest in escrow funds did not render secured claim modifiable following BAPCA

amendments); *Singletary v. PNC (In re Singletary)*, Adv. Case No. 13-000560-mdc, Order Dkt.

No. 23 at *6, ¶ 13 (Bankr. E.D. Pa. Oct. 17, 2014) (finding security interest in escrow fund does

not render claim modifiable pursuant to Section 101's definitions of principal residence and incidental property).

**Legal Argument**

I.      **The Debtor is Not Permitted to Modify PNC's Secured Claim.**

25.      Debtor argues that she should be permitted to modify and cram-down PNC's secured Claim under the Third Circuit's ruling in *In re Scarborough*, 461 F.3d 406.  However, such an argument fails under the facts of this case, the law as it existed and was applied in the *Scarborough* ruling, and the current Bankruptcy Code as amended in 2005.

A.      **At the Time of the 2004 Lending Transaction, There was No Evidence that the Property was not Solely Principal Residence Property.**

26.      First, the Debtor's reading of *In re Scarborough* misstates its holding and fails to note its many distinctions.  *Scarborough* involved a "multi-unit dwelling" for which the debtor executed a "'2-4 Family Rider (Assignment of Rents)' to 'amend and supplement the Mortgage'" which rider explicitly granted to the lender a security interest in what the court then held was non-principal residence property. 461 F.3d at 409.  Based upon the facts and law before it, the Third Circuit found that while taking a security interest in "rents" did not render the lender's security interest as taken in "non-real" property, the claim's security interest in property that was clearly not solely the debtor's principal residence rendered it modifiable under Section 1322(b) of the Bankruptcy Code.  *Id*. at 410-411.  Critical to the Third Circuit's decision was the evidence before it that "at the time that the underwriting decision [was] made" the lender knew that the property, by its nature, was to be used at least partly as non-principal residence property and, therefore, subject to potential modification pursuant to Section 1322(b).  *Id*. at 412.  The Third Circuit found that in order to determine whether a lender has taken an interest in non-

principal residence property the court must "look to the terms of the mortgage" before it.  *Id.*

The *Scarborough* Court held that upon examining a mortgage, that

> [w]hen a mortgagee takes an interest in real property that
> includes, by its nature at the time of the transaction, income-
> producing rental property, the mortgage is also secured by
> property that is not the debtor's principal residence and the
> claim may be modified in a debtor's later Chapter 13
> proceeding. A mortgagee secured by an interest in a multi-
> unit dwelling, one unit of which will be used to generate
> income, falls within this category of modifiable claims.

*Id.*

27.    However, the sole factual allegation in the Motion to support a finding that PNC

is secured in property that was "by its nature at the time of the transaction" "income-producing

rental property" is Debtor's allegation that PNC "was well aware that the Property was both a

third party rental property that was owner occupied and that Debtor's actual homestead was 812

Carew Avenue, Orlando, Florida." (Motion at 4.)  As support of such "awareness" Debtor cites

to this Court's <u>factual assumption</u> under a Rule 12(b)(6) standard in an unrelated adversary

proceeding between the Debtor and Chase Home Finance, LLC, that Debtor's primary residence

from 2001 until 2009 was the Carew Avenue Property.  *See* Motion at 4 n.2; Sept. 18, 2014 Ord.

at 3 ¶ C, *Merritt v. Chase Home Finance, LLC Successor by Merger to Chase Manhattan

Mortgage Corp.*, Adversary Case No. 13-00534 [Adv. Dkt. No. 28] (restating, without finding,

Debtor's own factual allegation based on Rule 12(b)(6) standard for dismissal).  However, this

"fact," assumed by the Court in the unrelated adversary proceedings for purposes of the Rule 12

motion then before it, has no support in the facts as presented here.

28.    The facts as stated above and evident both from the evidence attached to the

Motion and to this Objection indicate that at all relevant times during the original 2004

underwriting and lending decision and the taking of the security interest in the Property, the

Debtor affirmatively represented that she was residing and intending to reside at the Glen Rose Road Property as her principal residence, that she collected no rental income from the Property, and that there was nothing inherent in the nature of the single-family property that would alert the lender to its potential non-primary residential use. *See* Exs. A, C; Motion at 4. Further, Debtor's current rental of a single room in her principal residence does not render PNC's secured Claim modifiable pursuant to Section 1322(b). To permit modification upon a hidden, later decision to rent a portion of single family home (potentially to a relative given the circumstances of the current Property) would eviscerate the Third Circuit's caution that determination of whether a lender has taken a security interest in non-principal residence property be evaluated at the point in time of the underwriting decision in order to avoid any "sidestepping" of the "home mortgage exception" on the eve of bankruptcy. *Scarborough*, 461 F.3d at 412. The Debtor's rental of single room in her home does not render the secured Claim modifiable nor does it rise to the level of "multi-unit dwelling" addressed in *Scarborough*. All evidence in the record, including her explicit covenants in the Mortgage to occupy the Property as her principal residence, indicates that the Debtor was affirmatively stating to National City that she occupied and intended to continue occupying the Property as her principal residence. Nor has Debtor presented any clear evidence that she did not in fact reside at the Property as her principal residence since the security interest was taken in 2004 (and she in fact admits she does now reside there). *In re Laycock*, 497 B.R. 396, 402 (Bankr. S.D.N.Y. 2013) (finding that owner-occupancy requirement of mortgage undercut Debtor's argument that lender was aware of commercial nature of property at time of transaction and holding secured claim non-modifiable where even if court were to apply totality of circumstances approach adopted in other circuits,

facts supported finding "Debtor bargained for a residential mortgage on a piece of real property that he has resided in since the mid-1990s").[5]

       **B.**    **PNC Holds No Security Interest in <u>Any Additional</u> Property That Might Render its Claim Modifiable.**

29.    Finally, and perhaps most importantly, in this case, the Mortgage does not grant PNC a security interest in a "multi-unit property" nor any property (including rents) from which interest it could gather it was taking an interest in property that was not solely principal residence property. *See Scarborough*, 461 F.3d at 410-411; Ex. C Mortgage at 3; *In re Abdosh*, 513 B.R. at 886 (finding that mortgage's provisions regarding order of payments, maintenance of escrow and insurance did not result in grant of security interest in non-principal residence property but that even if it did, security interests in these types of collateral would not render claim modifiable following BAPCA amendments to definition of incidental property).

       **C.**    **Even if PNC Did Hold a Security Interest in Rental Income Generated by the Property, This Would Not Render the Claim Modifiable.**

30.    Moreover, the Third Circuit's ruling in *Scarborough* was expressly limited to the pre-BAPCA amendment of the Bankruptcy Code and noted that "it need not decide whether a rental unit located in a multi-unit dwelling could fit within the definition of 'incidental property' <u>and therefore be part of a debtor's principal residence</u> under 11 U.S.C. § 101(13A)" as the debtor in *Scarborough* had filed her bankruptcy case prior to the October 17, 2005 effective date of the amendments. *Scarborough*, 461 F.3d at 412 n.2 (emphasis added). Thus, the Third Circuit

---

[5]    The *Laycock* Court also found it instructive that the Debtor had applied for loss mitigation subsequent to his bankruptcy filing in connection with the property at issue. Subject to the Southern District of New York's standing general order M-451 (June 17, 2013), the Court found the debtor could not now argue the property was not his principal residence following his application for loss mitigation which only applied to a debtor's residential property. 497 B.R. at 401. Similarly, here, Debtor applied for loss mitigation with PNC following the filing of her bankruptcy petition. *See* Motion at Ex. 2 at 1 (May 6, 2014 letter noting debtor's "recent loss mitigation application").

acknowledged that any security interest taken in property included in the definition of "incidental property" under § 101(13A) would render such an interest part of the debtor's principal residence and protected from modification under Section 1322(b). *See id.*; *In re Abdosh*, 513 B.R. at 886; *In re Inglis*, 481 B.R. 480, 482-83; *In re Lunger*, 370 B.R. 649, 651; *Singletary v. PNC (In re Singletary)*, Adv. Case No. 13-000560-mdc at *6 ¶ 13. Thus, even if the Mortgage could be read to grant PNC a security interest in the "rents" generated from the Property, it would not render the secured Claim modifiable.

31. As such the Claim may not be modified and, as it is not disputed that PNC is secured in at least some value remaining in the Debtor's home, the Debtor must pay all her arrears and continue payments under the Mortgage or risk foreclosure. *See Nobelman v. American Savings Bank,* 508 U.S. 324 (1993); *McDonald v. Master Fin., Inc. (In re McDonald),* 205 F.3d 606, 609-610 (3d Cir. 2000) (holding that only wholly unsecured mortgage may be modified pursuant to 11 U.S.C. § 1322(b)).

## II. Even if Modification Were Permitted, PNC Contests Debtor's Valuation.

32. Even if the Court finds PNC's secured Claim modifiable pursuant to 11 U.S.C. § 1322(b), the Debtor has not presented sufficient evidence of valuation to cram-down PNC's Claim to the estimate contained in the BPO. In order to cram-down the Claim, the Court must determine the value of the Property in light of the purpose of the valuation and the proposed use of the Property. 11 U.S.C. § 506(a); *see Associates Commercial Corp. v. Rash*, 520 U.S. 953, 965 n.6, (1997). Because PNC's properly filed claim is granted *prima facie* effect as to the validity and amount of the Claim, the Debtor must present "sufficient evidence" that the proof of claim overvalues a creditor's secured claim before the court may then shift the burden of persuasion to the creditor to demonstrate, by a preponderance of the evidence, "the value of the

collateral securing its claims." *Verratti v. PNC Bank (In re Verratti)*, 517 B.R. 564, 567 (Bankr. E.D. Pa. 2014).

33.    Here, the debtor has not presented sufficient evidence that the value of the Property is less than PNC's Claim.  The BPO itself admits that it is "NOT AN APPRAISAL" and that the estimate was based solely on an "Exterior/Curb Side" inspection.  (Motion Ex. 2 at 1, 2.)  Moreover, the BPO is almost a year old and relies on data and assumptions, such as recent sales, similar listings and market conditions that are even more out of date.  *See In re Verratti*, 517 B.R. at 567 (basing valuation on later appraisal date).  The BPO, without more, is therefore insufficient to shift the burden to PNC, let alone establish the $225,000 estimate in the BPO as the sale value of the Property.  *See generally id*.  PNC further reserves all of its rights to present additional evidence and valuation testimony of an expert at a full evidentiary hearing on this matter should it proceed to hearing.

WHEREFORE, PNC respectfully requests that the Court DENY the Debtor's Motion and grant such other and further relief is just and proper.

Respectfully submitted,


Dated:  February 4, 2015
Philadelphia, Pennsylvania            */s/ Sarah Schindler-Williams*
                                      Sarah Schindler-Williams
                                      Ballard Spahr LLP
                                      1735 Market Street, 51st Floor
                                      Philadelphia, PA 19103
                                      Tel:  (215) 665-8500
                                      Fax:  (215) 864-8999

                                      *Counsel for PNC Bank, N.A.*

# NOTE

November 24 , 2004
[Date]                                          [City]                                          [State]

699 W GLENROSE RD, COATESVILLE, Pennsylvania 19320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $        297,150.00    (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
NATIONAL CITY MORTGAGE CO

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate
of        5.750      %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st      day of each month beginning on    January 1 , 2005    . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on    December 1, 2019        , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at    National City Mortgage Co.,
P O Box 17677, Baltimore, MD 21297-1677        or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $        2,467.57 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to
the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the
Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the
Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

-5N (0207)                          Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                          Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be           5.00       % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.


-5N (0207)

Page 2 of 3

Form 3200 1/01
Initials: _____

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
GLINDA MERRITT      -Borrower
264436770

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*[Sign Original Only]*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re LINDA MERRITT, | : | CHAPTER 13 |
| | : | |
| Debtor | : | Bky. No. 11-18134-JKF |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## LINDA MERRITT CHAPTER 13 DEBTOR IN POSSESSION OBJECTION TO PNC BANK NATIONAL ASSOCIATION (CLAIM NO. 4-1)

Chapter 13 Debtor in possession, Linda Merritt (hereinafter "Debtor") by and through undersigned counsel submits this Objection to PNC Bank, N. A. (hereinafter "PNC") (Claim No.- 4-1) pursuant to Federal Bankruptcy Rule 3007.

## I. RELEVANT FACTUAL AND PROCEDURAL BACK GROUND

On October 21, 2011 Debtor filed for bankruptcy under Chapter 13. On November 14, 2011, PNC filed a proof of claim in this estate in the amount of $358,866.71(Claim - 4-1) asserting that it is a legitimate creditor. On April 8, 2014, the Court confirmed Debtors Fourth Amended Chapter 13 Plan. (hereinafter the "Plan") (Doc. 262). The Plan provided that PNC's claim would be resolved by litigation (Doc. 235 at pg. 5). PNC initially objected to the Plan then subsequently withdrew its objection. PNC is bound by the terms of the Plan.

## II. DEBTOR'S OBJECTION TO PNC'S CLAIM IS TIMELY

Debtor submits this Objection to PNC's Proof Of Claim (Claim No. 4-1) pursuant to Federal Bankruptcy Rule 3007. Rule 3007 establishes no deadline in which an objection to a proof of claim must be filed. See *e.g. In re Innovative Communication Corp.*, 2010 Bankr. LEXIS 1141 (Bankr. D.V.I. April 27, 2010). Thus the timing of the Objection is permissible.

It should be further noted that an objection to a proof of claim including a demand of a kind specified in Rule 7001 may not be included in a Rule 3007 objection, but may be included in an adversary proceeding. Debtor has made no such claim here.

### III. PNC LACKS STANDING TO FILE A PROOF OF CLAIM IN THIS ESTATE

Debtor contends that PNC lacks standing to file its Proof of Claim because PNC was never the actual owner, holder or lawful assignee of the underlying note and mortgage. Since 2005, the owner, holder and or lawful assignee of the note and mortgage has been Freddie Mac. See **Exhibit 1**, 1/19/05 Freddie Mac letter. Nevertheless, PNC, despite only being the alleged mortgage servicer, and never having established authority to act on the note and mortgage, obtained a foreclosure judgment and seeks to enforce that foreclosure judgment in this court; this PNC may not do.

A Proof of Claim is deemed allowed unless a party in interest objects *§11 U.S.C. 502 (a)*. While the initial burden is on the claimant to allege sufficient facts to support its claim. *In re Allegheny Inter. Ins.*, 984 F. 2d  167, 173 (3d.  Cir. 1992), the burden shifts to the objector to overcome the prima facie nature of a properly filed and supported claim. Id. "If the objector provides sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant." Id.

Fed. R.  Bankr. P. 3001 (b) requires that the proof of claim be executed by the creditor or the creditor's authorized agent. Rule 3001(c) provides that if a claim is based "on a writing", a copy of the writing must be attached to the proof of claim. Unless the writing has been lost or destroyed, in which case a statement of the "circumstances of the loss or destruction" must be

2

filed with the claim "shall be accompanied by the evidence that the security interest has been perfected. See *e.g., In re O'Brien*, 440 B.R. 654, 660 (Bankr. E.D. Pa. 2010).

Debtor herein submits that PNC's Proof of Claim is deficient because it has not been filed with the proper evidence that its security interest has been perfected. Rule 3001(d): *In re Ahmadi*, 467 B.R. 782, 788 (Bankr. E.D. Pa. 2012).

Debtor also submits, PNC was never the actual owner, holder or lawful assignee of the mortgage and therefore lacks standing to support the Proof of Claim. The Third Circuit has found that "Article III standing and standing under the bankruptcy code are co-extensive." *In re Global Tech. Inc.*, 645 F. 3d 201, 210 (3d Cir. 2011)(GIT). In addition there is an "Inherent ...additional requirement that the party must be asserting its own rights and not that of another." *In re Alcide*, 450 B.R. 526, 535 (Bankr.E.D. Pa. 2011) (citations omitted).

In *Alcide*, cited above, the court denied the motion by a mortgage loan servicer for relief from the automatic stay of Section 362. The court concluded that the servicer had not established that it was a party in interest pursuant to *§11 U.S.C.1109*, entitled to seek relief from the automatic stay. The court found that the servicer had not presented sufficient evidence to permit a finding that it was; (1) the holder of the mortgage with the concomitant right to enforce it under state law, or (2) an agent authorized by the holder of the mortgage to initiate court proceedings to enforce the mortgage on the holders behalf. 450 B.R. at 536. The mortgage servicer in *Alcide*, Everhome, made no claim that it was the mortgage holder; all of its evidence was designed to prove that it was servicing the mortgage for its parent company. Id.

In the present case, Debtor has presented evidence that Freddie Mac, and not PNC, is the owner of the subject mortgage. Exhibit 1, 1/19/05 Freddie Mac letter. PNC thus has the burden to prove the validity of its claim. See *In re Allegheny Intern. Ins.*, 954 F. 2d at 173. This PNC has

3

not done. PNC has asserted it is the holder of the note with no proof supporting authority to act

on behalf of Freddie Mac.

PNC has supplied a certificate of merger (Doc. 3-4 **Ex. A**) , which establishes that PNC,

and the various original mortgage entities, beginning with National City Mortgage Co., merged

into PNC. PNC alleges that it is the holder of the note (see, Doc. 3-1, at 15) but it provides no

proof thereof, and has not provided a copy of the note showing it is the proper holder thereof.

There is some legal authority for the proposition that in Pennsylvania, "a production of an

accompanying bond or note ...is not essential to a mortgagees' right of action on a mortgage,"

*Alcide* 450 B.R. at 548 (citing, *inter alia, Anderson v. Kern*, 259 Pa.81, 102 A. 427 (Pa.1917)

(other citations omitted ).[1] However PNC is not here pursuing a right of action on a mortgage,

but a Proof of Claim in bankruptcy. Debtor submits that it has not proffered evidence to permit a

finding under Fed. R. Bankr. P. 9017 that it is a "real party in interest".

Under Rule 9017, Freddie Mac, and not PNC, is the real party in interest and, other than

from the Debtor, this Court would not be aware that Freddie Mac, and not PNC, is the proper

party to pursue the Proof of Claim in this Court.

As noted pursuant to Fed. R. Bankr. P. 3001(c), "[W]hen a claim, or an interest in

property of the debtor securing the claim is based on a writing, a copy of the writing shall be

filed with the proof of claim." PNC did not attach copies of the state court judgment to its Proof

of Claim. When a proof of claim does not adhere to the requirements of Rule 3001 by providing

the documents necessary to support the claim, it should not necessarily be disallowed, but rather

is denied prima facie validity. *In re Kincaid*, 388 B.R. 610,614 (Bankr. E.D.Pa.2008).

---

[1] In Pennsylvania all mortgage assignments need to be recorded. See *Montgomery County v. Merscorp. Inc.*, 904 F.Supp. 2d 436,445 (E.D. Pa. 2012) (citing 21 Pa. Stat. 351) The failure of the mortgage assignee to record a mortgage assignment subjects said assignee to a potential quiet title action to compel the recordation of the assignment. *Id*.

However Debtor's objection to the Proof Of Claim raised the issue of the validity of the state court judgment, and PNC's lack of authority to act for the owner of the mortgage. In a similar situation, the debtor's objection to the loan servicer's proof of claim was sustained as to the identity of the creditor, and the actual owner of the mortgage was given fifteen days to amend the proof of claim. *In re Brooks*, 2008 Bankr. LEXIS 621 (Bankr. E.D. Pa. Feb. 13, 2008). Thereafter, the *Brooks* court noted that, under Rule 3002, in those circumstances, the amended proof of claim would timely relate back. The *Brooks* court subsequently sustained the debtor's objection to the proof of claim, because the creditor was unable to base its proof of claim on the mortgage, which merged into the foreclosure judgment under state law and was no longer in existence, and the creditor failed to show that the obligation was secured by a valid security interest. In re *Brooks*, 2008 Bankr. LEXIS 4595 (Bankr. E.D. Pa. July 31, 2008).

Here PNC, as did the creditor in Brooks, fails to meet its ultimate burden of persuasion with regard to the Proof of Claim despite having ample time and warning to supplement the filing. Thus here as in *Brooks* the objection to the Proof of Claim should be sustained.

PNC admittedly is the mortgage servicer. In *In re Kemp*, 440 B.R. 624 (Bankr. 2010) ( a servicers proof of claim was disallowed as it was not the party entitled to enforce the note in bankruptcy court).

PNC also may not avail itself of the opportunity to have Freddie Mac ratify, join or substitute in. The time within which to file or amend a proof of claim in the present case has long expired. "The effect of ratification is to give the agent the authority to perform the unauthorized act as of the time the agent performed the unauthorized act...but the intervening bar date vitiates [such an argument] because ratifications are deemed ineffective in the face of an intervening

5

deadline." *In re W.R. Grace and Co.*, 316 F. Appx.134,136  (3d Cir. 2008)(internal quotations omitted).

## CONCLUSION

For the foregoing reasons Debtor's objection to PNC's Proof of Claim should be sustained.

Dated: February 17, 2015                              Respectfully submitted,

                                                     /s/ Barry Penn
                                                     Barry Penn, Esq.

6

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re: LINDA MERRITT,                     :
        Debtor                          :
                                        :      CHAPTER 13
                                        :      Case No.: 11-18134
                                        :
                                        :

## CERTIFICATE OF SERVICE

     Barry F. Penn certifies that he has served a copy of the forgoing, a February 17, 2015 Linda Merritt Chapter 13 Debtor In Possession Objection To PNC Bank National Association (Claim No. 4-1), to PNC's attorney of record:

John Kishbaugh, Esq.
Udren Law Offices, P.C.
Woodcrest Corporate Center
111 Woodcrest Road, Suite 200
Cherry Hill, NJ 08003-3620

Sarah Schindler-Williams, Esq.
Ballard Spahr LLLC
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Dated: February 17, 2015                    */s/ Barry F. Penn*
                                         Barry F. Penn, Esquire

[Go straight to content.](#)

- [Home](#)   |
- [Terms and Conditions](#)   |
- [Privacy Policy](#)



Freddie Mac
How to Get Help with Your Mortgage

# Yes. Our records show that Freddie Mac is the owner of your mortgage and it was acquired on January 19, 2005. This date is also referred to as the Freddie Mac settlement date.

[En Español](#)

## What to Do Next

1. **For help with your mortgage, contact your lender and let them know you would like to pursue assistance through the federal Making Home Affordable (MHA) program.**

   a. Your lender, the company to which you make your mortgage payments (also referred to as a mortgage servicer), can help you determine if you are eligible for the options under MHA.

      ■ If you are current on your mortgage payments, but have been unable to refinance because you have little or no equity in the home, the **Home Affordable Refinance Program** may help you obtain a lower interest rate or more stable mortgage.

      ■ If you are behind in making your mortgage payments or believe you may soon fall behind, a Home Affordable Modification may help you obtain more affordable mortgage payments.

**Avoiding Foreclosure Resources**

- [Alternatives to Foreclosure](#)
- [Working with Your Lender](#)
- [Who to Contact for Help](#)
- [Avoiding Fraud](#)

**Steps to Get Started with HARP**

1. See if Freddie Mac Owns Your Loan
2. [Learn More About HARP](#)
3. [Check Your Eligibility for HARP](#)
4. [Get Prepared and Call Your Lender](#)
5. [Consider Another HARP-Participating Lender](#)

R.59

■ If it is not realistic for you to keep your home, a **short sale** or **"deed-in-lieu of foreclosure"** may help you transition to more affordable housing.

Freddie Mac is working with its lenders to offer these solutions to eligible borrowers with Freddie Mac-owned mortgages. *Because Freddie Mac does not work directly with consumers, you will need to work with your lender to determine your best foreclosure prevention option.*

b. **If you are not eligible for MHA**, don't give up! Ask your lender about other options to make your payments more affordable or to avoid foreclosure. There are other options available for homeowners with Freddie Mac-owned mortgages that are available through your lender.

2. **If you are unable to reach your lender, call a U.S. Department of Housing & Urban Development (HUD)-certified housing counselor at 1-800-569-4287 or visit the web site to find a housing counselor in your area.**

Housing counselors can help you contact and work with your lender to get help with your mortgage – free of charge

# Support Information

- **Be informed.** Visit our Avoiding Foreclosure Resource Center for information and guidance on alternatives to foreclosure, working with your lender, avoiding fraud and more.
- **Be patient and diligent.** Lenders are working hard to get to every call and sometimes it takes longer than you expect.
- **Get prepared.** Before you call your lender, here's what you'll need for your conversation.

Learn more about the options available to you under MHA.

Thank you for contacting Freddie Mac. One of our top priorities is making sure homeowners with Freddie Mac-owned mortgages are able to get proper help and understand all options available to them during this difficult time.

R.60

© Freddie Mac

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | CHAPTER 13 |
| Linda Merritt | |
| Aka: Lyn Merritt | CASE NO. 11-18134-jkf |
| Debtor(s). | |

**RESPONSE OF PNC BANK, N.A. to LINDA MERRITT'S OBJECTION TO CLAIM**

PNC Bank, N.A., ("Respondent"), by its Attorneys, Udren Law Offices, P.C., hereby responds to the Objection to Claim of Linda Merritt as follows:

**I.    DEBTOR'S OBJECTIONS BASED UPON LACK OF STANDING OF PNC BANK, N.A. TO FILE A CLAIM MUST BE OVERRULED**

1.    The holder of the note and mortgage is PNC Bank, N.A.  PNC Bank, N.A. is in possession of the original promissory note in favor of National City Mortgage Co. executed by Linda Merritt on or about November 24, 2004.  PNC Bank, N.A. is a successor by merger to National City Mortgage Co.  A true and correct copy of the promissory note is attached hereto as Exhibit "A".  A true and correct copy of the Certificate of Merger is attached hereto as Exhibit "B".

2.    On the aforementioned date, Linda Merritt executed a Mortgage in favor of National City Mortgage Co.  to secure the money loaned under the aforementioned promissory note.   The Mortgage was recorded on December 29, 2004 in the Chester County Recorder of Deeds Office at Book 6374, Page 75.  A true and correct copy of the Recorded Mortgage is attached hereto as Exhibit "C".    PNC Bank, N.A. is a successor by merger to National City Mortgage Co.  A true and correct copy of the Certificate of Merger is attached hereto as Exhibit "B".

3.    The document attached as Exhibit 1 to the Objection to Claim is generic and makes

R.62

no reference to the aforementioned loan that was executed by Linda Merrit. By way of further response and without waiving the foregoing, Freddie Mac is the investor of the loan of Linda Merritt. However, PNC Bank, N.A. is the holder of the note and mortgage and has standing both to file the Proof of Claim in Federal Bankruptcy Court and to prosecute a foreclosure action in state court.

4.     PNC Bank, N.A. is entitled to enforce the note because it is the holder of the Promissory Note pursuant to the Pennsylvania Uniform Commercial Code. *See J.P. Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258 (2013) (stating that in Pennsylvania mortgage notes are negotiable instruments governed by the PUCC).

5.     Contrary to the further assertions of Linda Merritt in her objection, PNC Bank, N.A, not Freddie Mac, is the holder of the note and mortgage and is the real party in interest.

WHEREFORE, PNC Bank, N.A. respectfully requests that the Objection to Claim filed by Linda Merritt be overruled in its entirety with prejudice.

Dated: March 5, 2015

Respectfully submitted,

By:     /s/ Nicole LaBLetta
Nicole LaBletta, Esquire
UDREN LAW OFFICES, P.C.
Attorneys for Movant
Woodcrest Corporate Center
111 Woodcrest Road, Suite 200
Cherry Hill, NJ  08003-3620
(856) 669-5400



# NOTE

**November 24 , 2004**
[Date]                                    [City]                                    [State]


**699 W GLENROSE RD, COATESVILLE, Pennsylvania 19320**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $        **297,150.00**   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
**NATIONAL CITY MORTGAGE CO**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   **5.750**   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   **1st**   day of each month beginning on   **January 1 , 2005**   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   **December 1, 2019**   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   **National City Mortgage Co.,**
**P O Box 17677, Baltimore, MD 21297-1677**   or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $   **2,467.57** .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

-5N (0207)
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3            Initials: ___
**Form 3200 1/01**



R.64

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.00        % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.





Form 3200 1/01
Initials

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



Form 3200 1/01
Initials:

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)     _____ (Seal)
LINDA MERRITT                    -Borrower                                    -Borrower

_____ (Seal)     _____ (Seal)
                                 -Borrower                                    -Borrower

_____ (Seal)     _____ (Seal)
                                 -Borrower                                    -Borrower

PAY TO THE ORDER OF

WITHOUT RECOURSE
NATIONAL CITY MORTGAGE CO.

_____ (Seal)     _____ (Seal)
                                 -Borrower   TERRIE ROBERTS                   -Borrower
                                             LOAN REVIEW ADMINISTRATOR

*[Sign Original Only]*



**⊛PNC BANK**

CERTIFICATE

The undersigned, Laura L. Long, Assistant Secretary of PNC Bank, National Association, does hereby certify as follows:

1.  On December 11, 2000, National City Mortgage Co. ("Old NCMC"), an Ohio corporation and wholly owned subsidiary of National City Bank of Indiana ("NCBIN"), registered the trade name "Commonwealth United Mortgage Company" in the State of Ohio.

2.  Effective January 4, 2005, NCMC NewCo, Inc. ("New NCMC"), a wholly owned subsidiary of Old NCMC, changed its name to "National City Mortgage Co." and Old NCMC changed its name to "National City Mortgage, Inc."

3.  Effective July 22, 2006, NCBIN merged with and into National City Bank and National City Mortgage Co. became a wholly owned subsidiary of National City Bank, a wholly owned subsidiary of National City Corporation.

4.  Effective October 1, 2008, National City Mortgage Co. merged into National City Bank and became a division of National City Bank.

5.  Effective December 31, 2008, National City Corporation merged with and into The PNC Financial Services Group, Inc. and National City Bank became a wholly owned subsidiary of The PNC Financial Services Group, Inc.

6.  Effective as of November 6, 2009, National City Bank was merged with and into PNC Bank, National Association.  This merger was approved by the United States Office of the Comptroller of the Currency (as evidenced by the official certification dated November 6, 2009 attached hereto as Exhibit "A").

7.  PNC Bank, National Association is a wholly owned subsidiary of PNC Bancorp, Inc.  PNC Bancorp, Inc. is a wholly owned subsidiary of The PNC Financial Services Group, Inc.

8.  PNC Bank, National Association is a duly organized and existing national banking association (Charter Number 1316) having its main office located at 222 Delaware Avenue, Wilmington, Delaware 19801 and using federal Employer Identification Number 22-1146430.

IN WITNESS WHEREOF, the undersigned has hereunto set her hand and affixed the seal of this Bank this 17th day of December, 2010.

_____

Laura L. Long

SEAL

Member of The PNC Financial Services Group

One PNC Plaza  249 Fifth Avenue  Pittsburgh  Pennsylvania  15222 2707

M:\Pittsburgh\CF\BOARD\CERT\CERTS BY ENTITY\NATIONAL CITY\COMMONWEALTH UNITED MORTGAGE COMPANY.doc



Exhibit C

Merritt
(65)

RECORDER OF DEEDS

Prepared By:

**MIKKEA COPELAND**
**NATIONAL CITY MORTGAGE CO**

**1 NATIONAL CITY PARKWAY**
**KALAMAZOO, MI 49009**
Parcel Number:
**45-3-47.2** ✓

Return To:

**NATIONAL CITY MORTGAGE CO**

**P.O. Box 8800**
**Dayton, OH 45401-8800**

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE



## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    **November 24, 2004**
together with all Riders to this document.
**(B) "Borrower"** is

**LINDA MERRITT,** *unmarried*

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is    **NATIONAL CITY MORTGAGE CO**

Lender is a    **corporation**

**PENNSYLVANIA** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        **Form 3039  1/01**

**VMP®-6(PA)** (0008)

Page 1 of 16        Initials: _J.M._

VMP MORTGAGE FORMS - (800)521-7291

UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44        Page 1 of 17
B-6374 P-75

This Document Recorded
12/29/2004
08:44AM
Doc Code: MTG Chester County, Recorder of Deeds Office

Doc
Receipt
Rec Fee: 98.50

R.69

organized and existing under the laws of **THE STATE OF OHIO**
Lender's address is **3232 Newmark Drive, Miamisburg, OH 45342**

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated **November 24, 2004**
The Note states that Borrower owes Lender
**TWO HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED FIFTY & 00/100** Dollars
(U.S. $ **297,150.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **December 1, 2019**
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider
☐ Balloon Rider  ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider  ☐ Biweekly Payment Rider  ☐ Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

UNIFIED TITLE & SETTLEMENT  R.70  B-6374 P-75

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the      **County**      [Type of Recording Jurisdiction]
of      **Chester**      [Name of Recording Jurisdiction]:

which currently has the address of      *45-3-47.2*
       **699 W GLENROSE RD,**                              [Street]
       **COATESVILLE**          [City], Pennsylvania     **19320**     [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials: _J.M._

-6(PA) (0008)                      Page 3 of 16                          Form 3039  1/01



BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in


Initials: _____

UNIFIED TITLE & SETTLEMENT     12/29/2004 09:44A     Page 4 of 17
B-6374 P-75

R.72

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the


Initials:


-6(PA) (0008)                    Page 5 of 16                    Form 3039  1/01

Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Initials: _J.m._

UNIFIED TITLE & SETTLEMENT          12/29/2004 08:44    Page 6 of 17
B-6374 P-75

R.74

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

UNIFIED TITLE & SETTLEMENT     12/29/2004 08:44A     B-6374 P-75
R.75

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.


UNIFIED TITLE & SETTLEMENT     12/29/2004 08:44A     B-6374 P-75
Page 8 of 17
R.76

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

 -6(PA) (0008)　　　　　　　　Page 9 of 16　　　　　 Initials: _____　　　　**Form 3039   1/01**

UNIFIED TITLE & SETTLEMENT　　　12/29/2004 08:44A

Page 9 of 17
B-6374 P-75

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of


Initials: ____

-6(PA) (0008)　　　　　　　　　　Page 10 of 16　　　　　　　　　　**Form 3039  1/01**

UNIFIED TITLE & SETTLEMENT
12/29/2004 08:44A
R.78
Page 10 of 17
B-6374 P-75

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.



-6(PA) (0008)                        Page 11 of 16                        Form 3039  1/01

Initials: _____

UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44A        B-6374 P-75

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all



Initials: _____


-6(PA) (0008)

Page 12 of 16

Form 3039 1/01

UNIFIED TITLE & SETTLEMENT

R.80

B-6374 P-75

expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

UNIFIED TITLE & SETTLEMENT          12/29/2004 08:44A    B-6374 P-75
                                         R.81

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                                        -Borrower
                                             LINDA MERRITT

_____                    _____ (Seal)
                                                                        -Borrower

_____ (Seal)             _____ (Seal)
                -Borrower                                     -Borrower

_____ (Seal)             _____ (Seal)
                -Borrower                                     -Borrower

_____ (Seal)             _____ (Seal)
                -Borrower                                     -Borrower

**Certificate of Residence**

I, *Beth Maslowski* , do hereby certify that the correct address of the within-named Mortgagee is *3232 Newmark Drive, Miamisburg, OH 45342* Witness my hand this *24th* day of *November 2004* .

*Beth Maslowski, as agent*

Agent of Mortgagee

**COMMONWEALTH OF PENNSYLVANIA,** *Chester* **County ss:**

On this, the *24* day of *Nov , 2004* , before me, the undersigned officer, personally appeared *LINDA MERRITT*

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:

> Notarial Seal
> David J. Kelly, Notary Public
> Valley Twp., Chester County
> My Commission Expires May 20, 2006
> Member, Pennsylvania Association Of Notaries

*David J. Kelly*

*NOTARY Public*

Title of Officer

Initials: *J.M.*

UNIFIED TITLE & SETTLEMENT          R.84          B-6374 P-75

## EXHIBIT A

The land referred to is situated in the County of Chester, State of PENNSYLVANIA, is described as follows:

All that certain tract of lands, hereditaments and appurtenances, situate in the Township of Highland, County of Chester and State of Pennsylvania, bounded and described in accordance with a survey made by Edger Laub, the plan soon to be recorded, as follows;

Beginning at a spike at the intersection of West Glenrose Road and Old Stottsville Road; thence by said Old Stottsville Road (LR 15110), a public mascadam road, the following (3) courses and distances: (1) North 42 deg 3 min 20 sec west 97.74 feet to a spike; thence (2) north 21 deg 43 min 40 sec west, 212.52 feet to a spike; thence (3) north 35 deg 32 min 50 sec west, 96.43 feet to a spike; thence leaving said road and by remaining lands of Donald Copeland, the following (2) courses and distances (1) north 71 deg 1 min 20 sec east, 274.2 feet to an iron pin; thence (2) south 21 deg 1 min east, 397.5 feet to a spike in west Glenrose Road (LR 15110); thence by said road; south 71 deg 33 min 40 sec west, 212.13 feet to the point of beginning.

Containing 2.24 acres.

699 W. Glenrose Rd

45-3-47.2



B-6374 P-75

Unified Title and Settlement, a national independent title agency.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: Linda Merritt aka Lyn Merritt  :  CHAPTER 13

: CASE NO. 11-18134-JKF

## ORDER

   **AND NOW**, this _____ day of _____, 20_____, upon Objection to Claim of Linda Merritt a/k/a Lyn Merritt and the response of PNC Bank, National Association, it is

   **ORDERED AND DECREED THAT:**

   The Objection to Claim of Linda Merritt a/k/a Lyn Merritt is overruled with prejudice in its entirety.

_____
Bankruptcy Judge

cc.    Nicole LaBletta, Esquire
    UDREN LAW OFFICES, P.C.
    Woodcrest Corporate Center
    111 Woodcrest Road, Suite 200
    Cherry Hill, NJ  08003-3620

    William C. Miller, Trustee
    111 South Independence Mall, Ste. 583
    Philadelphia, PA 19106

    Eugene A. Camposano, Esquire
    115 W. Germantown Pike
    Suite 100
    Norristown, PA 19401

    Barry F. Penn
    Law Offices of Barry F. Penn PC
    1500 JFK Blvd
    Two Penn Center
    Suite 950

Philadelphia, PA 19102

Thomas D. Schneider, Esquire
55 Green Valley Road
Wallingford, PA 19084

Linda Merritt
699 West Glenrose Road
Coatesville, PA 19320

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: Linda Merritt aka Lyn Merritt | CHAPTER 13 |
| | CASE NO. 11-18134-JKF |

### CERTIFICATE OF SERVICE

I hereby certify that service upon all interested parties, indicated below, was made by sending true and correct copies of the Response to Objection to Claim,, by First Class mail.[*]

**Date Served: March 4, 2015**

**Persons Served:**

Chapter 13 Trustee:    William C. Miller
                       111 South Independence Mall, Ste. 583
                       Philadelphia, PA 19106

Debtor's Attorney:     Eugene A. Camposano, Esquire
                       115 W. Germantown Pike
                       Suite 100
                       Norristown, PA 19401

                       Barry F. Penn
                       Law Offices of Barry F. Penn PC
                       1500 JFK Blvd
                       Two Penn Center
                       Suite 950
                       Philadelphia, PA 19102

                       Thomas D. Schneider, Esquire
                       55 Green Valley Road
                       Wallingford, PA 19084

Debtor(s):             Linda Merritt aka Lyn Merritt

---

[*]Parties served by the court via ECF electronic notification are not also being served by regular mail.

R.88

699 West Glenrose Road
Coatesville, PA 19320

By:    /s/ Nicole LaBLetta

        Nicole LaBletta, Esquire
        UDREN LAW OFFICES, P.C.
        Attorneys for Movant
        Woodcrest Corporate Center
        111 Woodcrest Road, Suite 200
        Cherry Hill, NJ  08003-3620
        (856) 669-5400

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re: LINDA MERRITT,                          :
      Debtor                                  :
                                    :        CHAPTER 13
                                    :        Case No.: 11-18134
                                    :
                                    :

## REPLY OF DEBTOR LINDA MERRITT TO RESPONSE OF PNC BANK, N.A.
## TO LINDA MERRITT'S OBJECTION TO CLAIM

     Linda Merritt, Chapter 13 Debtor in possession, (hereinafter "Debtor") by and through counsel, Barry F. Penn, Esquire, submits this Reply to the Response (Doc. 294) of PNC Bank, N.A. ("PNC") to Linda Merritt's Objection to PNC's claim (hereinafter "Response") (Doc. Claim 4-1). PNC's Response is actually an attempt to defraud the Court.

     1. In PNC's Response to Debtor's Objection to its Proof of Claim (Case No. 11-18134, Doc. 294) PNC attaches as Exhibit A, a purported copy of the alleged original subject Note and, as Exhibit C, a purported copy of the original Mortgage. A review of these exhibits reveals that PNC has redacted portions of these purported copies of the original Note and Mortgage, by blacking them out. (Doc. 294-1, page 1 and Doc. 294-3, page 1)  The purported Note also has a blacking out under Merritt's signature. (Doc. 294-1 page 4).

     2. In PNC's Response and Objection To Debtor's Cram Down Cross Motion (hereinafter "Response and Objection")(Case No. 11-18134, Doc. 288), PNC also annexed purported copies of the Note and of the Mortgage. The purported copy of the Note there (DOC. 288-2, page 2), does not contain the blacked out bar at the top, just a white space with some unidentifiable markings, and at the bottom of this document, where the blacking out bar appears on Doc. 294-1, there is a bar code on Doc. 288-2, page 2. Similarly, where the copy of the Mortgage annexed to

the Response has blacking bars at the bottom of each page (Doc. 294-3), the purported Mortgage

copy annexed to the Response and Objection has bar codes and what appears to be the Document

Identification Number for the Chester County Recorder of Deeds, "Doc. Id: 10492564". (Doc.

288).

3. In paragraph 1 of their Response, PNC asserts that "[a] true and correct copy of the

promissory note is attached here to as Exhibit "A")(Doc. 294, page 1). In paragraph 2 of their

Response, PNC asserts that "[a] true and correct copy of the recorded mortgage is attached

hereto as Exhibit "C".) (Doc. 294, page 1). The purported "true and correct copy" of the

documents attached to the Response (Doc. 284) are blatantly less "true and correct" than the

copies attached to the Response and Objection, (Doc. 288).

4. Fortunately for this Court, Debtor has completely unredacted versions of the Note and

Mortgage. (Debtor notes that the originals have never been produced.) The blacking out bar at

the top of the Note has the typewritten number, "0003695149", which corresponds to Debtor's

PNC loan account number, and the characters "Fred Mac 444840036". See **Exhibit 1**, attached.

Debtor's copy of the Mortgage also reflects the number "3695149", See **Exhibit 2**, attached.

Debtor submits that PNC, in its Response (Doc. 294), has attempted to prevent this Court and

Debtor from seeing the PNC loan number, "3695149", the "Fred Mac # 444840036", the bar

codes on the documents and, even more bizarre, the Chester County Recorder of Deeds

Document Identification number.

5. Knowingly offering falsified documents into evidence subjects a party to Rule 9011(b)

sanctions. See, *e.g., Pope v. Federal Express Corp.*, 49 F. 3d 1327, 1328 (8th Cir. 1995). See

also *Sea World, Inc., v. Lizarazo Olivarria*, 144 F.R.D. 384, 389-91 (E.D Cal. 1992)(submission

of fraudulent documentary evidence warrants dismissal under Rule 11 under the Court's inherent

power). Indeed, examples of egregious misconduct sufficient for an action for fraud on the court include the fabrication of evidence by a party in which an attorney is implicated. *Herring v. United States*, 424 F. 3d 384, 386 n.1 (3d Cir. 2005) (quoting *Rozier v. Ford Motor Co.*, 573 F. 2d 1332, 1338 (5th Cir.1978)).

6. It is difficult to see how PNC's conduct in presenting two differently redacted copies of the purported Note and Mortgage, including the redacting of the "Fred Mac # 444840036" and the number under Debtor's signature on the Note, the Chester County Recorder of Deeds identification number on the Mortgage, or the bar codes on each document, is objectively reasonable. PNC could have no legitimate, valid purpose in redacting any information on these documents.

7. This is the same conduct that caused the Office of the Comptroller of the Currency (hereinafter "OCC"), to seek and enforce the April 13, 2011, Cease and Desist Order (the "Consent Order"). See Exhibit 3, 4/13/11 Consent Order. While not admitting to the OCC's findings, PNC committed in the Consent Order to take "all necessary and appropriate steps to remedy deficiencies and unsafe or unsound practices identified by the OCC..." Exhibit 3, Consent Order at page 2. PNC committed to proper management of third parties to the foreclosure process and take:

> Measures to insure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of the mortgages any judicial or non - judicial foreclosure proceedings, related bankruptcy proceedings, or any other foreclosure- related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced.

Exhibit 3, Consent Order at pp. 10-11.

3

8. PNC's falsification of the Note and Mortgage in two separate bankruptcy filings directly impacts whether it has supplied documentation sufficient to establish its right to enforce the Note and Mortgage.

9. A "fraud on the court" occurs when it can be demonstrated clearly and convincingly that a party has intentionally set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense. *Aoude v. Mobil Oil Corp.*, 892 F. 2d 1115, 1118 (1st. Cir. 1989) (affirming the district court's dismissal of a lawsuit wherein the plaintiff had attached to his complaint a fictional purchase agreement).

10. At the time of the filing of the Response, Doc. 294, PNC had already submitted differently redacted versions of the purported original Note and Mortgage in their Response and Objection, Doc. 288. Thus, at the time PNC's counsel asserted that the copies of the Note and Mortgage attached to the Response were "true and correct", PNC's counsel had already submitted differently redacted copies. "It is hard to imagine a more willful act than perpetrating a fraud on the court by submitting knowingly falsified documents." *Wesley v. Scharff*, 2011 U.S. Dist. LEXIS 13820 (W.D. Pa. Sept. 26, 2011), adopted by 2011 U.S. Dist. LEXIS 13882 (W.D. Pa. Nov. 23, 2011).

11. PNC has continued to insist that it is entitled to pursue the Proof of Claim because of its succession in interest to National City Mortgage (see Doc. 294, ¶ 2; Doc. 288, ¶ 2), but PNC now admits that Freddie Mac is the investor of the loan of Linda Merritt" (Doc. 294, ¶ 3)

12. If Freddie Mac is the "investor of the loan of Linda Merritt," then ownership of the loan had to be transferred to Freddie Mac. "[T]he transfer of the note by operation of law also

4

transfers the mortgage... "[F]ailure to create and record documents evincing the transfer of promissory notes secured by mortgages and real estate in the Commonwealth of Pennsylvania is ...in violation of the Pennsylvania recording law ..." *Montgomery County v. Merscorp.*, 16 F. Supp.3d 542 (E.D. Pa. 2014). Moreover in other courts, PNC made contrary claims, such as "PNC/ National City had an agreement with some investors, mainly Freddie Mac and Fannie Mae, that it would buy back the mortgages [involved] in the case of fraud and reimburse the investor for any losses resulting from the fraud." *United States v. Berger*, 2012 U.S. Dist. LEXIS 88276 (W.D. Pa. June 26, 2002). PNC would not have to "buy back" a mortgage from the investor Freddie Mac if it had not sold it to Freddie Mac in the first place. Ergo "investor" means "owner" and as, Debtor asserts, Freddie Mac, and not PNC, is the real party in interest.

13. One of the reasons PNC must have redacted the "Fred Mac # 444840016" from the copy of the Note it attached to the Response was to bolster its position that the "generic" document annexed to Debtor's Objection to claim that shows that Freddie Mac is the owner of subject loan is of no evidentiary value. (Doc. 294, ¶ 3) In light of PNC's nefarious redaction of the Freddie Mac identification as owner/holder of the note, PNC's misconduct confirms the overwhelming evidentiary value of Debtor's claim as to the Freddie Mac's ownership.

14. Court's may exercise their inherent power "to impose sanctions on both litigants and attorneys to regulate their dockets, to promote judicial efficiency, and to deter abuse of judicial process." *Quiroga v. Hasbro*, 934 F. 2d 497,505 (3d Cir. 1991). District courts also possess the inherent power to impose the sanction of dismissal on one "who defiles the judicial system by committing fraud on the court". See *Aoude v. Mobil Oil Corp.*, 892 F 2d 1115,1118 (1st Cir. 1989) (affirming dismissal of cause of action for "fraud on the Court" where plaintiff attached false agreement to complaint). See *In re Genesis Health Ventures, Inc.*, 362 B.R. 657,

662 (D.De. 2007)("[T]he Bankruptcy Court concluded and the [District] court agrees, that the Bankruptcy court retains the inherent power to award sanctions in order to enforce decorum and redress vexatious litigation") (citing *Fellheimer, Eichen & Braverman, P.C. v Charter Technologies, Inc.*, 57 F. 3d 1215, 1224-25 (3d Cir. 1995)(upholding bankruptcy Court's inherent authority to impose sanctions)).

15. The Second Circuit has opined that under Rule 11, a court may *sua sponte* impose sanctions if a party fails to correct or withdraw a submission that has no evidentiary value. *In re Pennie & Edmonds, LLP*, 323 F. 2d 86, 89-91 (2d Cir. 2003). However the Ninth Circuit has stated that, in *sua sponte* circumstances, unlike the situation in which an opposing party moves for Rule 9011 sanctions, there is no "safe harbor" in the rule allowing lawyers to correct or withdraw their challenged filings. *United Nat. Ins. Co. v. R&D. Latex Corp.*, 242 F. 3d at 1102, 1115-16(9th Cir. 25001) (citing Fed. R.Civ. P 11 (b)(2)). Courts will therefore impose "sua sponte sanctions'...in situations that are akin to contempt of court". *United Nat. Ins. Co. v. R&D Latex Corp.*, 242 F. 3d at 1102 (citing *Barber v. Miller*, 146 F. 3d 707,711 (9th Cir.1998)). Nevertheless, Rule 11(c)(3) states that when a district court initiates Rule 11 sanctions *sua sponte*, it should enter an order directing the party "to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed R.Civ. P. 11(c).

16. In addition, the filing of a fraudulent proof of claim is a specific violation of 18 U.S.C. 152(3), imposing criminal liability on a person who "knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, or in relation to any case under title 11."

17. PNC's misconduct confirms Debtor's position that PNC is not the real party in interest entitled to pursue the Proof of Claim filed by PNC. This has been Debtor's argument since this petition was filed, and PNC's misconduct in redacting the Freddie Mac and other identifying information to conform the documents to their representations should not be rewarded.

## **CONCLUSION**

WHEREFORE, Debtor respectfully requests that Debtor's Objection to PNC's Proof of Claim be sustained and the Proof of Claim denied and dismissed with prejudice in its entirety.

Respectfully submitted,

*Barry F. Penn*

BARRY F. PENN

Dated: March 23, 2015

# Exhibit 1

0003695149

FredMac# 444840036

# NOTE

November 24 , 2004
[Date]                              [City]                              [State]

699 W GLENROSE RD, COATESVILLE, Pennsylvania 19320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    297,150.00   (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
NATIONAL CITY MORTGAGE CO

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    5.750    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   1st    day of each month beginning on   January 1 , 2005    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   December 1, 2019    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    National City Mortgage Co.,
P O Box 17677, Baltimore, MD 21297-1677            or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    2,467.57 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

VMP®-5N (0207)          Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials:

R.98                              01-0000029

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of      15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.00      % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

-5N (0207)
®

Page 2 of 3

Form 3200 1/01
Initials: _____

R.99

01-0000030

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

 VMP®-5N (0207)

Page 2 of 3

Form 3200 1/01
Initials: _____

R.100

01-0000031

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)         _____ (Seal)
LINDA MERRITT                    -Borrower                                        -Borrower
264436770

_____ (Seal)         _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)         _____ (Seal)
                                 -Borrower                                        -Borrower

PAY TO THE ORDER OF

WITHOUT RECOURSE
_____ (Seal)    NATIONAL CITY MORTGAGE CO.        _____ (Seal)
                                 -Borrower                                        -Borrower
                                          TERRIE ROBERTS
                                          LOAN REVIEW ADMINISTRATOR

*[Sign Original Only]*

VMP-5N (0207)                    Page 3 of 3                          Form 3200 1/01

R.101                                            01-0000032

# Exhibit 2



5695149

Merritt
(45)





RECORDER OF DEEDS

Prepared By:

MIKKEA COPELAND
NATIONAL CITY MORTGAGE CO

1 NATIONAL CITY PARKWAY
KALAMAZOO, MI 49009
Parcel Number:
45-3-47.2

Return To:

NATIONAL CITY MORTGAGE CO

P.O. Box 8800
Dayton, OH 45401-8800

───────────── [Space Above This Line For Recording Data] ─────────────

# MORTGAGE

0003695149

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated   November 24, 2004
together with all Riders to this document.
(B) **"Borrower"** is

LINDA MERRITT, unmarried

Borrower is the mortgagor under this Security Instrument.
(C) **"Lender"** is   NATIONAL CITY MORTGAGE CO

Lender is a   corporation

**PENNSYLVANIA** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3039  1/01

VMP® -6(PA) (0008)
Page 1 of 16
VMP MORTGAGE FORMS - (800)521-7291

UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44a

10492564
Page 1 of 17
B-6374 P-75

This Document Recorded
12/29/2004
08:44AM
Doc Code: MTG Chester County, Recorder of Deeds Office

Doc Id: 10492564
Receipt #: 201468
Rec Fee: 98.50

01-0000012

organized and existing under the laws of THE STATE OF OHIO
Lender's address is 3232 Newmark Drive, Miamisburg, OH 45342

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated November 24, 2004
The Note states that Borrower owes Lender

TWO HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED FIFTY & 00/100 Dollars
(U.S. $ 297,150.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 1, 2019
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

VMP -6(PA) (0008)                     Page 2 of 16          Initials: J.M.                     Form 3039  1/01

10492564
Page 2 of 17
UNIFIED TITLE & SETTLEMENT          12/29/2004 08:44A        B-6374 P-75

01-0000013

R.104

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the        County        [Type of Recording Jurisdiction]
of      Chester                                              [Name of Recording Jurisdiction]:

which currently has the address of    45-3-47.2
699 W GLENROSE RD,                                                            [Street]
COATESVILLE                          [City], Pennsylvania    19320        [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

-6(PA) (0008)                        Page 3 of 16                        Initials  J.M.        Form 3039   1/01



10492564
Page 3 of 17
B-6374 P-75

UNIFIED TITLE & SETTLEMENT       12/29/2004 08 44A

01-0000014

R.105

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

VMP-6(PA) (0008)          Page 4 of 16          Form 3039  1/01




01-0000015

R.106

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the

Initials: 

-6(PA) (0008)                    Page 5 of 16                    Form 3039  1/01



10492564
Page 5 of 17
B-6374 P-75

UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44A              01-0000016

Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Initials: _J.m._



10492564
Page 6 of 17
12/29/2004 08:44A    B-6374 P-75

UNIFIED TITLE & SETTLEMENT

01-0000017

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.



 -6(PA) (0008)          Page 7 of 16          Form 3039  1/01



 10492564
Page 7 of 17
B-6374 P-75

 01-0000018

R.109

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only, if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.





 10492564
Page 8 of 17
B-6374 P-75

 01-0000019

UNIFIED TITLE & SETTLEMENT    12/29/2004 08:44:4

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

 -6(PA) (0008)          Page 9 of 16           Initials          Form 3039  1/01

          10492564
Page 9 of 17
B-6374 P-75          01-0000020
UNIFIED TITLE & SETTLEMENT   12/25/2004 08:44A

R.111

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of



-6(PA) (0008)    Page 10 of 16    Form 3039  1/01


UNIFIED TITLE & SETTLEMENT    12/29/2004 08:44A    10492564
Page 10 of 17
B-6374 P-75    01-0000021

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

 -6(PA) (0008)

Page 11 of 16

Initials: 

Form 3039  1/01



UNIFIED TITLE & SETTLEMENT     12/29/2004 08:44A

10492564
Page 11 of 17
B-6374 P-75

01-0000022

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all

 -6(PA) (0008)

Page 12 of 16

Initials: 

Form 3039 1/01



10492564
Page 12 of 17
B-6374 P-75

01-0000023

R.114

expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

 -6(PA) (0008)    Page 13 of 16        Form 3039  1/01

  10492564
Page 13 of 17
B-6374 P-75    01-0000024

UNIFIED TITLE & SETTLEMENT    12/29/2004 09 44A

R.115

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.



VMP®-6(PA) (0008)                Page 14 of 16        Initials: ___        Form 3039  1/01



10492564
Page 14 of 17
B-6374 P-75

01-0000025

UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44A

R.116

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                   LINDA MERRITT            -Borrower

                                   _____ (Seal)
                                                            -Borrower

_____ (Seal)  _____ (Seal)
                -Borrower                                   -Borrower

_____ (Seal)  _____ (Seal)
                -Borrower                                   -Borrower

_____ (Seal)  _____ (Seal)
                -Borrower                                   -Borrower

VMP -6(PA) (0008)                 Page 15 of 16              Form 3039  1/01



UNIFIED TITLE & SETTLEMENT     12/29/2004 08:44A

10492564
Page 15 of 17
B-6374 P-75

01-0000026

R.117

**Certificate of Residence**

I, Beth Maslowski, do hereby certify that the correct address of the within-named Mortgagee is 3232 Newmark Drive, Miamisburg, OH 45342

Witness my hand this 24th day of November 2004

Beth Maslowski, as agent

Agent of Mortgagee

COMMONWEALTH OF PENNSYLVANIA, Chester County ss:

On this, the 24 day of Nov , 2004 , before me, the undersigned officer, personally appeared LINDA MERRITT

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires:

Notarial Seal
David J. Kelly, Notary Public
Valley Twp. Chester County
My Commission Expires May 20, 2006
Member, Pennsylvania Association Of Notaries

David J. Kelly

NOTARY Public

Title of Officer

-6(PA) (0008)

Page 16 of 16

Initials J.M.

Form 3039 1/01



10492564
Page 16 of 17
B-6374 P-75

UNIFIED TITLE & SETTLEMENT          12/29/2004 08:44A

01-0000027

## EXHIBIT A

The land referred to is situated in the County of Chester, State of PENNSYLVANIA, is described as follows:

All that certain tract of lands, hereditaments and appurtenances, situate in the Township of Highland, County of Chester and State of Pennsylvania, bounded and described in accordance with a survey made by Edger Laub, the plan soon to be recorded, as follows;

Beginning at a spike at the intersection of West Glenrose Road and Old Stottsville Road; thence by said Old Stottsville Road (LR 15110), a public mascadam road, the following (3) courses and distances: (1) North 42 deg 3 min 20 sec west 97.74 feet to a spike; thence (2) north 21 deg 43 min 40 sec west, 212.52 feet to a spike; thence (3) north 35 deg 32 min 50 sec west, 96.43 feet to a spike; thence leaving said road and by remaining lands of Donald Copeland, the following (2) courses and distances (1) north 71 deg 1 min 20 sec east, 274.2 feet to an iron pin; thence (2) south 21 deg 1 min east, 397.5 feet to a spike in west Glenrose Road (LR 15110); thence by said road; south 71 deg 33 min 40 sec west, 212.13 feet to the point of beginning.

Containing 2.24 acres.

699 W. Glenrose Rd

45-3-47.2

324921



10492564
Page 17 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT          12/29/2004 08:44A

Unified Title and Settlement, a national independent title agency.

01-0000028

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: LINDA MERRITT, | : |
| Debtor | : |
| | :        CHAPTER 13 |
| | :        Case No.: 11-18134 |
| | : |
| | : |

**CERTIFICATE OF SERVICE**

      Barry F. Penn certifies that he has served a copy of the forgoing, on March 24, 2015 Linda Merritt Chapter 13 Debtor In Possession Objection To PNC Bank National Association (Claim No. 4-1), to PNC's attorney of record:

John Kishbaugh, Esq.
Udren Law Offices, P.C.
Woodcrest Corporate Center
111 Woodcrest Road, Suite 200
Cherry Hill, NJ 08003-3620

Sarah Schindler-Williams, Esq.
Ballard Spahr LLLC
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Dated: March 24, 2015                        */s/ Barry F. Penn*
                                           Barry F. Penn, Esquire

15. Thus, despite the fact that Freddie Mac owns and continues to hold the Note and Mortgage and not PNC. PNC Falsely asserts that it is the holder of the Note and Mortgage. PNC's assertions are defeated by its own documents establishing that it is nothing more than the "Servicer for Freddie Mac".

16. In the case at bar, notwithstanding the fact that PNC does not dispute or deny in its Amended Response that it committed a fraud on the Court by submitting a copy of the fraudulently redacted Note and Mortgage, PNC has the temerity to ask this Court to rely on the fraudulent documents to deny Debtor's Objection. (Doc. 304 at pg. 1). This the Court cannot allow.

17. As stated in Debtor's Reply to PNC's Response to Objection of Claim, the redactions were placed on the Note to nefariously conceal the Freddie Mac name and loan number as owner and holder of the Note and Mortgage.(Doc.295 at pg. 2) .

18. In *In re Brooks*, 2008 Bankr. LEXIS 621 (Bankr. E.D.Pa.2008), a debtor's objection to a creditors motion for relief from stay and proof of claim based on a mortgage deficiency was sustained as to the identity of the creditor, and the actual owner of the mortgage was given fifteen days to act on its own behalf.

19. The *Brooks* court subsequently sustained the debtor's objection to the proof of claim and denied relief from the automatic stay because the mortgage owner did not seek to participate. *In re Brooks*, 2008 Bankr. LEXIS 4595 (Bankr. E.D. Pa. July 31, 2008).

20. Debtor has presented undisputed evidence that Freddie Mac, and not PNC, is the owner and holder of the Note and Mortgage, and that PNC is acting as the alleged servicer of the Mortgage for Freddie Mac, and not asserting its own rights. Thus PNC does not have standing to assert a Proof of Claim in this estate. Debtor's Objection to PNC's Proof of Claim must be sustained.

6

## IV. RES JUDICATA AND ROOKER FELDMAN DOES NOT BAR DEBTOR'S OBJECTION TO PNC'S PROOF OF CLAIM

### A. Res Judicata Does Not Bar Debtor's Challenge To PNC's Standing and Objection To Claim

21.   PNC argues that res judicata bars Debtor from asserting that PNC lacks standing to prosecute its Proof of Claim in this estate and that the issue of assignment of mortgage was decided by the state court when it denied debtor's petition to open judgment. (Doc. 304. at pg. 1 ¶1).

22.  PNC's argument that res judicata is a bar to Debtor's challenge of its standing in this court to prosecute the Proof of Claim is legally incorrect for several reasons: First, Debtor has not moved to vacate the state court judgment. Debtor is challenging PNC's standing to prosecute the Proof of Claim in this Court; Second, Freddie Mac the true owner /holder of the Note and Mortgage was not a party to the state court proceeding; and Third, PNC concealed in the state court proceedings, National City Mortgage's sale of the Note and Mortgage to Freddie Mac in 2005. Thus the issue that Freddie Mac is the owner/holder of the Note and mortgage was never litigated in state court. PNC's misconduct before the state court constituted a fraud on the court.

23.   In general *res judicata* precludes parties from litigating matters that have already been reviewed by a court of competent jurisdiction. See *e.g. Allen v McCurry*, 449 U.S. 90, 904 (1980).

24.  *Res Judicata* does not bar a bankruptcy court from reviewing a challenge to judgment of other courts "on grounds that the purported judgment is not a judgment because .... it was obtained by fraud of a party." See  *Heiser v. woodruff*, 327 U.S. 726,736 (1945) Here, PNC obtained a default judgment in state court, and when Debtor moved to vacate the default

7

R.122
R-705

# NOTE

November 24 , 2004

[Date]          [City]          [State]

699 W GLENROSE RD, COATESVILLE, Pennsylvania 19320

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 297,150.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

NATIONAL CITY MORTGAGE CO

will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.750 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on January 1 , 2005 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on December 1, 2019 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at National City Mortgage Co., P O Box 17677, Baltimore, MD 21297-1677 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,467.57 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

VMP-5N (0207)          **Form 3200 1/01**

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3          Initials: _____



R.123

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.00** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
LINDA MERRITT                            -Borrower                                                      -Borrower
264436770

_____ (Seal)          _____ (Seal)
                                                  -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                                  -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                                  -Borrower                                                      -Borrower

*[Sign Original Only]*

Prepared By:

**MIKKEA COPELAND**
**NATIONAL CITY MORTGAGE CO**

**1 NATIONAL CITY PARKWAY**
**KALAMAZOO, MI 49009**
Parcel Number:
**45 3 47.2**

Return To:

**NATIONAL CITY MORTGAGE CO**

**P.O. Box 8800**
**Dayton, OH 45401-8800**

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

**0003695149**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **November 24, 2004** , together with all Riders to this document.
**(B) "Borrower"** is

**LINDA MERRITT**

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is    **NATIONAL CITY MORTGAGE CO**

Lender is a    **corporation**

**PENNSYLVANIA** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3039  1/01**

Ⓥ**-6(PA)** (0008)

Page 1 of 16          Initials:_____

VMP MORTGAGE FORMS - (800)521-7291



R.126

organized and existing under the laws of **THE STATE OF OHIO**
Lender's address is **3232 Newmark Drive, Miamisburg, OH   45342**

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated **November 24, 2004**
The Note states that Borrower owes Lender

   **TWO HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED FIFTY & 00/100** Dollars
(U.S. $    **297,150.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **December 1, 2019**
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:_____

**-6(PA)** (0008)              Page 2 of 16                **Form 3039  1/01**

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the    **County**    [Type of Recording Jurisdiction] of    **Chester**    [Name of Recording Jurisdiction]:

which currently has the address of
**699 W GLENROSE RD,**    [Street]
**COATESVILLE**    [City], Pennsylvania    **19320**    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

**-6(PA)** (0008)    Page 3 of 16    Initials:_____    **Form 3039  1/01**

R.128

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

 **-6(PA)** (0008)

Page 4 of 16

Initials:_____

Form 3039  1/01

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the



Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

 **-6(PA)** (0008)

Initials:_____

**Form 3039  1/01**

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

 -6(PA) (0008)

Page 7 of 16

Initials:_____

Form 3039  1/01

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full,  and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.



-6(PA) (0008)                    Page 11 of 16              Initials:_____            **Form 3039  1/01**

R.136

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all



expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.


-6(PA) (0008)                    Page 13 of 16

Initials:_____

Form 3039  1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                            LINDA MERRITT                      -Borrower

_____          _____ (Seal)
                                                                               -Borrower

_____ (Seal)   _____ (Seal)
                         -Borrower                                             -Borrower

_____ (Seal)   _____ (Seal)
                         -Borrower                                             -Borrower

_____ (Seal)   _____ (Seal)
                         -Borrower                                             -Borrower

 -6(PA) (0008)                 Page 15 of 16                          Form 3039  1/01

**Certificate of Residence**

I,                                                                    , do hereby certify that
the correct address of the within-named Mortgagee is

    Witness my hand this                          day of                                              .

_____

Agent of Mortgagee

**COMMONWEALTH OF PENNSYLVANIA,**                          **County ss:**

    On this, the                          day of                                    , before me, the
undersigned officer, personally appeared

                                                          known to me (or
satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes herein contained.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:

_____

_____
Title of Officer

UDREN LAW OFFICES, P.C.                          **ATTORNEY FOR PLAINTIFF**
**MARK J. UDREN, ESQUIRE - ID #04302**
**STUART WINNEG, ESQUIRE - ID #45362**          *FILED*
**LORRAINE DOYLE, ESQUIRE - ID #34576**         10 MAY 11 PM 2:11
**ALAN M. MINATO, ESQUIRE - ID #75860**
**CHANDRA M. ARKEMA, ESQUIRE - ID #203437**     *OFFICE OF THE*
**LOUIS A. SIMONI, ESQUIRE - ID #200869**       *PROTHONOTARY*
**ADAM L. KAYES, ESQUIRE - ID #86408**          *CHESTER CO., PA.*
**MARGUERITE L. THOMAS, ESQUIRE - ID #204460**
**WOODCREST CORPORATE CENTER**
**111 WOODCREST ROAD, SUITE 200**
**CHERRY HILL, NJ 08003-3620**
**856-669-5400**
**pleadings@udren.com**

| | |
|---|---|
| PNC Mortgage, a division of PNC Bank NA<br>3232 Newmark Drive<br>Miamisburg, OH 45342<br>                    Plaintiff | COURT OF COMMON PLEAS<br>CIVIL DIVISION<br><br>Chester County |
| v. | |
| Linda Merritt<br>699 West Glenrose Road<br>Coatesville, PA 19320 | NO. *10- 05953* |
| United States of America<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106-4476<br>                    Defendant(s) | |

### COMPLAINT IN MORTGAGE FORECLOSURE

YOU HAVE BEEN SUED IN COURT.  If you wish to defend against the
claims set forth in the following pages, you must take action
within twenty (20) days after this Complaint and Notice are served,
by entering a written appearance personally or by attorney and
filing in writing with the Court your defenses or objections to the
claims set forth against you.  You are warned that if you fail to
do so the case may proceed without you and a judgment may be
entered against you by the Court without further notice for any
money claimed in the Complaint or for any other claim or relief
requested by the Plaintiff.  You may lose money or property or
other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT
HAVE A LAWYER GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS
OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.  IF**

YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYERS REFERRAL SERVICE
Lawyer Referral Service
Chester County Bar Association
15 West Gay Street
P.O. Box 3191
West Chester, PA 19381-3191

10-05953

# NOTICE

The amount of your debt is as stated in the attached document. The name of the creditor to whom the debt is owed is as named in the attached document. Unless you notify us within 30 days after receipt of this Notice and the attached document that the validity of the stated debt, or any portion of it, is disputed, we will assume that the debt is valid. If you do notify us in writing of a dispute within the 30 day period, we will obtain verification of the debt or a copy of a judgment against you, and mail it to you. If you do not dispute the debt, it is not an admission of liability on your part. Also, upon your written request within the 30 day period, we will provide you with the name and address of the original creditor if different from the current creditor.

If you notify us in writing within the 30 day period as stated above, we will cease collection of your debt, or any disputed portion of it, until we obtain the information that is required and mail it to you. Once we have mailed to you the required information, we will then continue the collection of your debt.

This law firm is deemed to be a debt collector and this Notice and the attached document is an attempt to collect a debt, and any information obtained will be used for that purpose.

UDREN LAW OFFICES, P.C.
/s/ Mark J. Udren, Esquire
Woodcrest Corporate Center
111 Woodcrest Road, Suite 200
Cherry Hill, NJ 08003-3620
(856) 669-5400

10-05953

1.    Plaintiff is the Corporation designated as such in the caption on a preceding page. Plaintiff is the legal holder of the Mortgage that is the subject of this action.

2.    Defendant(s), Linda Merritt are/is the individual(s) designated as such on the caption, whose last known address is as set forth in the caption, and unless designated otherwise, are the real owner(s) and mortgagor(s) of the premises being foreclosed. Defendant, The United States of America is a Defendant by virtue of a judgment, lien, or other interest in the mortgaged property. Evidence of the USA's interest is attached hereto.

3.    On or about the date appearing on the Mortgage hereinafter described, at the instance and request of Defendant(s), Plaintiff (or its predecessor, hereinafter called Plaintiff) loaned to the Defendant(s) the sum appearing on said Mortgage, which Mortgage was executed and delivered to Plaintiff as security for the indebtedness.    Said Mortgage is incorporated herein by reference in accordance with Pa.R.C.P. 1019 (g).

The information regarding the Mortgage being foreclosed is as follows:

MORTGAGED PREMISES:  699 West Glenrose Road
MUNICIPALITY/TOWNSHIP/BOROUGH: Highland Township
COUNTY:  Chester
DATE EXECUTED: 11/24/04
DATE RECORDED: 12/29/04   BOOK: 6374    PAGE: 75

The legal description of the mortgaged premises is attached hereto and made part hereof.

4.    Said Mortgage is in default because the required payments have not been made as set forth below, and by its terms, upon breach and failure to cure said breach after notice, all sums secured by said Mortgage, together with other charges authorized by said Mortgage itemized below,  shall be immediately due.

5.    After demand, the Defendant(s) continues to fail or

refuses to comply with the terms of the Mortgage as follows:

(a) by failing or refusing to pay the installments of principal and interest when due in the amounts indicated below;

(b) by failing or refusing to pay other charges, if any, indicated below.

6.  The following amounts are due on the said Mortgage as of 05/01/10:

| | |
|---|---|
| Principal of debt due | $284,889.55 |
| Unpaid Interest at 5.75%<br>from 10/01/08 to 05/01/10<br>(the per diem interest accruing on<br>  this debt is $44.88 and that sum<br>should be added each day after 05/01/10) | 25,936.90 |
| Title Report | 325.00 |
| Court Costs (anticipated, excluding<br>  Sheriff's Sale costs) | 280.00 |
| Escrow Overdraft/(Balance)<br>(The monthly escrow on this account<br>is $554.69 and that sum should<br>be added on the first of each<br>month after 05/01/10) | 6,396.89 |
| Late Charges<br>(monthly late charge of $83.55<br>should be added in accordance<br>with the terms of the note<br>each month after 05/01/10) | 1,503.90 |
| Attorneys Fees (anticipated and actual<br>to 5% of principal) | 14,244.48 |
| TOTAL | $333,576.72 |

7.  The attorney's fee set forth above are in conformity with the mortgage documents and Pennsylvania law, and will be collected in the event of a third party purchaser at Sheriff's Sale.  If the

mortgage is reinstated prior to the sale, reasonable attorney's fees will be charged in accordance with the reduction provisions of Act 6, if applicable.

8.    The combined notice specified by the Pennsylvania Homeowner's Emergency Mortgage Assistance Program, Act 91 of 1983 and Notice of Intention to Foreclose under Act 6 of 1974 has been sent to each defendant, via certified and regular mail, in accordance with the requirements of those acts, on the date appearing on the copy attached hereto as Exhibit "A", and made part hereof, and defendant(s) have failed to proceed within the time limits, or have been determined ineligible, or Plaintiff has not been notified in a timely manner of Defendant(s) eligibility.

WHEREFORE, the Plaintiff demands judgment, in rem, against the Defendant(s) herein in the sum of $333,576.72 plus interest, costs and attorneys fees as more fully set forth in the Complaint, and for foreclosure and sale of the Mortgaged premises.

UDREN LAW OFFICES, P.C.

BY _____
Attorneys for Plaintiff
MARK J. UDREN, ESQUIRE
STUART WINNEG, ESQUIRE
LORRAINE DOYLE, ESQUIRE
ALAN M. MINATO, ESQUIRE
CHANDRA M. ARKEMA, ESQUIRE
LOUIS A. SIMONI, ESQUIRE
ADAM L. KAYES, ESQUIRE
MARGUERITE L. THOMAS, ESQUIRE

pbh_1 2010/05/24 16:45:56

V E R I F I C A T I O N

The undersigned, hereby states that he/she is the attorney for
the Plaintiff, a corporation unless designated otherwise; that
he/she is authorized to make this Verification and does so because
of the exigencies regarding this matter, and because Plaintiff must
verify much of the information through agents, and because he/she
has personal knowledge of some of the facts averred in the
foregoing pleading; and that the statements made in the foregoing
pleading are true and correct to the best of his/her knowledge,
information and belief and the source of his information is public
records and reports of Plaintiff's agents.    The undersigned
understands that this statement herein is made subject to the
penalties of 18 Pa.C.S. Section 4904 relating to unsworn
falsification to authorities.

UDREN LAW OFFICES, P.C.

BY: _____
Attorneys for Plaintiff
MARK J. UDREN, ESQUIRE
STUART WINNEG, ESQUIRE
LORRAINE DOYLE, ESQUIRE
ALAN M. MINATO, ESQUIRE
CHANDRA M. ARKEMA, ESQUIRE
LOUIS A. SIMONI, ESQUIRE
ADAM L. KAYES, ESQUIRE
MARGUERITE L. THOMAS, ESQUIRE

Form 668 (Y)(c)
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service

## Notice of Federal Tax Lien

| Area: SMALL BUSINESS/SELF EMPLOYED AREA #2 Lien Unit Phone: (800) 913-6050 | Serial Number 535297509 | For Optional Use by Recording Office |
|---|---|---|

FILED
09 APR 23 PM 2: 24
OFFICE OF THE
PROTHONOTARY
CHESTER CO. PA.

FT0900365

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer LINDA MERRITT

Residence    699 GLENROSE RD
             COATESVILLE, PA 19320-0000

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 6721 | 12/31/2004 | 41-2118787 | 10/29/2007 | 11/28/2017 | 9134.19 |
| 940 | 12/31/2005 | 41-2118787 | 05/22/2006 | 06/21/2016 | 1521.02 |
| 941 | 03/31/2006 | 41-2118787 | 04/09/2006 | 05/09/2017 | 7601.38 |
| 941 | 06/30/2006 | 41-2118787 | 04/02/2007 | 05/02/2017 | 4282.91 |
| 941 | 12/31/2006 | 41-2118787 | 04/30/2007 | 05/30/2017 | |
| 941 | 12/31/2006 | 41-2118787 | 10/27/2008 | 11/26/2018 | 1879.54 |

| Place of Filing | | |
|---|---|---|
| Prothonotary Chester County West Chester, PA 19380 | Total $ | 24419.04 |

This notice was prepared and signed at    DETROIT, MI                                    , on this,

the ___13th___ day of ___April___, ___2009___.

| Signature *R. A. Mitchell* for DEBORAH J GILLISON | Title REVENUE OFFICER (484) 636-0405 | 22-08-2214 |
|---|---|---|

(**NOTE:** Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

Part 1 - Kept By Recording Office

Form 668(Y)(c) (Rev. 2-2004)
CAT. NO 60025X

**PNC MORTGAGE™**

P.O. Box 1820
Dayton, Ohio 45401-1820

PNC Mortgage
3232 Newmark Drive
Miamisburg, Ohio 45342
Telephone: (937) 910-1200

**Mailing Address:**
P.O. Box 1820
Dayton, Ohio 45401-1820

7107 8381 6540 2103 1858

March 19, 2010

49120-0000392-001-001-000-000-000

MERRITT, LINDA
699 W GLENROSE RD
COATESVILLE PA  19320-4931

EXHIBIT A

DATE:  March 19, 2010

# ACT 91 NOTICE
# TAKE ACTION TO SAVE YOUR
# HOME FROM FORECLOSURE

**This is an official notice that the mortgage on your home is in default, and the lender intends to foreclose. Specific information about the nature of the default is provided in the attached pages**

**The HOMEOWNER'S EMERGENCY MORTGAGE ASSISTANCE PROGRAM (HEMAP) may be able to help to save your home. This Notice explains how the program works. To see if HEMAP can help, you must MEET WITH A CONSUMER CREDIT COUNSELING AGENCY WITHIN 33 DAYS OF THE DATE OF THIS NOTICE. Take this Notice with you when you meet with the Counseling Agency.**

The name, address and phone number of Consumer Credit Counseling Agencies serving your County are listed at the end of this Notice. If you have any questions, you may call the Pennsylvania Housing Finance Agency toll free at 1-800-342-2397.  (Persons with impaired hearing can call (717) 780-1869).

**This Notice contains important legal information. If you have any questions, representatives at the Consumer Credit Counseling Agency may be able to help explain it. You may also want to contact an attorney in your area. The local bar association may be able to help you find a lawyer.**

**LA NOTIFICACIÓN EN ADJUNTO ES DE SUMA IMPORTANCIA, PUES AFECTA SU DERECHO A CONTINUAR VIVIENDO EN SU CASA. SI NO COMPRENDE EL CONTENIDO DE ESTA NOTIFICACIÓN OBTENGA UNA TRADUCCIÓN INMEDIATAMENTE LLAMANDO ESTA AGENCIA (PENNSYLVANIA HOUSING FINANCE AGENCY) SIN CARGOS AL NUMERO MENCIONADO ARRIBA. PUEDE SER ELEGIBLE PARA UN PRÉSTAMO POR EL PROGRAMA LLAMADO "HOMEOWNER'S EMERGENCY MORTGAGE ASSISTANCE PROGRAM" EL CUAL PUEDE SALVAR SU CASA DE LA PERDIDA DEL DERECHO A REDIMIR SU HIPOTECA.**

| HOMEOWNER'S NAME(S): | MERRITT, LINDA |
|---|---|
| PROPERTY ADDRESS: | 699 W GLENROSE RD |
| LOAN ACCT. NO.: | 0003695149 |
| ORIGINAL LENDER: | n/a |
| CURRENT LENDER/SERVICER: | PNC |

# HOMEOWNER'S EMERGENCY MORTGAGE ASSISTANCE PROGRAM

<u>YOU MAY BE ELIGIBLE FOR FINANCIAL ASSISTANCE WHICH CAN SAVE YOUR HOME FROM FORECLOSURE AND HELP YOU MAKE FUTURE MORTGAGE PAYMENTS.</u>

IF YOU COMPLY WITH THE PROVISIONS OF THE HOMEOWNER'S EMERGENCY MORTGAGE ASSISTANCE ACT OF 1983 (THE "ACT"), YOU MAY BE ELIGIBLE FOR EMERGENCY MORTGAGE ASSISTANCE:

- IF YOUR DEFAULT HAS BEEN CAUSED BY CIRCUMSTANCES BEYOND YOUR CONTROL,

- IF YOU HAVE A REASONABLE PROSPECT OF BEING ABLE TO PAY YOUR MORTGAGE PAYMENTS, AND

- IF YOU MEET OTHER ELIGIBILITY REQUIREMENTS ESTABLISHED BY THE PENNSYLVANIA HOUSING FINANCE AGENCY.

**TEMPORARY STAY OF FORECLOSURE** -- Under the Act, you are entitled to a temporary stay of foreclosure on your mortgage for thirty (30) days from the date of this Notice (plus three (3) days for mailing). During that time you must arrange and attend a ''face-to-face'' meeting with one of the consumer credit counseling agencies listed at the end of this Notice. <u>THIS MEETING MUST OCCUR WITHIN (33) DAYS OF THE DATE OF THIS NOTICE. IF YOU DO NOT APPLY FOR EMERGENCY MORTGAGE ASSISTANCE, YOU MUST BRING YOUR MORTGAGE UP TO DATE. THE PART OF THIS NOTICE CALLED "HOW TO CURE YOUR MORTGAGE DEFAULT", EXPLAINS HOW TO BRING YOUR MORTGAGE UP TO DATE.</u>

**CONSUMER CREDIT COUNSELING AGENCIES** -- If you meet with one of the consumer credit counseling agencies listed at the end of this notice, the lender may NOT take action against you for thirty (30) days after the date of this meeting. <u>The names, addresses and telephone numbers of designated consumer credit counseling agencies for the county in which the property is located are set forth at the end of this Notice</u>. It is only necessary to schedule one face-to-face meeting. Advise your lender <u>immediately</u> of your intentions.

**APPLICATION FOR MORTGAGE ASSISTANCE** -- Your mortgage is in default for the reasons set forth later in this Notice (see following pages for specific information about the nature of your default.) You have the right to apply for financial assistance from the Homeowner's Emergency Mortgage Assistance Program. To do so, you must fill out, sign and file a completed Homeowner's Emergency Assistance Program Application with one of the designated consumer credit counseling agencies listed at the end of this Notice. Only consumer credit counseling agencies have applications for the program and they will assist you in submitting a complete application to the Pennsylvania Housing Finance Agency. To temporarily stop the lender from filing a foreclosure action, your application MUST be forwarded to PHFA and received within thirty (30) days of your face-to-face meeting with the counseling agency.

*YOU SHOULD FILE A HEMAP APPLICATION <u>AS SOON AS POSSIBLE</u>. IF YOU HAVE A MEETING WITH A COUNSELING AGENCY WITHIN 33 DAYS OF THE POSTMARK DATE OF THIS NOTICE <u>AND</u> FILE AN APPLICATION WITH PHFA WITHIN 30 DAYS OF THAT MEETING, THEN THE LENDER WILL BE TEMPORARILY PREVENTED FROM STARTING A FORECLOSURE AGAINST YOUR PROPERTY, AS EXPLAINED ABOVE, IN THE SECTION CALLED "TEMPORARY STAY OF FORECLOSURE".*

*<u>YOU HAVE THE RIGHT TO FILE A HEMAP APPLICATION EVEN BEYOND THESE TIME PERIODS</u>. A LATE APPLICATION WILL NOT PREVENT THE LENDER FROM STARTING A FORECLOSURE ACTION, BUT IF YOUR APPLICATION IS EVENTUALLY APPROVED AT ANY TIME BEFORE A SHERIFF'S SALE, THE FORECLOSURE WILL BE STOPPED.*

**AGENCY ACTION** -- Available funds for emergency mortgage assistance are very limited. They will be disbursed by the Agency under the eligibility criteria established by the Act. The Pennsylvania Housing Finance Agency has sixty (60) days to make a decision after it receives your application. During that time, no foreclosure proceedings will be pursued against you if you have met the time requirements set forth above. You will be notified directly by the Pennsylvania Housing Finance Agency of its decision on your application.

---

> **NOTE: IF YOU ARE CURRENTLY PROTECTED BY THE FILING OF A PETITION IN BANKRUPTCY, THE FOLLOWING PART OF THIS NOTICE IS FOR INFORMATION PURPOSES ONLY AND SHOULD NOT BE CONSIDERED AS AN ATTEMPT TO COLLECT THE DEBT.**
> (If you have filed bankruptcy you can still apply for Emergency Mortgage Assistance.)

---

## HOW TO CURE YOUR MORTGAGE DEFAULT (Bring it up to date).

**NATURE OF THE DEFAULT** -- The MORTGAGE debt held by the above lender on your property located at:

                    699 W GLENROSE RD
                    COATESVILLE PA 19320
IS SERIOUSLY IN DEFAULT because:

YOU HAVE NOT MADE MONTHLY MORTGAGE PAYMENTS for the following month(s) November 01, 2008 to March 01, 2010 and the following amount(s) are now past due:

| | |
|---|---|
| Monthly Payments | 2,225.65 |
| Corporate Fees | 0.00 |
| Late Charges | 1,420.35 |
| Non-Sufficient Funds | .00 |
| Fax Fees | .00 |
| Property Inspection Fees | 135.00 |
| Less Suspense Balance | .00 |
| **Total Amount Past Due** | $39,365.95 |

**HOW TO CURE THE DEFAULT** - You may cure the default within thirty (30) days of the date of this notice **BY PAYING THE TOTAL AMOUNT PAST DUE TO THE LENDER, WHICH IS** $39,365.95, PLUS ANY MORTGAGE PAYMENTS AND LATE CHARGES WHICH BECOME DUE DURING THE THIRTY (30) DAY PERIOD. Payments must be made either by cashier's check, certified check, cash or money order made payable and sent to:

                    PNC Mortgage
                    Collections Center
                    3232 Newmark Dr
                    Miamisburg, OH 45432

This is an attempt to collect a debt, any information obtained will be used for that purpose.

Enclosure

DR672

**IF YOU DO NOT CURE THE DEFAULT** -- If you do not cure the default within THIRTY (30) DAYS of the date of this Notice, **the lender intends to exercise its rights to accelerate the mortgage debt**. This means that the entire outstanding balance of this debt will be considered due immediately and you may lose the chance to pay the mortgage in monthly installments. If full payment of the total amount past due is not made within THIRTY (30) DAYS, the lender also intends to instruct its attorneys to start legal action to **foreclose upon your mortgaged property**.

**IF THE MORTGAGE IS FORECLOSED UPON** -- The mortgaged property will be sold by the Sheriff to pay off the mortgage debt. If the lender refers your case to its attorneys, but you cure the delinquency before the lender begins legal proceedings against you, you will still be required to pay the reasonable attorney's fees that were actually incurred, up to $50.00. However, if legal proceedings are started against you, you will have to pay all reasonable attorney's fees actually incurred by the lender even if they exceed $50.00. Any attorney's fees will be added to the amount you owe the lender, which may also include other reasonable costs. **If you cure the default within the THIRTY (30) DAY period, you will not be required to pay attorney's fees**

**OTHER LENDER REMEDIES** -- The lender may also sue you personally for the unpaid principal balance and all other sums due under the mortgage.

**RIGHT TO CURE THE DEFAULT PRIOR TO SHERIFF'S SALE** -- If you have not cured the default within the THIRTY (30) DAY period and foreclosure proceedings have begun, you still have the right to cure the default and prevent the sale at any time up to one hour before the Sheriff's Sale. You may do so by paying the total amount then past due, plus any late or other charges then due, reasonable attorney's fees and costs connected with the foreclosure sale and any other costs connected with the Sheriff's Sale as specified in writing by the lender and by performing any other requirements under the mortgage. Curing your default in the manner set forth in this notice **will restore your mortgage to the same position as if you had never defaulted**

**EARLIEST POSSIBLE SHERIFF'S SALE DATE** -- It is estimated that the earliest date that such a Sheriff's Sale of the mortgaged property could be held would be **approximately _nine - ten_ months from the date of this Notice**. A notice of the actual date of the Sheriff's Sale will be sent to you before the sale. Of course, the amount needed to cure the default will increase the longer you wait. You may find out at any time exactly what the required payment or action will be by contacting the lender.

**HOW TO CONTACT THE LENDER :**

| |
|---|
| **Name of Lender:  PNC Mortgage** |
| **Address:    3232 Newmark Dr.** |
| **Miamisburg, OH 45432** |
| **Phone Number: 1-800-523-8654** |
| **Fax Number: 937-910-4009** |
| **Contact Person: Collections Center** |
| **E-Mail Address: Loss.Mitigation@pncmortgage.com** |

**EFFECT OF SHERIFF'S SALE** -- You should realize that a Sheriff's Sale will end your ownership of the mortgaged property and your right to occupy it. If you continue to live in the property after the Sheriff's Sale, a lawsuit to remove you and your furnishings and other belongings could be started by the lender at any time.

**ASSUMPTION OF MORTGAGE** -- You **may**    or may not **X** (CHECK ONE) sell or transfer your home to a buyer or transferee who will assume the mortgage debt, provided that all the outstanding payments, charges and attorney's fees and costs are paid prior to or at the sale and that the other requirements of the mortgage are satisfied.

## YOU MAY ALSO HAVE THE RIGHT:

- TO SELL THE PROPERTY TO OBTAIN MONEY TO PAY OFF THE MORTGAGE DEBT OR TO BORROW MONEY FROM ANOTHER LENDING INSTITUTION TO PAY OFF THIS DEBT.

- TO HAVE THIS DEFAULT CURED BY ANY THIRD PARTY ACTING ON YOUR BEHALF.

- TO HAVE THE MORTGAGE RESTORED TO THE SAME POSITION AS IF NO DEFAULT HAD OCCURRED, IF YOU CURE THE DEFAULT. (HOWEVER, YOU DO NOT HAVE THIS RIGHT TO CURE YOUR DEFAULT MORE THAN THREE TIMES IN ANY CALENDAR YEAR.)

- TO ASSERT THE NONEXISTENCE OF A DEFAULT IN ANY FORECLOSURE PROCEEDING OR ANY OTHER LAWSUIT INSTITUTED UNDER THE MORTGAGE DOCUMENTS.

- TO ASSERT ANY OTHER DEFENSE YOU BELIEVE YOU MAY HAVE TO SUCH ACTION BY THE LENDER.

- TO SEEK PROTECTION UNDER THE FEDERAL BANKRUPTCY LAW.

## CONSUMER CREDIT COUNSELING AGENCIES SERVING YOUR COUNTY

**THOMAS D. SCHNEIDER, ESQUIRE**
55 Green Valley Road
Wallingford, PA 19086
(610) 565-1134
(610) 565-2342 (FAX)
Attorney for defendant Linda Merritt

| | | |
|---|---|---|
| PNC MORTGAGE, A division of PNC | : | **Court of Common Please** |
| Bank NA | : | **Civil Division** |
| 3232 Newmark Drive | : | |
| Miamisburg, OH 45342 | : | **Chester County** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| Linda Merritt | : | |
| 699 West Glenrose Road | : | **No. 10-05953** |
| Coatesville, PA 19320 | : | |
| | : | |
| United States of America | : | |
| 615 Chestnut Street, Suite 1250 | : | |
| Philadelphia, PA 19106-4476 | : | |
| Defendant(s) | : | |

## PETITION TO OPEN JUDGMENT OF DEFENDANT LINDA MERRITT

Defendant Linda Merritt, by and through her undersigned counsel, hereby files the following petition to open the default judgment entered against her in the above case:

1. On August 9, 2010, plaintiff entered a default judgment against defendant at the above caption number.

2. Pa.R.Civ.P. 237.3 provides:

(a) A petition for relief from a judgment of non pros or of default entered pursuant to Rule 237.1 shall have attached thereto a verified copy of the complaint or answer which the petitioner seeks leave to file.

(b) If the petition is filed within ten days after the entry of the judgment on the docket, the court shall open the judgment if the proposed complaint or answer states a meritorious cause of action or defense.

3.  In compliance with Rule 237.3, defendant is attaching a verified copy of her answer and new matter that she seeks to file.

4.  Since defendant is filing this petition and verified answer within ten days after the default judgment,[1] the answer need only state a meritorious defense in order for the Court to open the judgment.

5.  The answer and new matter state several meritorious defenses, such as plaintiff's failure to provide notice of the assignment of the note and mortgage from National City Mortgage Co. and plaintiff's failure to provide notice of its intent to foreclose against defendant under relevant Pennsylvania statutes.

6.  Accordingly, the Court should open judgment pursuant to Rule 237.3 and permit Merritt to defend this case and present her counterclaim against plaintiff.

Respectfully submitted:

Thomas D. Schneider
Attorney for defendant
Linda Merritt

---

[1] The tenth calendar day after the judgment was Sunday, August 15, 2010. Today, August 16, 2010, is therefore deemed the tenth day under Rule 237.3.

Thomas D. Schneider, Esquire
Attorney for Defendant
Identification No.: 48219
55 Green Valley Road
Wallingford, PA 19086
(610) 565-1134

| | | |
|---|---|---|
| PNC MORTGAGE, A division of PNC Bank NA | : | **Court of Common Please** **Civil Division** |
| 3232 Newmark Drive | : | |
| Miamisburg, OH 45342 | : | **Chester County** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| Linda Merritt | : | |
| 699 West Glenrose Road | : | **No. 10-05953** |
| Coatesville, PA 19320 | : | |
| | : | |
| United States of America | : | |
| 615 Chestnut Street, Suite 1250 | : | |
| Philadelphia, PA 19106-4476 | : | |
| Defendant(s) | : | |

## MEMORANDUM IN SUPPORT OF PETITION TO OPEN JUDGMENT OF DEFENDANT LINDA MERRITT

Defendant Linda Merritt incorporates by reference her petition to open judgment

in the above-captioned case.

Respectfully submitted:

*Thomas O. Schneider*

Thomas D. Schneider
Attorney for defendant
Linda Merritt

THOMAS D. SCHNEIDER, ESQUIRE
55 Green Valley Road
Wallingford, PA 19086
(610) 565-1134
(610) 565-2342 (FAX)
Attorney for defendant Linda Merritt

| | | |
|---|---|---|
| PNC MORTGAGE, A division of PNC | : | Court of Common Please |
| Bank NA | : | Civil Division |
| 3232 Newmark Drive | : | |
| Miamisburg, OH 45342 | : | Chester County |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| Linda Merritt | : | |
| 699 West Glenrose Road | : | No. 10-05953 |
| Coatesville, PA 19320 | : | |
| | : | |
| United States of America | : | |
| 615 Chestnut Street, Suite 1250 | : | |
| Philadelphia, PA 19106-4476 | : | |
| Defendant(s) | : | |

## ANSWER, NEW MATTER AND COUNTERCLAIM OF DEFENDANT LINDA MERRITT

AND NOW comes Defendant, Linda Merritt, by and through her attorney,
Thomas D. Schneider, and files the following answer to the complaint:

1. Denied. Defendant is without knowledge or information that Plaintiff PNC
mortgage is a division of PNC bank is a corporation or the legal holder of the mortgage
that is the subject of this action.

2. Admitted in part. Denied in part. Defendant is the owner of the property
located at 699 West Glenrose Road, Coatesville, PA 19320.  The remaining averments
are denied as conclusions of law.

3. Denied that Plaintiff loaned to Defendant the amount appearing on the alleged mortgage nor was said mortgage delivered to Plaintiff as security for any indebtedness. The legal description of the property is a written document and speaks for itself.

4. Denied that Defendant owes any payments on the alleged mortgage to Plaintiffs. Defendant was never given notice on any basis.

5. Denied that Plaintiff ever made a demand of Defendant for payment of the alleged mortgage.

6. Denied that Defendant owes the amounts claimed by Plaintiffs

7. Denied that Defendant owes Plaintiff legal fees

8. Denied. Defendant never received by regular mail or certified mail any notice under the Pennsylvania homeowners emergency mortgage assistance program act 91 of 1983 and notice of intention to foreclose under act 6 of 1974.

## NEW MATTER

### NATIONAL CITY MORTGAGE/PNC BREACH OF THE LOAN MODIFICATION AGREEMENT ARISING OUT OF THE MORTGAGE

9. On November 24, 2004, Defendant executed a note and mortgage in favor of National City Mortgage Co. ("NCM")

10. The proceeds of the loan were used by Defendant to acquire 699 West Glenrose Road, the property at issue in this case.

11. On August 5, 2008, NCM and Defendant entered into a loan modification agreement attached hereto as **Exhibit A.**

12. NCM allegedly approved the loan modification agreement, obtained certified funds in the amount of $2,877.98 and mailed the payment with the executed agreements to NCM. **Exhibit B (**loan modification approval and cashiers check for $2,877.98).

13. Under the loan modification agreement, NCM required that it receive the documents and payment by August 21, 2008, otherwise "the loan modification may be null and void". **Exhibit B, ¶ 4.**

14. Defendant complied with NCM's instructions per the modification agreement.

15. Thereafter, defendant made additional payments under the agreement and awaited the executed copies from NCM on the agreed modification agreement.

16. Defendant never received the executed agreement from NCM. Defendant received any monthly statement reflecting previous payments made by Defendant to Plaintiffs or balances due.

17. Pursuant to the mortgage agreement between NCM and Merritt, NCM was to provide written notice to Merritt of any sale/assignment of the note and mortgage to another loan servicer or purchaser. The mortgage states as follows at paragraph 20:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

> Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class)

that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for the purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**See Exhibit C, Mortgage at ¶ 20.**

18.    Neither NCM nor PNC gave notice to Merritt of NCM's alleged sale/assignment to PNC of the note and mortgage. It was not until PNC filed this complaint that Merritt received notice that an alleged sale/assignment of the note occurred:

19.    Plaintiff has produced no evidence that it is the holder of the note and mortgage.

20.    Furthermore, the mortgage agreement specifically required NCM and PNC to comply with all applicable laws and RESPA as to notice to Defendant.

Borrower will be given written notice of the change which will state the name and address of the new loan servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.

**Exhibit C, Mortgage at ¶ 20.**

21.    Upon information and belief NCM no longer exists as an operating corporate entity and is being wound up. Neither NCM and PNC has complied with RESPA's requirements to provide notice to Defendant.

22. Defendant requests that the assignment be declared null and void and the note and mortgage be marked paid in full.

23. At paragraph 8 of the complaint Plaintiff alleges that its has complied with Pennsylvania law on the following basis:

> The combined notice specified by the Pennsylvania homeowner's emergency mortgage assistance program, Act 91 of 1983 and Notice of Intention to foreclose under Act 6 of 1974 has been sent to each defendant, via certified and regular mail, in accordance with the requirements of those acts, on the date appearing on the copy attached hereto as Exhibit "A" and made part hereof, and defendant(s) have failed to proceed within the time limits, or have been determined ineligible, or Plaintiff has not been notified in a timely manner of Defendant(s) eligibility.

24. Plaintiff has never given any notice to Defendant under Acts 91 or 6.

25. Defendant did not learn about plaintiff's intent to foreclose until she was served with the complaint.

26. Based on these deficiencies, defendant respectfully requests that the Court dismiss the above case against her with prejudice.

**WHEREFORE**, defendant respectfully requests that the Court enter judgment in her favor and against plaintiff in the above-captioned case.

Thomas D. Schneider
Attorney for defendant
Linda Merritt

## VERIFICATION

I, Linda Merritt, hereby verify that all factual averments in the foregoing pleading are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties within 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_Linda Merritt_

Linda Merritt

# Exhibit "A"

# Exhibit "A"

When Recorded Mail To:
FIRST AMERICAN TITLE
P.O. BOX 27670
SANTA ANA, CA 92799-7670
ATTN: LMTS

Parcel No.

PREPARED BY:
COURTNAY KELLER
NATIONAL CITY MORTGAGE
3232 NEWMARK DRIVE
MIAMISBURG, OHIO 45342

_____ [Space Above This Line For Recording Data] _____
Original Recorded Date: DECEMBER 29, 2004    Loan No.          0003695149
Original Principal Amount: $   297,150.00

## LOAN MODIFICATION AGREEMENT
### (To a Fixed Interest Rate)

**IF THE LOAN MODIFICATION AGREEMENT MUST BE RECORDED, TWO ORIGINAL LOAN MODIFICATION AGREEMENTS MUST BE EXECUTED BY THE BORROWER: ONE ORIGINAL IS TO BE FILED WITH THE NOTE AND ONE ORIGINAL IS TO BE RECORDED IN THE LAND RECORDS WHERE THE SECURITY INSTRUMENT IS RECORDED**

This Loan Modification Agreement (the "Agreement"), made and effective this   **5TH**   day of **AUGUST, 2008**          , between
**NATIONAL CITY MORTGAGE CO., A SUBSIDIARY OF NATIONAL CITY BANK**

("Lender")

and  **LINDA MERRITT**

("Borrower"),

modifies and amends certain terms of Borrower's indebtedness evidenced by (1) the Note (the "Note") to Lender dated **NOVEMBER 24, 2004** , in the original principal sum of U.S. $   **297,150.00**   and secured by (2) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") and Rider(s), if any, dated the same date as the Note and recorded in                                                                               ,
of the  **Official**              Records of **CHESTER COUNTY, PENNSYLVANIA**                   . The
          [Name of Records]           [County and State, or other jurisdiction]
Security Instrument covers the real and personal property described in the Security Instrument and defined as the "Property", located at:
**699 W GLENROSE RD, COATESVILLE, PENNSYLVANIA 19320**

[Property Address]

---

MULTISTATE LOAN MODIFICATION AGREEMENT (To a Fixed Interest rate)--Single Family--Freddie Mac UNIFORM INSTRUMENT          Form 5161    3/04
First American Loan Production Services                                                                                                    *(page 1 of 5)*
First American Real Estate Solutions LLC                                                                                                   PENNSYLVANIA
FALPS# PAFR5161 Rev. 07-08-08

0003695149

the real property described being set forth as follows:
**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF;**

*property is occupied*
*Jina Merritt.*

In consideration of the mutual promises and agreements exchanged, Lender and Borrower agree as follows (notwithstanding anything to the contrary contained in the Note and Security Instrument):

1. Current Balance. As of **OCTOBER 1, 2007**      , the amount payable under the Note and Security Instrument (the "Unpaid Principal Balance") is U.S. $    **286,333.34**    .

2. Interest Rate. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender.  Interest will be charged on the Unpaid Principal Balance at the yearly rate of  **5.750**    %, beginning **SEPTEMBER 1, 2008**    , both before and after any default described in the Note.  The yearly rate of    **5.750**    % will remain in effect until principal and interest is paid in full.

3. Monthly Payments and Maturity Date. Borrower promises to make monthly payments of principal and interest of U.S. $     **1,670.96**      , beginning on the    **1ST**    day of **OCTOBER, 2008**      , and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.  If on **SEPTEMBER 01, 2038**      , (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Modification Agreement, the Borrower will pay these amounts in full on the Maturity Date.

4. Place of Payment.    Borrower  must  make  the  monthly  payments  at **3232 NEWMARK DRIVE MIAMISBURG, OHIO 45342** or such other place as Lender may require.

5. Partial Payments. Borrower may make a full prepayment or partial prepayments without paying any prepayment charge.  Lender will use the prepayments to reduce the amount of principal that Borrower owes under the Note.  However, Lender may apply the Prepayment to the accrued and unpaid interest on the prepayment amount before applying the prepayment to reduce the principal amount of the Note.  If Borrower makes a partial prepayment, there will be no changes in the due dates or the amount of the monthly payments unless Lender agrees in writing to those changes.

---

MULTISTATE LOAN MODIFICATION AGREEMENT (To a Fixed Interest rate) –Single Family--Freddie Mac UNIFORM INSTRUMENT        Form 5161      3/04

First American Loan Production Services                                                                           *(page 2 of 5)*

First American Real Estate Solutions LLC                                                                          PENNSYLVANIA

FALPS# PAFR5161-2 Rev. 06-13-08

0003695149

6.  Property Transfer.  If all or any part of the Property or any interest in the Property is
    sold or transfered (or if Borrower is not a natural person and a beneficial interest in
    Borrower is sold or transferred) without Lender's prior written consent, Lender may
    require immediate payment in full of all sums secured by the Security Instrument.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The
    notice shall provide a period of not less than 30 days from the date the notice is given in
    accordance with Section 15 of the Security Instrument, within which Borrower must pay
    all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to
    the expiration of this period, Lender may invoke any remedies permitted by this Security
    Instrument without further notice or demand of Borrower.

7.  Compliance with Covenants. Borrower also will comply with all other covenants,
    agreements, and requirements of the Security Instrument, including without limitation,
    Borrower's covenants and agreements to make all payments of taxes, insurance premiums,
    assessments, escrow items, impounds, and all other payments that Borrower is obligated to
    make under the Security Instrument.

8.  **This Agreement modifies an obligation secured by an existing security instrument recorded in
    CHESTER                County, PENNSYLVANIA      , upon which all recordation taxes
    have been paid.  As of the date of this Agreement, the unpaid principal balance of the original
    obligation secured by the existing security instrument is $  258,584.72 . The principal balance
    secured by the existing security instrument as a result of this Agreement is $  286,333.34      ,
    which amount represents the excess of the unpaid principal balance of this original obligation.**

(Acknowledgments on following page)

MULTISTATE LOAN MODIFICATION AGREEMENT (To a Fixed Interest rate) –Single Family–Freddie Mac UNIFORM INSTRUMENT      Form 5161    3/04

First American Loan Production Services                                                                (page 3 of 5)

First American Real Estate Solutions LLC                                                            PENNSYLVANIA

FALPS# PAFR5161-3 Rev. 06-13-08

0003695149

Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except where otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

In Witness Whereof, Lender and Borrower have executed this Agreement.

**NATIONAL CITY MORTGAGE CO., A SUBSIDIARY OF NATIONAL CITY BANK**

Name: **MICHAEL GREASER**                                                                      - Lender
Its: **MORTGAGE OFFICER**

**LINDA MERRITT**                                                                                        - Borrower

—————————————————————————————————— - Borrower

—————————————————————————————————— - Borrower

—————————————————————————————————— - Borrower

—————————————————————————————————— - Borrower

—————————————————————————————————— - Borrower

MULTISTATE LOAN MODIFICATION AGREEMENT (To a Fixed Interest rate) --Single Family--Freddie Mac UNIFORM INSTRUMENT     Form 5161   3/04
First American Loan Production Services                                                                                                                            *(page 4 of 5)*
First American Real Estate Solutions LLC                                                                                                                          PENNSYLVANIA
FALPS# PAFR5161-4 Rev. 06-13-08

0003695149

_____ [Space Below This Line For Acknowledgment] _____

## BORROWER ACKNOWLEDGMENT

**STATE OF PENNSYLVANIA**                    COUNTY _CHESTER_

On this, the _18_ day of _Aug_____, before me, _David S Kelly_ the
undersigned officer, personally appeared _____
**LINDA MERRITT** _____

_____

known to me (or satisfactorily proven) to be the person whose name subscribed to the within instrument
and acknowledged that _____ executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

| COMMONWEALTH OF PENNSYLVANIA |
| My commission expires: Notarial Seal |
| David J. Kelly, Notary Public |
| Valley Twp., Chester County |
| My Commission Expires May 20, 2010 |

_____

_Notary Public_
Title of Officer

Member, Pennsylvania Association of Notaries

## LENDER ACKNOWLEDGMENT

**STATE OF _OHIO_____**                    COUNTY _MONTGOMERY_____

The foregoing instrument was acknowledged before me this _____ by
**MICHAEL GREASER**_____ , the **MORTGAGE OFFICER**_____
of _____

_____ ,

a _____ , on behalf of said entity.

Signature of Person Taking Acknowledgment _____

Printed Name _____

Title or Rank _____

Serial Number, if any _____

### CERTIFICATE OF RESIDENCE

I do hereby certify that the precise address of the within name mortgagee is
**NATIONAL CITY MORTGAGE CO., A SUBSIDIARY OF NATIONAL CITY BANK
3232 NEWMARK DRIVE
MIAMISBURG, OHIO 45342**

By: _____
Name:
Title:

MULTISTATE LOAN MODIFICATION AGREEMENT (To a Fixed Interest rate) --Single Family--Freddie Mac UNIFORM INSTRUMENT       Form 5161    3/04
First American Loan Production Services                                                                               (page 5 of 5)
First American Real Estate Solutions LLC                                                                             PENNSYLVANIA
FALPS# PAFR5161-5 Rev. 06-13-08

## EXHIBIT A

**BORROWER(S):**    **LINDA MERRITT**

**LOAN NUMBER:**    **0003695149**

**LEGAL DESCRIPTION:**

**ALSO KNOWN AS:    699 W GLENROSE RD, COATESVILLE, PENNSYLVANIA 19320**

FAND# EXHIBIT A Rev. 07-03-07

## EXHIBIT A

The land referred to is situated in the County of Chester, State of PENNSYLVANIA, is
described as follows:

All that certain tract of lands, hereditaments and appurtenances, situate in the Township
of Highland, County of Chester and State of Pennsylvania, bounded and described in
accordance with a survey made by Edger Laub, the plan soon to be recorded, as follows;

Beginning at a spike at the intersection of West Glenrose Road and Old Stottsville Road;
thence by said Old Stottsville Road (LR 15110), a public mascadam road, the following
(3) courses and distances: (1) North 42 deg 3 min 20 sec west 97.74 feet to a spike;
thence (2) north 21 deg 43 min 40 sec west, 212.52 feet to a spike; thence (3) north 35
deg 32 min 50 sec west, 96.43 feet to a spike; thence leaving said road and by remaining
lands of Donald Copeland, the following (2) courses and distances (1) north 71 deg 1 min
20 sec east, 274.2 feet to an iron pin; thence (2) south 21 deg 1 min east, 397.5 feet to a
spike in west Glenrose Road (LR 15110); thence by said road; south 71 deg 33 min 40
sec west, 212.13 feet to the point of beginning.

Containing 2.24 acres.

699 W. Glenrose Rd

45-3-47.2

R.172

**MERRITT**
**699 W GLENROSE RD**
**COATESVILLE, PENNSYLVANIA 19320**
**NATIONAL CITY MORTGAGE CO., A SUBSIDIARY OF NATIONAL CITY BANK**

## NOTICE OF NO ORAL AGREEMENTS

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Receipt of Notice.** The undersigned hereby admit to having each received and read a copy of this Notice on or before execution of the Loan Agreement. "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods or any other thing of value or to otherwise extend credit or make a financial accommodation.

Borrower
**LINDA MERRITT**                                                                                     August 18, 2008
                                                                                                            Date

Borrower                                                                                                      Date

Borrower                                                                                                      Date

Borrower                                                                                                      Date

Borrower                                                                                                      Date

Borrower                                                                                                      Date

FAND# FAND033 Rev. 06-11-02

MERRITT                                                                       0003695149
699 W GLENROSE RD
COATESVILLE, PENNSYLVANIA 19320
NATIONAL CITY MORTGAGE CO., A SUBSIDIARY OF NATIONAL CITY BANK

# ERRORS AND OMISSIONS
# COMPLIANCE AGREEMENT

In consideration of
**NATIONAL CITY MORTGAGE CO., A SUBSIDIARY OF NATIONAL CITY BANK**

(the "Lender") agreeing to modify the referenced loan (the "Loan") to the Borrower, the Borrower agrees that if requested by the Lender, the Borrower will correct, or cooperate in the correction of, any clerical errors made in any document or agreement entered into in connection with the modification of the Loan, if deemed necessary or desirable in the reasonable discretion of the Lender, to enable Lender to sell, convey, seek guaranty or market the Loan to any entity, including without limitation, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, the Federal Housing Authority, the Department of Veterans Affairs or any municipal bond authority.

The Borrower agrees to comply with all such requests made by the Lender within 30 days of receipt of written request from the Lender.  Borrower agrees to assume all costs that may be incurred by the Lender, including without limitation, actual expenses, legal fees and marketing losses, as a result of the Borrower's failure to comply with all such requests within such 30 day time period.

The Borrower makes this agreement in order to assure that the documents and agreements executed in connection with the modification of the Loan will conform to and be acceptable in the marketplace in the event the Loan is transferred, conveyed, guaranteed or marketed by the Lender.

_____        _August 18, 2008_
LINDA MERRITT                                                                        Date

_____
                                                                                     Date

_____
                                                                                     Date

_____
                                                                                     Date

_____
                                                                                     Date

_____
                                                                                     Date

FAND# FAND034 Rev. 06-18-02

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

Creditor: **NATIONAL CITY MORTGAGE CO.,**
**A SUBSIDIARY OF NATIONAL CITY BANK**
**3232 NEWMARK DRIVE**
**MIAMISBURG, OHIO 45342**

Loan Number: **0003695149**
Date: **SEPTEMBER 1, 2008**

Borrower(s) Name(s): **LINDA MERRITT**

Mailing Address: **699 W GLENROSE RD, COATESVILLE, PENNSYLVANIA 19320**
Property Address: **699 W GLENROSE RD, COATESVILLE, PENNSYLVANIA 19320**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total Payments The amount you have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.750 % | $ 315,211.02 | $ 286,333.34 | $ 601,544.36 |

**YOUR PAYMENT SCHEDULE WILL BE:**

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|
| | | Monthly Beginning: | | | |
| 359 | 1,670.96 | 10/01/2008 | | | |
| 1 | $1,669.72 | 09/01/2038 | | | |

☐ **Variable Rate Feature:** Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

**Insurance:** You may obtain property insurance from anyone you want that is acceptable to Creditor.

**Security:** You are giving a security interest in the property being purchased or refinanced.

**Filing or Recording Fees:** $ **360.00**

**Late Charge:** If a payment is more than **15** days late, you will be charged **4.000** % of the payment.

**Prepayment:** If you pay off early, you ☐ may ☒ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

**Assumption:** Someone buying your property ☐ may ☐ may, subject to conditions ☒ may not assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties. All numerical disclosures except the late payment disclosure are estimates.
NOTE: The Payments shown above may include reserve deposits for Mortgage Insurance (if applicable), but exclude Property Taxes and Insurance.

THE UNDERSIGNED ACKNOWLEDGES RECEIVING A COMPLETED COPY OF THIS DISCLOSURE.

_Linda Merritt_
LINDA MERRITT

Exhibit "B"

Exhibit "B"



**National City** ®
Mortgage

National City Mortgage Co.,
a subsidiary of National City Bank
3232 Newmark Drive
Miamisburg, Ohio 45342

**Borrower's Copy**

National City Loan Number:    3695149
Investor Loan Number:    444840036

Dear Borrower:

The modification of your loan has been approved. To successfully complete this transaction, you must follow these instructions very carefully. **Be advised, until such time National City Mortgage Co., a subsidiary of National City Bank has fully executed documents and all required money, we will proceed with any and all of our rights and remedies as provided by the loan papers.**

On all pages where a signature is required, please sign your name exactly how it is typed below. The county will not record the modification unless it is signed this way.

1)   Using **black ink** only,   LINDA MERRITT

     must sign all three (3) copies of the Loan Modification **in the presence of an official notary,** who will witness each signature.

2)   **On Page #2, Paragraph #1,** you must indicate if you occupy the property that is being modified

3)   Exhibit #1 gives you the terms of the Loan Modification.

4)   **Sign and notarize all three (3) copies of the Loan Modification Agreement.** Return **two (2) originals** in the large envelope. These documents must be returned to our office by <u>August 21, 2008</u>       . IF NOT, THIS LOAN MODIFICATION MAY BE NULL AND VOID.

5)   Retain one (1) copy of all documents for your personal records.
     Your first modified monthly payments is due in the amount of         $2,217.98
     In addition, a processing fee of                                      $300.00
     modification closing costs of                                         $360.00
     and a cash contribution in the amount of                             $0.00

6)   Please <u>enclose **certified funds in the amount of**</u>            <u>**$2,877.98**</u>
     along with the two signed documents

If you have any questions regarding the modification, please call me at 1-800-367-9305
ext. #  52860

Sincerely,

COURTNAY KELLER
National City Mortgage Co.,
a subsidiary of National City Bank
Loss Mitigation Department

# Exhibit #1

| | |
|---|---|
| Interest rate of existing Mortgage | 5.7500% |
| New modified interest rate | 5.7500% |
| New modified loan term (months) | 360 |
| Servicer fee (bps) | 0.250 |
| | |
| Effective date of Modification | 09/01/2008 |
| Due date of first modified payment | 10/01/2008 |
| | |
| Maturity date of existing Mortgage | 12/01/2019 |
| New maturity date of modified mortgage | 09/01/2038 |
| Existing unpaid principal balance | $258,584.72 |
| | |
| Additions to principal balance: | |
| Accrued interest to effective date (Estimate) | $13,629.55 |
| Escrow advance/due | $369.43 |
| Amount to fully refund escrow (Estimate) | $7,464.38 |
| Legal fees and costs (Estimate) | $6,285.23 |
| Other fees and costs | $0.00 |
| Modification Processing fee if capitalized: | $0.00 |
| | |
| Subtractions from principal balance: | |
| Less borrower's cash contribution | $0.00 |
| Less mortgage insurance contribution | $0.00 |
| Less SBA contribution | $0.00 |
| | |
| Total capitalization amount | $27,748.59 |
| | |
| New Modified unpaid principal balance (Estimate) | $286,333.31 |
| | |
| New modified payment of principal and interest (Estimate) | $1,670.96 |
| New modified monthly escrow payment for taxes and insurance (Estimate) | $547.02 |
| TOTAL new modified monthly payment (Estimate) | $2,217.98 |
| | |
| Amounts due from borrower for modification (by certified or cashier's check) | |
| Borrower cash contribution to reduce principal balance * | $0.00 |
| Closing costs for modification (title, documents, closing) (Estimate) ** | $360.00 |
| Processing fee for review of modification request | $300.00 |
| Borrower's first modified monthly payment (Estimate) | $2,217.98 |
| Less funds received by NCM and placed into suspense | $0.00 |
| TOTAL CASH DUE FROM BORROWER | $2,877.98 |

**YOUR SECOND MODIFIED PAYMENT WILL BE DUE ON:**          November 1, 2008
**If you have not received new payment coupons send your payments to my attention.**
NOTE TO PROCESSOR: CHECK THE MORTGAGORS COUPON PAGE FOR CORRECT DATES

* Borrower's cash contribution will be applied to reduce the total amount due on the mortgage, and this amount must be paid in full regardless of whether actual amounts are higher or lower than estimated amounts.  ** The amount shown for closing costs is the minimum amount due.  If the final closing costs are less than the estimate, then the excess amount will be applied to reduce the total amount due on the mortgage. If the final closing costs are more than the estimate, the borrower is responsible for these amounts and they must be collected when the modification documents are signed and final cash amounts are due.

National City Mortgage Co.,
a subsidiary of National City Bank

For your records:

| Due Date | | LOAN NUMBER | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| November 1, 2008 | LINDA MERRITT | 3695149 | November 1, 2008 | $2,217.98 |

| IMPORTANT | | IF NOT REC'D BY | LATE PAYMENT |
|---|---|---|---|
| Payments not received by the due date are considered late. | * Additional funds shall be applied toward outstanding fee,s and current month's payment must be satisfied prior to additional principal payments being applied. | November 15, 2008 | $2,341.36 |

| | | |
|---|---|---|
| | REGULAR PAYMENT | |
| | ADDITIONAL PRINCIPAL* | |
| DATE | National City Mortgage Co., | LATE FEES | |
| | a subsidiary of National City Bank | TOTAL PAYMENT | |
| | Attention: COURTNAY KELLER | | |
| CHECK NO. | Loss Mitigation | | |
| | 3232 Newmark Drive | | |
| | Miamisburg, Ohio 45342 | | |
| AMOUNT | | | |

Website:  www.nationalcitymortgage.com

| Due Date | | LOAN NUMBER | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| December 1, 2008 | LINDA MERRITT | 3695149 | December 1, 2008 | $2,217.98 |

| IMPORTANT | | IF NOT REC'D BY | LATE PAYMEN |
|---|---|---|---|
| Payments not received by the due date are considered late. | * Additional funds shall be applied toward outstanding fee,s and current month's payment must be satisfied prior to additional principal payments being applied. | December 15, 2008 | $2,341.36 |

| | | |
|---|---|---|
| | REGULAR PAYMENT | |
| | ADDITIONAL PRINCIPAL* | |
| DATE | National City Mortgage Co., | LATE FEES | |
| | a subsidiary of National City Bank | TOTAL PAYMENT | |
| | Attention: COURTNAY KELLER | | |
| CHECK NO. | Loss Mitigation | | |
| | 3232 Newmark Drive | | |
| | Miamisburg, Ohio 45342 | | |
| AMOUNT | | | |

Customer Service: 1-800-822-5626

| Due Date | | LOAN NUMBER | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| January 1, 2009 | LINDA MERRITT | 3695149 | January 1, 2009 | $2,217.98 |

| IMPORTANT | | IF NOT REC'D BY | LATE PAYMEN |
|---|---|---|---|
| Payments not received by the due date are considered late. | * Additional funds shall be applied toward outstanding fee,s and current month's payment must be satisfied prior to additional principal payments being applied. | January 15, 2009 | $2,341.36 |

| | | |
|---|---|---|
| | REGULAR PAYMENT | |
| | ADDITIONAL PRINCIPAL* | |
| DATE | National City Mortgage Co., | LATE FEES | |
| | a subsidiary of National City Bank | TOTAL PAYMENT | |
| | Attention: COURTNAY KELLER | | |
| CHECK NO. | Loss Mitigation | | |
| | 3232 Newmark Drive | | |
| | Miamisburg, Ohio 45342 | | |
| AMOUNT | | | |

# Exhibit "C"

# Exhibit "C"

# BORROWERS COPIES

Prepared By:

MIKKEA COPELAND
NATIONAL CITY MORTGAGE CO

1 NATIONAL CITY PARKWAY
KALAMAZOO, MI 49009
Parcel Number:
45 3 47.2

Return To:

NATIONAL CITY MORTGAGE CO

P.O. Box 8800
Dayton, OH 45401-8800

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE

0003695149

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    November 24, 2004          ,
together with all Riders to this document.
**(B) "Borrower"** is

LINDA MERRITT

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is    NATIONAL CITY MORTGAGE CO

Lender is a    corporation

**PENNSYLVANIA** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3039 1/01

*VMP* -6(PA) (0008)

Page 1 of 16          Initials:_____

VMP MORTGAGE FORMS - (800)521-7291



organized and existing under the laws of **THE STATE OF OHIO**
Lender's address is **3232 Newmark Drive, Miamisburg, OH  45342**

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated **November 24, 2004**
The Note states that Borrower owes Lender

**TWO HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED FIFTY & 00/100** Dollars
(U.S. $       **297,150.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **December 1, 2019** .

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider           ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:_____

VMP -6(PA) (0008)              Page 2 of 16                    **Form 3039  1/01**

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the          County          [Type of Recording Jurisdiction]
of          Chester          [Name of Recording Jurisdiction]:

which currently has the address of
          699 W GLENROSE RD,          [Street]
          COATESVILLE          [City], Pennsylvania     19320     [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials:_____

*VMP*®-6(PA) (0008)          Page 3 of 16          Form 3039 1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the

-6(PA) (0008)                    Page 5 of 16

Initials:_____

Form 3039  1/01

Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials:_____

-6(PA) (0008)    Page 8 of 16    **Form 3039  1/01**

R.189

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all

expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.



Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
LINDA MERRITT                                        -Borrower

_____

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                                    -Borrower

 -6(PA) (0008)                    Page 15 of 16                    Form 3039  1/01

**Certificate of Residence**

    I,                                                      , do hereby certify that
the correct address of the within-named Mortgagee is

        Witness my hand this                    day of                              .

_____

Agent of Mortgagee


**COMMONWEALTH OF PENNSYLVANIA,**                                    **County ss:**

    On this, the                  day of                              , before me, the
undersigned officer, personally appeared



known to me (or
satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes herein contained.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:



_____


_____
Title of Officer

0003695149

Case 1:16-18154-jkf Doc 860-403 Filed 02/31/15 Entered 08/04/15 14:04:2015 Case 116-18154-jkf Doc 860-403 Filed 02/31/15 Page 200 of Date 04/2015

Exhibit Exhibit 4    Page 43 of 45

# NOTE

November 24 , 2004
[Date]                              [City]                                        [State]

699 W GLENROSE RD, COATESVILLE, Pennsylvania 19320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $      297,150.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
NATIONAL CITY MORTGAGE CO

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      5.750     %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   1st     day of each month beginning on   January 1 , 2005     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   December 1, 2019     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at      National City Mortgage Co.,
P O Box 17677, Baltimore, MD 21297-1677           or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $      2,467.57 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

 -5N (0207)        **Form 3200 1/01**
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                  Initials:_____



## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
LINDA MERRITT                            -Borrower                                                    -Borrower
   264436770

_____ (Seal)          _____ (Seal)
                                         -Borrower                                                    -Borrower

_____ (Seal)          _____ (Seal)
                                         -Borrower                                                    -Borrower

_____ (Seal)          _____ (Seal)
                                         -Borrower                                                    -Borrower

*[Sign Original Only]*



## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing petition to open was

served upon the following persons this day via first-class mail, postage prepaid:

Marguerite Thomas, Esquire
Urden Law Offices PC
111 Woodcrest Road, Suite 200
Cherry Hill, NJ 08003

*Thomas D. Schneider*

Thomas D. Schneider

OFFICE OF THE
PROTHONOTARY
CHESTER CO. PA.
2010 AUG 19 PM 3: 54

**UDREN LAW OFFICES, P.C.**                                    **ATTORNEY FOR PLAINTIFF**
**CHANDRA M. ARKEMA, ESQUIRE - ID #203437**
**WOODCREST CORPORATE CENTER**
**111 WOODCREST ROAD, SUITE 200**
**CHERRY HILL, NJ 08003-3620**
**856-669-5400**
pleadings@udren.com

| | |
|---|---|
| PNC Mortgage, a division of PNC Bank NA | COURT OF COMMON PLEAS |
| | CIVIL DIVISION |
|     Plaintiff | Chester County |
| | |
|     v. | |
| | |
| Linda Merritt | NO. 10-05953 |
| United States of America | |
| | |
|     Defendants | |

### PLAINTIFF'S MEMORANDUM OF LAW  IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S PETITION TO OPEN DEFAULT JUDGMENT

## I.    STATEMENT OF FACTS

On August 30, 2002, Defendant purchased the property located at 699 West Glenrose Road, Coatesville, PA 19320 (**"Property"**), for the sum of $325,000.00.  On November 24, 2004, National City Mortgage Co. (**"National City"**) loaned to the Defendant the sum of $297,150.00.  In exchange for this loan, Defendant executed a Mortgage, granting National City a security interest in the Property; this is not a purchase money mortgage as Defendant incorrectly alleges in her proposed New Matter.   The loan was subsequently modified to cure a previous default.  Recently, National City was acquired by PNC Mortgage, a division of PNC Bank NA, the Plaintiff named herein. *See* Exhibit A.

Shortly after the loan was modified, Defendant ceased making payments on November 1, 2008, and on March 19, 20010, a pre-foreclosure Notice was sent in accordance with Act 91 (35 P.S. Section 1680.401c, *et seq*.). *See* Exhibit B.

On or about May 11, 2010, Plaintiff commenced the instant action by filing of a Complaint. Defendant accepted personal service of the Complaint on or about June 7, 2010.  A true and correct copy of the Sheriff's Return of Service is attached hereto as Exhibit "E."   On or about June 28, 2010, Plaintiff sent a "Ten Day Notice" to Defendant.  A true and correct copy of Plaintiff's Ten Day Notice is attached hereto as Exhibit "F".

Defendant filed no response to Plaintiff's Complaint and an *in rem* judgment by default was entered against Defendant on August 9, 2010.   On or about August 19, 2010, Defendant filed a Petition to Open Judgment, to which Plaintiff now responds.

## II.     STATEMENT OF THE QUESTION INVOLVED

Should the Court open the default judgment, entered on August 9, 2010, when the proposed Answer with New Matter attached Defendant's Petition does not set forth a meritorious defense to the foreclosure action, nor  give a reasonable excuse for her failure to answer Plaintiff's Complaint?

Suggested Answer: **No.**

## III.     ARGUMENT

To open a default judgment, the petition to open must be timely filed, the petition to open must state an adequate excuse why a timely answer was not filed and the petition must show a meritorious defense. Schultz v. Erie Insurance Exchange, 5050 Pa.90, 477 A.2d 471 (1984). *All three requirements must be met and all three must coalesce*. A failure to meet any portion of the three part test is fatal to obtaining the relief sought. Cross v. 50th Ward Community Ambulance Company, 365 Pa.Super.74, 528 A.2d 1369 (1987) (emphasis added).

In this case, the default judgment was docketed August 9, 2010. Although the Petition to Open Judgment is timely the  court "shall" open the judgment, *if* the proposed answer states a meritorious defense. Pa. R.C.P. 237.3(b).  While Defendant's Petition to Open Judgment was filed within the requisite timeframe, it nevertheless fails to allege a meritorious defense to the instant action.  Defendant attempts to shift the blame to Plaintiff by alleging that she has made all payments required of her and that Plaintiff has breached a loan modification agreement; that Plaintiff violated RESPA by failing to provide her with a notice of assignment; and that Plaintiff violated Act 91 by failing to provide her with a pre-foreclosure notice.  Not only are these arguments flimsy, but they are all factually and legally incorrect.

First, Plaintiff has at all times acted appropriately in its dealings with the Defendant.  Defendant is correct in that the subject mortgage loan was modified on or about August 5, 2008.  However, Defendant, *not Plaintiff*,  breached the modified loan agreement by failing to tender payments in accordance with its terms. This is clearly evident in the Loan History that Plaintiff has attached hereto as Exhibit D and Defendant has not provided an "proof of payments" that were not credited to her account to show

otherwise.

Certainly, Plaintiff would not reject any legitimate attempt by the Defendant to cure her default on the Mortgage or to otherwise comply with the Note and Mortgage. To the extent Defendant tendered payments which were insufficient to bring the delinquent Mortgage current, once it had been accelerated, said payments would have been returned to the Defendant, as Plaintiff had the right to do so; no payment arrangement existed between the parties allowing for payments less than the full amount required to bring the Mortgage current.

Second, Defendant's understanding of RESPA is misguided, as is her understanding of the terms contained in the mortgage and note that pertain to notice requirements when the servicing of the loan changes hands. In this day and age, it is not uncommon for the servicer of a mortgage, who collects payments, to be a different entity than the investor, or the entity that actually holds and owns the mortgage and corresponding promissory note. It is also quite common for mortgage loans to be bought and sold amongst investors, even though the servicer stays the same. When a mortgage is assigned to another investor, an Assignment of Mortgage is typically executed and then recorded with the Recorder of Deeds of the county in which the mortgaged property is located. This is a public record. Investors are not required to give "special" notice to a borrower when this happens.

RESPA, on the other hand, requires servicers to tell consumers about the possibility that the mortgage loans which they sign might be transferred and when a transfer is imminent. *See* 12 U.S.C. § 2605. Servicing rights, generally speaking, are not public record. Therefore, when servicing rights are transferred, "goodbye letters" are sent by the old servicer to the borrower, while the new servicer sends the borrower a "hello letter."

In the case at hand, neither scenario occurred, despite Defendant's attempts to convince this Court otherwise. National City Mortgage Company originated and serviced Defendant's mortgage loan. On November 7, 2009, National City was acquired by PNC Bank. *See* Exhibit A. There was no sale or assignment of the mortgage/note and no transfer of the servicing rights. And the address to which Defendant was to send mortgage payments never changed. Therefore, Plaintiff did not violate RESPA by failing to provide Defendant with a "notice of sale/assignment."

Last, Defendant's allegation that Plaintiff failed to send a pre-foreclosure notice, thereby violating Act 91, is also completely inaccurate. The pre-foreclosure notice was sent to Defendant on March 19, 2010, via regular and certified mail. *See* Exhibit B. The notice sent via certified mail was eventually

returned Plaintiff as unclaimed. Act 91 requires only that pre-foreclosure notices be sent. It does *not* require Plaintiff to prove receipt of same by a Defendant. Thus, Plaintiff fully complied with Act 91.

Although Defendant's Petition was timely filed, it does not state an adequate excuse why a timely answer was not filed, nor does it state a meritorious defense to the action in foreclosure. This failure to meet all prongs of the three-prong test is fatal to the relief sought by the Defendant; her request to open the default judgment must denied.

## IV.    CONCLUSION

Defendant's Petition to Open Judgment has been interposed for the purpose of delay only, and it does not put forth or substantiate any meritorious defense to the underlying lawsuit in mortgage foreclosure action per se. Therefore, for the reasons set forth hereinabove, the Plaintiff respectfully requests that this Honorable Court deny and dismiss, with prejudice, Defendant's Petition to Open Default Judgment, and confirm the validity of Plaintiff's *in rem* default judgment which was entered on or about August 9, 2010.

Respectfully submitted,

UDREN LAW OFFICES, P.C.

By *Chandra Arkema*

Chandra M. Arkema, Esquire
Attorney for Plaintiff

## VERIFICATION

Chandra M. Arkema, Esquire, hereby states that she is the attorney for the Plaintiff in this action, that she is authorized to take this Verification, and that the statements made in the foregoing Reply to Defendants' Petition to Strike or Open Judgment and Memorandum of Law are true and correct to the best of her knowledge, information and belief. The undersigned understands that this statement herein is made subject to the penalties of 18 Pa.C.S. section 4904 relating to unsworn falsification to authorities.

UDREN LAW OFFICES, P.C.

By: _Chandra Arkema_

Chandra M. Arkema, Esquire
Attorney for Plaintiff

Dated: September 3, 2010

1          I want to start with the objection to the claim

2    motion, which is the most critical one here I believe.  What is

3    also critical and significant in this case on this motion is

4    that the same law firm that's representing PNC here today

5    several years ago was sanctioned by the Court for doing almost

6    exactly what we suggest and the documents prove is happening in

7    this case, specifically submitting and attesting to documents

8    that PNC claims are true and correct copies.

9          And why do they submit these copies?  The only reason

10   is, Your Honor, they submitted them in order to bolster and

11   support their contention that PNC has standing to submit its

12   proof of claim.  Now, the problem with the argument by PNC Bank

13   is the documents they submitted are redacted copies.  What do I

14   mean by that?

15         Well, what I mean is at the top and the bottom, as

16   indicated on the exhibits attached to my motion, certain

17   information is blacked out.  We had no idea what that

18   information was.  That information is critical to determining

19   whether or not PNC has a legal right to present its proof of

20   claim.

21         Fortunately -- and my client will testify how she was

22   able to get these documents -- were provided to her back in

23   2012 by the same law firm, and also when she -- my client

24   accessed the Freddie Mac website, and what the documents

25   showed, because she was able to get to her precise loan

1  account, is that the redacted portions of the documents

2  submitted by PNC show that Freddie Mac's identifying number and

3  the name of Freddie Mac was blacked out.

4          THE COURT:  Understood, counsel.  I'm still having a

5  basic problem with understanding how this is even vaguely

6  relevant, given that, number one, if that was the bank's

7  intention, they did a remarkably poor job of it since one can

8  in fact look at the document and still see Fannie Mae/Freddie

9  Mac Unfirm -- I presume Uniform Instrument.

10         Second, therefore I was not deceived and so there is

11  no possible fraud on the Court here, which is one of the

12  requirements for you to prevail on that.  So the fraud on the

13  Court just falls apart and I'm not sure why any of this is even

14  vaguely relevant to my consideration of this matter.

15         MR. PENN:  Well, Your Honor, the point is why did

16  they redact that information?

17         THE COURT:  Well, but I -- who cares?  It's not

18  redacted, number one, because in fact it appears on the face of

19  the mortgage and the note; and number two, who cares?

20         MR. PENN:  Well, the reason --

21         THE COURT:  The frank answer is you've got -- you had

22  this basic servicer and assignee problem and you've admitted to

23  there being an assignee, so I'm just -- I have no idea why you

24  think this is even vaguely relevant.

25         I'm going to give you one shot at explaining that to

1   me because I've looked at it every which way I could think of

2   and I can't see how it's possibly relevant to my consideration

3   of your claim objection.

4          MR. PENN:  PNC has to prove that they have standing

5   and that they're the owner of the mortgage.  The only thing

6   they've submitted --

7          THE COURT:  They don't have to prove that they're the

8   owner of the mortgage, they have to prove they have standing.

9          MR. PENN:  They have standing.  I'm sorry, Your

10  Honor.  What they've done is submitted a document that does not

11  prove that, and I understand that you don't feel that that was

12  fraud, but why weren't the original documents with Freddie

13  Mac's identification number submitted to prove if that was the

14  case?  The reason is because that mortgage was sold to Freddie

15  Mac --

16         THE COURT:  But your client has admitted that they're

17  an assignee, right?

18         MR. PENN:  No.

19         THE COURT:  Counsel?

20         MR. PENN:  To being a servicer of the mortgage, yes,

21  Your Honor --

22         THE COURT:  Okay.

23         MR. PENN:  -- I would agree with that.

24         THE COURT:  And?

25         MR. PENN:  Well --

 1          THE COURT:  What does Scarborough tell you about

 2  that?  I mean, my basic problem, counsel, is you've got one

 3  case in the Third Circuit that couldn't be clearer on every

 4  single point.  I kind of assumed that this was your throw-this-

 5  at-the-wall because you didn't have anything else to argue

 6  about.

 7          MR. PENN:  No, this was the argument, Your Honor,

 8  that the documents submitted don't prove that they have

 9  standing, and that's their burden --

10          THE COURT:  But you have --

11          MR. PENN:  -- and we've raised that.

12          THE COURT:  -- admitted that they are a servicer,

13  counsel --

14          MR. PENN:  Yes.

15          THE COURT:  -- and the law in the Third Circuit is

16  clear, they have standing to file a proof of claim as a

17  servicer.  That's what Scarborough says.

18          I mean, my difficulty is I don't -- I have no idea

19  whether you've got an argument in here because every argument

20  that I've looked at, you're either wrong on or Scarborough says

21  you're wrong on it.

22          So you need to tell me what your argument is because

23  Scarborough says a servicer has standing to file a proof of

24  claim, so your argument on that aspect of standing is gone.

25  Your argument that there was a fraud perpetrated on the Court

1  doesn't stand because I wasn't -- if for no other reason, I

2  wasn't deceived, which is a requirement for that.  So what's

3  the rest of your argument?

4       MR. PENN:  Your Honor, when you say the Court was not

5  deceived, in the documents that were submitted, that

6  information was redacted.

7       THE COURT:  The proof -- the note and the mortgage

8  exhibits both demonstrate that Fannie Mae, Freddie Mac appear

9  on the face of the documents.  The net result is, counsel, that

10 at no time was there anybody, including your client, that

11 didn't know that Fannie Mae, Freddie Mac was the in fact

12 original owner of this -- of the notes, so nobody was deceived

13 here, counsel.

14      Looking for a smoking gun just because there was a

15 redaction doesn't do you any good.  Now, if you think there's

16 sanctionable behavior on their part, you can bring another form

17 of action, but it ain't going to get you out of the proof of

18 claim.

19      MR. PENN:  Right.  Well, that was the argument, Your

20 Honor, and if the Court doesn't accept that that conduct and

21 those documents were misleading and intentionally misleading

22 and never corrected, then obviously I have to abide by what the

23 Court finds.

24      THE COURT:  Okay.  Do you have any other argument

25 with regard to the proof of claim form?

Case 1:16-cv-08164-jkf Doc 365-103 Filed 05/02/30/15 Page 213 of Date Filed 08/04/2015
Exhibit Exhibit A   Page 11 of 37
Labletta - Argument / Ruling of the Court                11

1          MR. PENN:  No, Your Honor.

2          THE COURT:  All right.  Okay.  I presume you don't

3     need to be heard then, counsel.  Or were you getting ready to

4     snatch defeat from the jaws of victory here?

5          MS. LABLETTA:  No, I wasn't, Your Honor, but I just

6     wanted to clarify the record since a personal affront was made

7     to the Udren Law Firm, and that is that to comply with Rule

8     9037 Bankruptcy Rule, personal identifiers must be redacted.

9     That includes the Freddie Mac number.  So that's short and

10    sweet, Your Honor.  That's all I have to say.

11         THE COURT:  I'm happy to hear that and glad to take

12    that information and as a result, I'm going to deny the

13    debtor's objection to the claim.

14         All right, counsel, a motion?

15       (Pause)

16         THE COURT:  I'm sorry, counsel, I kept referring to

17    Scarborough when I meant Alcide --

18         MR. PENN:  Alcide.

19         THE COURT:  -- with regard -- sorry about that.

20         MR. PENN:  Okay.

21         THE COURT:  I just got Scarborough on the brain this

22    morning because of the cram down issue.

23         MR. PENN:  On the cram down motion, Your Honor, this

24    Court has already ruled as a matter of law that the debtor's

25    primary residence was the property located in Florida, the Peru

1  mortgage, there has to be -- a holder has to

2  execute a mortgage; correct?  Is that fair to

3  say of the mortgage?

4     A.      When the mortgage is executed, it's

5  executed by the borrower.

6     Q.      Okay.  The borrower would be the

7  holder of the mortgage; right?

8     A.      No.

9     Q.      The borrower may assign that mortgage

10  to somebody else; is that fair to say too?

11     A.      Mortgage holder?  No.  The borrower.

12  No.

13     Q.      Okay.  PNC Bank -- PNC Mortgage, is

14  PNC Mortgage the holder of this mortgage in this

15  case?

16     A.      Yes.

17     Q.      Okay.  What is Freddie Mac's status?

18     A.      They are the investor and they are

19  the owner.

20     Q.      They are the owner, but they're not

21  the holder?

22     A.      That is correct.

23     Q.      Okay.  Is it your position that the

24  holder has standing to execute foreclosure

25  against the -- against Ms. Merritt?



DOROTHY J. THOMAS                                    February 13, 2013
PNC BANK vs. MERRITT                                            26

1          A.       Yeah.

2                   MS. FIALKOFF:   Objection foreclosure.

3      We are in the bankruptcy, and there's motion

4      for -- it's outside the scope.

5  BY MR. SCHNEIDER:

6          Q.       You can answer.

7          A.       Yes.

8          Q.       Okay.  You mentioned you worked for

9      National City Mortgage from 1992 until 2009, I

10     believe you said?

11         A.       Yes.

12         Q.       Okay.  And that was -- 2009 was when

13     PNC acquired National City Mortgage?

14         A.       Yes.

15         Q.       Okay.  Was there a time when

16     National City Mortgage sold the note and

17     mortgage to PNC or was there a sale of that note

18     and mortgage?

19         A.       I am sorry.  I don't understand what

20     you're asking.

21                  Which note?

22                  MS. FIALKOFF:   Objection.  Compound

23     question.  Rephrase.

24  BY MR. SCHNEIDER:

25         Q.       The note and mortgage that



```
 1        Ms. Merritt executed in 2004.
 2        A.      That they sold it?
 3        Q.      Yes.
 4        A.      I am not sure I understand what you
 5    mean by the term "sold."
 6        Q.      Okay.  Was there an assignment of
 7    that note and mortgage, if you know?
 8        A.      These are not even --
 9              MS. FIALKOFF:  That's not a copy.
10              THE WITNESS:  These aren't even
11    signed copies.
12              (Whereupon, reporter received and
13    marked a 16-Page Document as Exhibit Thomas-3
14    for identification.)
15              ^CK(Whereupon, reporter received and
16    marked a 2-Page Document as Exhibit Thomas-4 for
17    identification.)
18  BY MR. SCHNEIDER:
19        Q.      Okay.  I can give you that.  I'm
20    giving you Exhibits 3 and 4, which are the note
21    and the mortgage in this case.
22              MS. FIALKOFF:  What's No. 2?  What's
23    with Exhibit No. 2?
24              MR. SCHNEIDER:  Exhibit 2 was the --
25              MS. FIALKOFF:  Oh.  This was the
```



```
 1   second part of the --
 2              MR. SCHNEIDER:  Yes.
 3              MS. FIALKOFF:  -- consent order.
 4              MR. SCHNEIDER:  Correct.
 5              MS. FIALKOFF:  Okay.
 6              THE WITNESS:  Again, this is not an
 7   executed copy.
 8              MS. FIALKOFF:  Do you have our copies
 9   that I provided you?
10              THE WITNESS:  These are not signed.
11              MR. SCHNEIDER:  Do you have the
12   executed copy?
13              MS. FIALKOFF:  Yeah.  I'll just give
14   her the original.
15              MR. SCHNEIDER:  All right.
16              MS. FIALKOFF:  Do you want the
17   original?
18              MR. SCHNEIDER:  Okay.
19              THE WITNESS:  This one is showing two
20   pages and this is actually a one, two, three,
21   four -- they're two-sided.  Some pages are
22   two-sided pages.
23              MR. SCHNEIDER:  Okay.
24              MS. FIALKOFF:  Just one second.
25              MS. BRAUNSTEIN:  What is Exhibit 3?
```



| | |
|---|---|
| 1 | THE WITNESS:   No.   This has not been |
| 2 | assigned to anyone. |
| 3 | BY MR. SCHNEIDER: |
| 4 | Q.      Okay.  May I see that please? |
| 5 | A.      It is endorsed in blank. |
| 6 | (Whereupon, an off-the-record |
| 7 | discussion was held.) |
| 8 | BY MR. SCHNEIDER: |
| 9 | Q.      Okay.  So this was a note signed |
| 10 | November 24, 2004, to -- and the borrower -- I'm |
| 11 | sorry. |
| 12 | What's -- National City Mortgage is |
| 13 | on there listed as what? |
| 14 | A.      The lender. |
| 15 | Q.      The lender.  Thank you. |
| 16 | Now, at the top of the page here on |
| 17 | that document, there's something that says |
| 18 | "Freddie Mac." |
| 19 | Would you read that for the record, |
| 20 | please, what it says? |
| 21 | A.      It says, "Fred Mac No. 44" -- |
| 22 | MS. FIALKOFF:  I would object just |
| 23 | because it is a loan number. |
| 24 | BY MR. SCHNEIDER: |
| 25 | Q.      Would you please read that number, |



1     please?  What's the number?

2       A.     444840036.

3       Q.     What is that number?

4       A.     It's Freddie Mac's investor number.

5       Q.     Freddie Mac's number --

6       A.     It is their loan number.

7       Q.     Okay.  And the number above that is

8     what?

9            MS. FIALKOFF:  Objection putting the

10     loan number on the record.

11            THE WITNESS:  That is --

12            COURT REPORTER:  I'm sorry.

13     Objection?

14            MS. FIALKOFF:  Objection to putting

15     the loan number on the record.

16 BY MR. SCHNEIDER:

17       Q.     You can answer.

18       A.     That is the borrower's loan number.

19       Q.     And the borrower's loan number is

20     National City Mortgage's loan number; correct?

21       A.     An then, ultimately, PNC's.

22       Q.     Ultimately, PNC's.

23            And that is because why?  National

24     City became -- merged with PNC.  Is that what

25     you mean?



DOROTHY J. THOMAS
PNC BANK vs. MERRITT

February 13, 2013
31

1         A.       PNC merged with National City.

2         Q.       Okay.  So, can you tell us why there

3    are two different numbers there on the top of

4    that document?

5         A.       Again, the first number is -- the top

6    number is the PNC/National City number, and the

7    second is Freddie Mac's number.

8         Q.       Okay.  So that indicates that there's

9    a difference in status between Freddie Mac and

10   National City; correct?  They are different --

11               MS. FIALKOFF:  Objection to form.

12               THE WITNESS:  I have no idea what you

13   are asking.  I'm sorry.  I apologize, but I

14   don't understand what you're asking.

15 BY MR. SCHNEIDER:

16        Q.       Okay.  National City is not the same

17   as Freddie Mac; correct?

18        A.       That is correct.

19        Q.       Okay.  National City was simply

20   servicing the mortgage for Freddie Mac?

21        A.       We were servicing and we were also

22   the holder.  I'm holding the note.

23        Q.       Okay.  Are you aware whether at the

24   time that Ms. Merritt executed -- that's the

25   original; correct?



DOROTHY J. THOMAS
PNC BANK vs. MERRITT

February 13, 2013
32

1    A.    That is correct.

2    Q.    And that's because her signature is

3    the original signature on that document --

4    A.    Yes, sir.

5    Q.    -- in blue ink?

6    A.    In blue ink.

7    Q.    Okay.  Now, are you aware of whether

8    at the time she executed -- she signed that

9    mortgage, whether the Freddie Mac number that

10    you just read into the record was on that

11    document?

12          MS. FIALKOFF:  Object.  This is the

13    note.  This document is the note.

14  BY MR. SCHNEIDER:

15    Q.    I am sorry if I said mortgage,

16    whatever I said.  I'll ask it again.

17          Are you aware whether -- at the time

18    Ms. Merritt signed that document whether the

19    Freddie Mac number that you just read into the

20    record was on that document?

21    A.    I don't know.

22    Q.    Okay.

23          MR. SCHNEIDER:  Could we make this

24    document part of the record?  Because right now

25    there is a different -- I'd like to make that an



800.211.DEPO (3376)
EsquireSolutions.com

R.219

1    exhibit, and, perhaps, you want to make a copy

2    of that, Kassia, in order to make it part of

3    the --

4            MS. FIALKOFF:  Well, that was the

5    copy I provided to you already.

6            MR. SCHNEIDER:  I understand that,

7    but if we could -- if we could make -- what I

8    want to do is make that, just so we are clear,

9    just so the record is clear.

10            MS. FIALKOFF:  Yes.

11            MR. SCHNEIDER:  Thank you.

12            MS. FIALKOFF:  The original note, one

13    of the pages is double-sided.  When I copied it,

14    I just copied both sides.

15            MR. SCHNEIDER:  I understand.

16            MS. FIALKOFF:  And I've redacted the

17    loan number on the original -- the copy.

18            MR. SCHNEIDER:  You redacted the loan

19    number, the National City loan number.  I just

20    want to make that clear --

21            MS. FIALKOFF:  Yes.

22            MR. SCHNEIDER:  -- for the record.

23            Okay.  The Freddie Mac number is

24    there in its complete form.  I just want to make

25    this an exhibit so, I guess, if you could make



1    this Exhibit Thomas-6; okay?

2            MS. FIALKOFF:  Oh.  So it's no longer

3    Exhibit No. 3?

4            MR. SCHNEIDER:  Because the reason --

5    the reason I'm making this a new exhibit is

6    because we have established -- Ms. Thomas

7    testified that what is now six is the original

8    that Ms. Merritt signed, and you had said

9    earlier that the note that I gave her was not

10   the original.

11           MS. FIALKOFF:  Yes.

12           MR. SCHNEIDER:  And, therefore --

13           THE WITNESS:  It's not even complete.

14           MR. SCHNEIDER:  Well, we're taking

15   care of that now.

16           So what I want to do is just include

17   this new exhibit so that the record is clear

18   what we're doing; okay?

19           MS. FIALKOFF:  Okay.

20           MR. SCHNEIDER:  Thank you.

21           (Whereupon, reporter received and

22   marked a 4-Page Document as Exhibit Thomas-6 for

23   identification.)

24  BY MR. SCHNEIDER:

25       Q.    Now, I believe you said earlier,



# UNITED STATES BANKRUPTCY COURT EASTERN DISTRICT OF PENNSYLVANIA   PROOF OF CLAIM

| Name of Debtor: **Linda Merritt aka Lyn Merritt** | Case Number: **11-18134-JKF** |
|---|---|

**NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.**

| | |
|---|---|
| Name of Creditor: **PNC Bank, N.A.** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. |
| Name and address where notices should be sent:<br>**PNC Bank, N.A.**<br>**3232 Newmark, Drive**<br>**Miamisburg, OH 45342**<br>**-AND-**<br>**UDREN LAW OFFICES, P.C.**<br>**Woodcrest Corporate Center**<br>**111 Woodcrest Road, Suite 200**<br>**Cherry Hill, NJ 08003-3620**<br><br>Telephone Number: **856-669-5400** | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court |
| Last four digits of account or other number by which creditor identifies debtor: **5149** | Check here if this claim  ☐ replaces<br>  ☐ amends  a previously filed claim, dated:_____ |

**1. Basis for Claim:** ☒ Money loaned

| **2. Date debt was incurred:** <u>11/24/2004</u> | **3. If court judgment, date obtained:** <u>08/09/2010</u> |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the tiime case filed.

**Unsecured Nonpriority Claim** $_____
  ☐ Check this box if (a) there is no collateral or lien securing your claim, or (b) your claiim exceeds the value of the property securing it, or if (c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**
☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority  $_____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,000), * earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Secured Claim:**
☒ Check this box if your claim is secured by collateral (including a right to setoff).

  Brief Description of Collateral:

  ☒ Real Estate  ☐ Motor Vehicle  ☐ Other_____
  Value of Collateral: $__unknown____

Amount of arrearage and other charges <u>at time case filed</u> included in secured claim, above, if any: $ <u>86,790.27</u>

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family or household use - 11 U.S.C. §507(a)(7)

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8)

☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a)(____).

*Amounts are subject to adjustment on 4/1/01 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**5. Total Amount of Claim at Time Case Filed:**

| $_____<br>(unsecured) | $ **$358,866.71**<br>(secured) | $_____<br>(priority) | $ **358,866.71**<br>(Total) |
|---|---|---|---|

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**8. Date-Stamped Copy:** To receive an acknowledgment of filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date:<br>November 14, 2011 | Sign and print name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>**/s/ Stuart Winneg, Esquire** | THIS SPACE FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine up to $500,000, imprisonment for up to 5 years, or both. 18 U.S.C.§§152 & 3571

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: Linda Merritt aka Lyn Merritt | CHAPTER 13 |
| Debtor(s) | CASE NO. 11-18134-JKF |

SOCIAL SECURITY NO.     ***-**-6770
                        ***-**-

## PROOF OF SECURED CLAIM OF PNC BANK, N.A.

**REINSTATEMENT AMOUNT (arrearage)**

| | |
|---|---|
| Monthly Payments 11/01/08 through 09/01/11 @ $ 2,225.65 10/01/11 @ $2,294.20 | $80,191.95 |
| Accrued Late Charges | $1,503.90 |
| Escrow Shortage | $1,860.34 |
| BPO | $125.00 |
| Property Inspections | $307.50 |
| Foreclosure Legal Fees & Cost | $2,801.58 |
| TOTAL: | $86,790.27 |

**TOTAL DEBT***

| | |
|---|---|
| Principal of debt due and unpaid | $284,889.55 |
| Interest at 5.75% from 10/01/08 to 10/20/2011 (the per diem interest accruing on this debt is $44.88 and that sum should be added each day after 10/20/2011) | $49,951.43. |
| Accrued Late Charges | $1,503.90 |
| Escrow Advances/(Balance) | $19,287.75 |
| BPO | $125.00 |
| Property Inspections | $307.50 |
| Foreclosure Legal Fees and Costs | $2,801.58 |
| TOTAL: | $358,866.71 |

*This figure is not intended to represent a payoff amount for the mortgage loan and should not be used as such.  For a complete payoff amount please contact the undersigned counsel for mortgagee.

Current monthly payment is: $2,294.20
Principal and Interest: $ 1,670.96
Escrow: $623.24

The calculations contained herein are as of the date of the filing of the Chapter 13 Petition (10/20/2011).

Property securing the debt:  699 West Glenrose Road
Coatesville, PA 19320.

The post office mailing address for the claimant to which **NOTICES** should be sent is:
>               PNC Bank, N.A.
>               3232 Newmark, Drive
>               Miamisburg, OH 45342

The post office mailing address for the claimant to which **DISTRIBUTION** should be sent is:
>               PNC Bank, N.A.
>               3232 Newmark, Drive
>               Miamisburg, OH 45342

Dated:  November 14, 2011

              /s/ Stuart Winneg
              Stuart Winneg, Esquire
              UDREN LAW OFFICES, P.C.
              Woodcrest Corporate Center
              111 Woodcrest Road, Suite 200
              Cherry Hill, NJ  08003-3620
              (856)669-5400

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: Linda Merritt aka Lyn Merritt | CHAPTER 13 |
| Debtor(s) | CASE NO. 11-18134-JKF |

### CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on November 14, 2011 I served the Proof of Secured Claim of PNC Bank, N.A., on the parties listed on the attached matrix, by first class mail.[*]

EXECUTED ON: November 14, 2011

_/s/ Stuart Winneg_____
Stuart Winneg, Esquire
UDREN LAW OFFICES, P.C.
Woodcrest Corporate Center
111 Woodcrest Road, Suite 200
Cherry Hill, NJ  08003-3620
(856) 669-5400

---

[*]Parties who are served electronically by the Court were not also served by regular mail.

**MATRIX OF PARTIES SERVED**
**WITH PROOF OF SECURED CLAIM**

Eugene A. Camposano, Esquire
115 W. Germantown Pike
Suite 100
Norristown, PA 19401

Eugene A. Camposano, Trustee
115 W. Germantown Pike
Suite 100
Norristown, PA 19401

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: Linda Merritt aka Lyn Merritt | CHAPTER 13 |
| Debtor(s) | CASE NO. 11-18134-JKF |

### CERTIFICATE OF SERVICE

    I, the undersigned, certify under penalty of perjury that on November 14, 2011 I served the Proof of Secured Claim of PNC Bank, N.A., on the parties listed on the attached matrix, by first class mail.*

EXECUTED ON: November 14, 2011

                  /s/ Stuart Winneg
                  Stuart Winneg, Esquire
                  UDREN LAW OFFICES, P.C.
                  Woodcrest Corporate Center
                  111 Woodcrest Road, Suite 200
                  Cherry Hill, NJ 08003-3620
                  (856) 669-5400

---

*Parties who are served electronically by the Court were not also served by regular mail.

## MATRIX OF PARTIES SERVED
## WITH PROOF OF SECURED CLAIM

Eugene A. Camposano, Esquire
115 W. Germantown Pike
Suite 100
Norristown, PA 19401

Eugene A. Camposano, Trustee
115 W. Germantown Pike
Suite 100
Norristown, PA 19401



Merritt

(45)


RECORDER OF DEEDS

Prepared By:

MIKKEA COPELAND
NATIONAL CITY MORTGAGE CO

1 NATIONAL CITY PARKWAY
KALAMAZOO, MI 49009
Parcel Number:
45-3-47.2

Return To:

NATIONAL CITY MORTGAGE CO

P.O. Box 8800
Dayton, OH 45401-8800



———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE



## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    November 24, 2004
together with all Riders to this document.
(B) "Borrower" is

LINDA MERRITT, unmarried

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is    NATIONAL CITY MORTGAGE CO

Lender is a    corporation

**PENNSYLVANIA** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     Form 3039 1/01

-6(PA) (0008)
Page 1 of 16

VMP MORTGAGE FORMS - (800)521-7291

UNIFIED TITLE & SETTLEMENT    12/29/2004 08:44:4

10492564
Page 1 of 17
B-6374 P-75

This Document Recorded
12/29/2004
08:44AM
Doc Code: MTG Chester County, Recorder of Deeds Office

Doc Id: 10492564
Receipt #: 201466
Rec Fee: 98.50

organized and existing under the laws of **THE STATE OF OHIO**
Lender's address is  **3232 Newmark Drive, Miamisburg, OH  45342**

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated  **November 24, 2004**
The Note states that Borrower owes Lender

    **TWO HUNDRED NINETY SEVEN THOUSAND ONE HUNDRED FIFTY & 00/100**   Dollars
(U.S. $     **297,150.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  **December 1, 2019**
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

10492564
Page 2 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44A

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the      **County**     [Type of Recording Jurisdiction]
of    **Chester**                                                                [Name of Recording Jurisdiction]:

*45-3-47.2*

which currently has the address of
      699 W GLENROSE RD,                                                    [Street]
      COATESVILLE                        [City], Pennsylvania     19320     [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials: 

-6(PA) (0008)                              Page 3 of 16                               Form 3039 1/01

10492564
Page 3 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT             12/28/2004 08:44A

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in


Initials: _____


-6(PA) (0008)

Page 4 of 16

Form 3039  1/01


UNIFIED TITLE & SETTLEMENT          12/29/2004 06:44A

10492564
Page 4 of 17
B-6374 P-75

R.232

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the


Initials:



UNIFIED TITLE & SETTLEMENT          12/28/2004 08:44A

10492564
Page 5 of 17
B-6374 P-75

R.233

Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Initials: _J.M._

-6(PA) (0008)

Page 6 of 16

Form 3039   1/01



10492564
Page 6 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT          12/29/2004 08:44A

R.234

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

VMP®-6(PA) (0008)　　　　　　　Page 7 of 16　　　　　Initials: _____　　　Form 3039　1/01



10492564
Page 7 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT　　12/29/2004 08:44A

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.



 -6(PA) (0008)　　　　　Page 8 of 16　　　　　Form 3039　1/01

10492564
Page 8 of 17
UNIFIED TITLE & SETTLEMENT　　12/29/2004 08:44A　B-6374 P-75

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

 -6(PA) (0008)

Page 9 of 16

 Initials: _____

Form 3039 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of



UNIFIED TITLE & SETTLEMENT      12/29/2004 08:44A

10492564
Page 10 of 17
B-6374 P-75

R.238

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.



-6(PA) (0008)                          Page 11 of 16                 Initials: _____          Form 3039   1/01

R.239

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all

 


10492564
Page 12 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT    12/29/2004 08:44A

expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.



UNIFIED TITLE & SETTLEMENT          12/29/2004 08:42A          10492564
Page 13 of 17
B-6374 P-75

R.241

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
LINDA MERRITT                                    -Borrower

_____

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                                 -Borrower



10492564
Page 15 of 17
B-6374 P-75

UNIFIED TITLE & SETTLEMENT        12/29/2004 08:44A

**Certificate of Residence**

I, *Beth Maslawski*, do hereby certify that the correct address of the within-named Mortgagee is *3232 Newmark Drive, Miamisburg, OH 45342*

Witness my hand this *24th* day of *November 2004*.

*Beth Maslawski, as agent*

Agent of Mortgagee

COMMONWEALTH OF PENNSYLVANIA, *Chester* County ss:

On this, the *24* day of *Nov, 2004*, before me, the undersigned officer, personally appeared *LINDA MERRITT* known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires:

Notarial Seal
David J. Kelly, Notary Public
Valley Twp., Chester County
My Commission Expires May 20, 2006
Member, Pennsylvania Association Of Notaries

*David V. Kelly*

*NOTARY Public*

Title of Officer

-6(PA) (0008)                    Page 16 of 16                    Form 3039  1/01



10492564
Page 16 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT     12/28/2004 08:44A

R.244

## EXHIBIT A

The land referred to is situated in the County of Chester, State of PENNSYLVANIA, is described as follows:

All that certain tract of lands, hereditaments and appurtenances, situate in the Township of Highland, County of Chester and State of Pennsylvania, bounded and described in accordance with a survey made by Edger Laub, the plan soon to be recorded, as follows;

Beginning at a spike at the intersection of West Glenrose Road and Old Stottsville Road; thence by said Old Stottsville Road (LR 15110), a public mascadam road, the following (3) courses and distances: (1) North 42 deg 3 min 20 sec west 97.74 feet to a spike; thence (2) north 21 deg 43 min 40 sec west, 212.52 feet to a spike; thence (3) north 35 deg 32 min 50 sec west, 96.43 feet to a spike; thence leaving said road and by remaining lands of Donald Copeland, the following (2) courses and distances (1) north 71 deg 1 min 20 sec east, 274.2 feet to an iron pin; thence (2) south 21 deg 1 min east, 397.5 feet to a spike in west Glenrose Road (LR 15110); thence by said road; south 71 deg 33 min 40 sec west, 212.13 feet to the point of beginning.

Containing 2.24 acres.

699 W. Glenrose Rd

45-3-47.2

324921



10492564
Page 17 of 17
B-6374 P-75
UNIFIED TITLE & SETTLEMENT    12/29/2004 08:44A

Unified Title and Settlement, a national independent title agency.

R.245

# NOTE

November 24 , 2004
[Date]                                    [City]                                    [State]

699 W GLENROSE RD, COATESVILLE, Pennsylvania 19320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $        297,150.00   (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
NATIONAL CITY MORTGAGE CO

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate
of      5.750    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st     day of each month beginning on   January 1 , 2005    . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on    December 1, 2019             , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at       National City Mortgage Co.,
P O Box 17677, Baltimore, MD 21297-1677              or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $       2,467.57  .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to
the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the
Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the
Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N (0207)                     Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                     Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.00** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



VMP -5N (0207)

Form 3200 3/01
Initials

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   **15**   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   **5.00**   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



-6N (0207)

Page 2 of 3

Form 3200 1/01
Initials _____

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
GLENDA MERRITT                   -Borrower
264436770

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*



## ESCROW/CORPORATE BREAKDOWN



| Date | Description | Prior Balance | Disbursements/Interest + | Payments/Interest - | Running Balance |
|------|-------------|---------------|--------------------------|---------------------|-----------------|
| | | | | | **$19,287.75** |
| 7/25/2011 | PROPERTY TAX | $14,009.27 | $5,278.48 | | $19,287.75 |
| 6/16/2011 | H/O INS | $13,967.27 | $42.00 | | $14,009.27 |
| 6/10/2011 | CITY TAX | $13,623.15 | $344.12 | | $13,967.27 |
| 1/26/2011 | COUNTY TAX | $13,029.92 | $593.23 | | $13,623.15 |
| 11/29/2010 | H/O INS | $11,845.92 | $1,184.00 | | $13,029.92 |
| 7/29/2010 | SCHOOL TAX | $6,591.39 | $5,254.53 | | $11,845.92 |
| 6/7/2010 | CITY TAX | $6,396.89 | $194.50 | | $6,591.39 |
| 2/1/2010 | COUNTY TAX | $5,803.66 | $593.23 | | $6,396.89 |
| 11/13/2009 | H/O INS | $4,619.66 | $1,184.00 | | $5,803.66 |
| 8/13/2009 | PROPERTY TAX | $0.00 | $4,619.66 | | $4,619.66 |